Christopher Thieme
Reg. No. 69451-050
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640



RECEIVED

MAY - 3 2021

AT 8:30_____M
WILLIAM T. WALSH
CLERK

Clerk of Court
U.S. District COurt
District of New Jersey
Mitchell H. Cohen U.S. Courthouse
4th & Cooper Streets - Room 1050
Camden, New Jersey 08101-2797

RE:  THIEME v. FEDERAL BUREAU OF PRISONS, et al.
     Case No. 1:21-CV-00682-RMB-AMD

Dear Sir or Madam:

Please find enclosed herewith for filing in the above-referenced matter the following documents:

(1) AMENDED COMPLAINT with exhibits
(2) DECLARATION OF INMATE FILING

The original and one copy✳are provided pursuant to the Court's instructions.  Kindly file the same and provide a receipt with the date and time of filing marked thereupon.

Thank you for your prompt attention to the matter.

Respectfully submitted,

Christopher Thieme
Reg. No. 69451-050

Date: April 18, 2021

✳FILED ELECTRONICALLY APRIL 26, 2021

ENCLOSURES

Christopher Thieme
Reg. No. 69451-050
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640

PLAINTIFF PRO SE -- ✸✸ PRESENTLY CONFINED ✸✸

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

CHRISTOPHER THIEME,               :
        Plaintiff,                :       Case No. 1:21-CV-00682-RMB-AMD
                                  :
v.                                :       CIVIL ACTION
                                  :
FEDERAL BUREAU OF PRISONS, et al.,:       DECLARATION OF INMATE FILING
        Defendants.               :
                                  :

PLEASE TAKE NOTICE that on the date undersigned, CHRISTOPHER THIEME, Plaintiff pro se in the above-captioned action, provided the original and copy of the enclosed document ("Amended Complaint - Class Action") to members of the unit team staff at FCI Fort Dix for proper logging and placement in the institution's outgoing legal mail system in a properly addressed envelope with sufficient pre-paid postage affixed thereupon.

DECLARATION PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _April 18_, 2021.

CHRISTOPHER THIEME
Plaintiff Pro Se

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(Camden Vicinage)

CHRISTOPHER THIEME,

  on behalf of himself and all
others similarly situated,

          Plaintiff,

   v.

FEDERAL BUREAU OF PRISONS,
FCI FORT DIX,
MICHAEL CARVAJAL,
NICOLE C. ENGLISH,
JOSEPH L. NORWOOD,
DAVID E. ORTIZ,
LAMINE N'DIAYE,
KIMBERLY KODGER,
JAMES GIBBS,
CHARLES PAVLOV,
CHARLES SMITH,
_____ SALINAS,
JAMES REISER,
NICOLETTA TURNER-FOSTER,
JEFF WILK,
TRAVIS HACZYNSKI,
  in their individual and
official capacities,
   and,
JOHN DOES & JANE DOES #1-500,
         Defendants.

Case No. 1:21-CV-00682-RMB-AMD

CIVIL ACTION



RECEIVED
MAY - 3 2021
AT 8:30_____M
WILLIAM T. WALSH
CLERK

AMENDED COMPLAINT -

CLASS ACTION

## COMPLAINT

1.     Federal Correctional Institution Fort Dix ("FCI Fort Dix") has experienced the largest uncontrolled COVID-19 outbreak in the federal prison system, rising quickly to the top of all 122 Federal Bureau of Prisons ("BOP")

1

facilities. This "number one" spot should be recognized as a mark of shame. With 2,041 inmates (over 800 more than the second spot on the BOP list), and with more than 90 sick staffers, FCI Fort Dix is the only prison in the entire United States--alone above all federal, state, and local prisons, jails, or private detention facilities--to experience THREE waves of COVID-19 outbreak. A delusional systemic unpreparedness, with staff routinely flouting safety protocols, coupled with the lack of medical care, human rights abuses, and utter disregard for inmates' constitutional rights, the prison became a Kafkaesque house of horrors. During this experience, the outbreaks were not only exacerbated by administrative incompetence and preventable negligence, but drastically worsened by an engrained culture of deliberate indifference to inmates' rights and medical needs. This was emboldened by the BOP's unchecked arrogance that no one--not the press, not the public, not Congress, and not the federal courts--would hold any federal employee accountable for what happened here. BOP has hoped and continues to rely on the perverse strategy that, by misleading the very institutions that could hold them accountable--institutions that would be called upon to preserve and protect inmates' rights--the magnitude of their deadly errors and malfeasance would be quickly forgotten if ever noticed at all. This lawsuit seeks to hold the Federal Bureau of Prisons, FCI Fort Dix, defendants--named and presently unknown--accountable.

2.      Plaintiff CHRISTOPHER THIEME ("Thieme") brings this action on behalf of himself and all others similarly situated against the Federal Bureau of Prisons, FCI Fort Dix, named defendants enumerated above, and unknown defendants to be joined as information becomes available, under the Civil Rights Act, 42 U.S.C. § 1983, Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971), and 28 U.S.C. § 1331; Rehabilitation Act, 29

U.S.C. § 794; Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202; Privacy Act, 5 U.S.C. § 552; Administrative Procedures Act, 5 U.S.C. §§ 701-706; Racketeering Influenced and Corrupt Organizations Act ("Civil RICO"), 18 U.S.C. §§ 1962, 1964; and the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, seeking monetary damages, declaratory relief, and injunctive relief described herein.

3.     The novel coronavirus 2019 ("COVID-19") pandemic continues to disproportionately ravage the incarcerated population in this country. Despite knowing early on that this population would be particularly susceptible to infection, illness, and death, the federal government has failed to stop the spread of the virus in federal prisons, including especially FCI Fort Dix. Two-thousand forty-one (2,041) inmates at FCI Fort Dix have been infected and five (5) inmates have died (although BOP only acknowledges 2 of those deaths). Ninety. Fort Dix officers, and countless members of the surrounding community have likely been sickened due to the uncontrolled spread of COVID-19 within FCI Fort Dix. As this deadly virus infects and kills prisoners, guards, and their families, government officials have publicly patted themselves on the back while providing little to no medical care, withholding vital information about their response to the crisis and obstructing efforts to demand transparency, obtain requested answers, and hold the BOP and its employees accountable for the damage they have caused.

4.     There are more than 150,000 federal inmates and detainees incarcerated in BOP facilities throughout the United States. At FCI Fort Dix, the largest prison in the federal prison system, there are approximately 2,580 inmates in a low-security facility and about 160 inmates in the adjacent minimum-security camp. Many of these inmates include increasing numbers of

3

elderly and other at-risk groups. (See ENDNOTE 1) Second, prisoners often lack the liberty to safely practice social distancing, particularly in light of rampant overcrowding and unsafe or unsanitary conditions in many prisons. (See ENDNOTE 2) Third, substandard prison healthcare services heighten the risk facing inmates who are infected while incarcerated. (See ENDNOTE 3)

5.      That heightened risk is not limited to prisoners; the failure to take adequate precautionary measures against the coronavirus also endangers prisoners' families, prison guards and other staff, and their families, lawyers with clients who are incarcerated, and the surrounding communities. As the president of the corrections officers' union at one BOP prison explained in August. "All of us are trying to survive ... Inmates and staff, we do not feel safe." (See ENDNOTE 4)

6.      Since the outset of the pandemic, members of Congress from both major parties, public interest and advocacy organizations, prisoners, and prison guards, as well as public health and infectious disease experts, have recognized that prison populations are uniquely at risk, and have urged the BOP and other federal agencies to address the risk of COVID-19 in federal detention facilities. (See ENDNOTE 5)

7.      Defendant BOP knew that the pandemic could have a devastating impact within its facilities. In January 2020, the White House announced the formation of the "Coronavirus Task Force", a group that would "lead the Administration's efforts to monitor, contain, and mitigate the spread of the virus." (See ENDNOTE 6) The BOP asserted that it was following the Task Force's guidance and "doing a good job working against an unseen threat." (See ENDNOTE 7) In its March 2020 "COVID-19 Action Plan", the BOP said it "ha[d] been planning for [COVID-19] since January 2020" admitting that "the population

4

density of prisons creates a risk of infection and transmission for inmates and staff." (See ENDNOTE 8)

8.          Based on the data available, it appears that the Defendant BOP has failed to prevent the spread of coronavirus within its facilities. Even today, over one year into the crisis and a nationwide lockdown, BOP has not tested 45,000 of its 150,000 inmates. However, as of March 22, 2021, it claimed 227 dead inmates, and 4 dead staff, with 45,542 inmates who had "recovered" from COVID-19, and its facilities had 1,804 inmates with "active" positive cases, (See ENDNOTE 9) which indicates an infection rate of 44%. Extrapolating this infection rate to the untested population, this suggests about 20,000 undetected cases within BOP facilities. However, BOP has been untrustworthy with its statistics--ruling inmates "recovered" without providing individualized medical treatment or assessments, denying many medical care, and using arbitrary "recovery" protocols rather than actual medical evaluation to determine recovery from COVID-19. Even at FCI Fort Dix, 2,030 inmates out of approximately 2,740 have been infected. Many have not received proper medical care but the facility Health Services declare all but about 30 to 40 "recovered." It took over 5 months to test most of the inmates at this facility during the course of the outbreak as no large-scale testing of the inmate population occurred until FCI Elkton transfers in late September. FCI Fort Dix inmates did not begin to be tested until after the outbreak began in late October 2020, but by then it was too late and FCI Fort Dix still delayed in testing most of its inmates until after the outbreak spread. FCI Fort Dix then endured the worst COVID-19 outbreak in the country's federal prison system. Today, FOUR inmates are dead--yet FCI Fort Dix and the BOP only acknowledge one--Myron Crosby died while in FCI Fort Dix custody; while Rodolfo Quiambao, Naroger Carter, and Dominick Pugliese, who were all sickened because

5

of FCI Fort Dix's mishandling of the COVID-19 outbreak and died within a few days or weeks of their release.

9.        In the face of these failures, BOP and FCI Fort Dix, and the named defendants have offered rosy assessments of its/their own performance and stonewalled the media, the public, the courts, New Jersey's congressional delegation, defense counsel, and countless inmates with misrepresentations, misdirection, and in some cases outright perjury. Despite this, Defendant BOP defended its response to the pandemic as "robust." (See ENDNOTE 10) Defendant CARVAJAL--in a week when 6 inmates died and hundreds more were sickened--had the gall to claim "we're dealing with it just as well as anybody else and I'm proud to say we're doing pretty good." (See ENDNOTE 11) However, even when federal officials have admitted the severity of the pandemic, (See ENDNOTE 12) BOP concealed from public view critical information about its management (rather, mismanagement) of the pandemic and its efforts to protect the prison population (or failure to do so). (See ENDNOTE 13) BOP's delays and stonewalling in meaningfully responding to congressional oversight eroded the trust in the BOP and potentially endangered its staff and the inmates in their care. Elected officials who sought information from BOP in March and April 2020 reiterated those demands in October and continued to throughout the winter into 2021--citing "mounting evidence that efforts to contain the virus within BOP facilities are failing." Defendant's secrecy, stonewalling, and mishandling of this emergency has dire consequences, as every additional day of delay, inaction, and mismanagement leads to more infections and deaths in prison facilities nationwide and at FCI Fort Dix, and increases the spread of the virus into the larger communities nearby. There is an urgent need for relief as throughout the last year inmates have been placed in unnecessary and reckless risk, denied proper medical treatment, retaliated against for

6

expecting relief, and too many have died.

## JURISDICTION AND VENUE

10.     This action is brought under 42 U.S.C. § 1983, Bivens v. Six Unknown Names Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971), 28 U.S.C. § 1331, as well as 29 U.S.C. § 794, 18 U.S.C. § 1595, § 1962(a) and (d), § 1964, 5 U.S.C. § 552, §§ 701-706, 28 U.S.C. §§ 2201, 2202, and the First, Fifth, Eighth, Ninth, Thirteenth, and Fourteenth Amendments to the United States Constitution.

11.     Therefore, the subject-matter jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343.

12.     As several prospective class member Plaintiffs are not American citizens and are foreign nationals, this Court's subject-matter jurisdiction may be supplemented by the Alien Tort Statute, 28 U.S.C. § 1350, if this Court grants class certification.

13.     Venue is proper before this Court as all acts and omissions met their effect within this judicial district, pursuant to 28 U.S.C. § 1391(b) and (e).

## PARTIES

Plaintiffs:

14.     Plaintiff CHRISTOPHER THIEME is a citizen of the United States and State of New Jersey. He is presently confined in the custody of the Federal Bureau of Prisons at FCI Fort Dix convicted of and serving a 210-month sentence imposed on counts of racketeering murder for hire and attempted kidnapping.

15.     Plaintiff brings this action on behalf of himself and all others similarly situated, namely a proposed class of Plaintiffs who are inmates who

7

have been confined at FCI Fort Dix since February 2020 through the present described in specific detail hereinbelow.

Defendants:

15.      Defendant FEDERAL BUREAU OF PRISONS is an agency within the U.S. Department of Justice in the executive branch of the federal government. Its place of business is a physical and mailing address at: Federal Bureau of Prisons, 320 First Street N.W., Washington, D.C. 20534

16.      Defendant FCI FORT DIX is a federal prison within the Federal Bureau of Prison system. Its physical address is 5756 Hartford and Pointville Roads, Joint Base MDL, New Jersey, 08640. Its administrative mailing address is: P.O. Box 38, Joint Base MDL, New Jersey, 08640. It is located on/within the grounds of Joint Base Maguire-Dix-Lakehurst, a U.S. Department of Defense installation.

17.      Defendant MICHAEL CARVAJAL is the Director of the Federal Bureau of Prisons. His work address is the same as indicated in Paragraph 15 above.

18.      Defendant NICOLE C. ENGLISH is the present Northeast Regional Director of the Federal Bureau of Prisons. The Northeast Regional Office's physical and mailing address is: Northeast Regional Office, Federal Bureau of Prisons, U.S. Customs House, 2nd and Chestnut Streets - 7th Floor, Philadelphia, Pennsylvania, 19106. Defendant ENGLISH's work address would be at this location.

19.      Defendant JOSEPH L. NORWOOD was the former Northeast Regional Director of the Federal Bureau of Prisons serving in that capacity until sometime in 2020. His present work assignment or status is unknown, and his location is unknown. However, as a present or former federal employee, the U.S. Attorney's Office should be able to locate this Defendant.

8

20.	Defendant DAVID E. ORTIZ is the former Warden of FCI Fort Dix, which post he served until being relieved in January 2021. He is still employed by the Federal Bureau of Prisons at the Northeast Regional Office whose address is the same as indicated in Paragraph 18 above.

21.	Defendant LAMINE N'DIAYE is the present acting or interim Warden of FCI Fort Dix beginning to serve in that capacity in January 2021. His present work address is FCI Fort Dix at the address indicated in Paragraph 16 above.

22.	Defendant KIMBERLY KODGER is presently Associate Warden for Administration at FCI Fort Dix, a position which she has held since February 1, 2021. Previously she was Associate Warden for Programs. Her place of work, FCI Fort Dix, is the same address indicated in Paragraph 16 above.

23.	Defendant JAMES GIBBS is presently Associate Warden for Operations at FCI Fort Dix, a position which he has held since February 1, 2021. Previously, he was Associate Warden for Services. His place of work, FCI Fort Dix, is the same address indicated in Paragraph 16 above.

24.	Defendant CHARLES PAVLOV is presently Associate Warden for Services at FCI Fort Dix, a position which he has held since February 1, 2021. His place of work, FCI Fort Dix, is the same address indicated in Paragraph 16 above.

25.	Defendant CHARLES SMITH is the former Associate Warden for Operations at FCI Fort Dix before February 1, 2021. His present work assignment, status, or location is unknown. However, as a present or former federal employee, the U.S. Attorney's Office should be able to locate this Defendant.

26.	Defendant SALINAS (first name unknown) is the former Associate Warden for Administration at FCI Fort Dix prior to February 1, 2021. His

present work assignment, status, or location is unknown. However, as a present or former federal employee, the U.S. Attorney's Office should be able to locate this Defendant.

27.       Defendant JAMES REISER is presently Case Management Coordinator at FCI Fort Dix and served in this capacity in 2020 and 2021. His place of work, FCI Fort Dix, is the same address indicated in Paragraph 16 above.

28.       Defendant NICOLETTA TURNER-FOSTER is presently clinical director of FCI Fort Dix Health Services and served in this capacity in 2020 and 2021. Her place of work, FCI Fort Dix, is the same address indicated in Paragraph 16 above.

29.       Defendant JEFF WILK is Assistant Health Services Administrator at FCI Fort Dix Health Services and served in this capacity in 2020 and 2021. His place of work, FCI Fort Dix, is the same address indicated in Paragraph 16 above.

30.       Defendant TRAVIS HACZYNSKI is presently Health Services Administrator at FCI Fort Dix Health Services and served in this capacity in 2020 and 2021. His place of work, FCI Fort Dix, is the same address indicated in Paragraph 16 above.

31.       Defendant's JOHN DOES and JANE DOES #1-500 are persons whose identity will be revealed through future discovery or investigative diligence and subsequently joined as named defendants to this action in the foreseeable future. These defendants are defined as:

(a)       Correctional officers, medical personnel, administrative staff, contractors, or other employees working at FCI Fort Dix between the months of February 2020 to present who played a role in the claimed injuries hereinbelow; and

10

(b)      Correctional officers, medical personnel, administrative staff, contractors, or other employees working at FCI Elkton or other Federal Bureau of Prisons facilities who were involved in sending COVID-19 positive inmates to FCI Fort Dix beginning in September 2020 through December 2020 at the time the outbreak first occurred; and

(c)      Any correctional officers, medical personnel, administrative staff, contractors, or other employees working with the Northeast Regional Office, Federal Bureau of Prisons Central Office, other Regional Offices, the Designation and Sentence Computation Center (DSCC), other correctional facilities, BOP transportation units, United States Marshal Service, and/or other federal agencies involved in the transfer of COVID-19 positive inmates from FCI Elkton or other BOP facilities to FCI Fort Dix from September 2020 through December 2020; and

(d)      These presently unknown defendants who were involved in acts and omissions that caused the claimed injuries hereinbelow.

32.      Each defendant is sued individually and in his or her official capacity.   Relief is sought against each defendant as well as his or her agents, assistants, successors, employees, attorneys, and all persons acting in concert or cooperation with them or at their direction or under their control.

33.      Defendants have been, are presently, and will be acting under color of authority and federal law.   All of the defendants are and will be at times relevant in this complaint responsible for and engaged in the enforcement and execution of statutes, regulations, and administrative policies (program statements) governing the operation of the Federal Bureau of Prisons and its constituent facilities.

11

34.     Defendants are legally responsible, in whole or in part, for the operation of the correctional facility, for the conditions there, and the health and safety of persons confined or incarcerated there.

35.     Plaintiff is not in position to find alternative addresses of defendants and relies on to-be-appointed counsel to assist.

### CLASS ALLEGATIONS

36.     This is a class action brought by the Petitioner on his own behalf and on behalf of others similarly situated.

37.     The proposed class represented by the Plaintiff consists of:

(a)     All federal prisoners housed at FCI Fort Dix from February 2020 to present and through the course of this complaint who have experienced the unsafe and unsanitary conditions at FCI Fort Dix, the lack of preparedness for the COVID-19 emergency, the COVID-19 lockdown, and were exposed to and/or sickened by COVID-19 during the outbreaks at FCI Fort Dix through 2020 and 2021 to the present day; this also includes inmates who were threatened or compelled into forced labor; and those who faced irreparable harm and injury due to denial of sufficient health care and the meeting of basic needs.

(b)     All federal prisoners or detainees who will in the future be transferred to or housed at FCI Fort Dix during the duration or continuation of the COVID-19 outbreaks or COVID-19 emergency at the risk of similar mistreatment, harm, risk, or injury.

38.     The number of persons in this class are so numerous as to make joinder impracticable.

39.     Defendant's acts and omissions, actions and threatened actions, as alleged below, are applicable to any and all members of the class.

12

40.     The parties to this action have not engaged in any collusion in bringing this suit.

41.     Plaintiff has no interest antagonistic to other members of the class.

42.     Plaintiff will adequately represent the interests of other members of the class.

43.     Plaintiff's claims are typical of the claims of other members of the class, who are subject to the same deprivations of their rights by defendants as alleged below.

44.     There are questions of law and fact common to all members of the class.

45.     The prosecution of separate actions by individual members of the class would be impracticable because (a) inconsistent adjudications regarding individual members of the class would establish incompatible standards of conduct for defendants, whose actions and threatened actions apply generally to any and all members of the class; and (b) adjudications with respect to individual members of the class would be dispositive of the interests of members not parties to the suits, because defendant's actions and threatened actions apply generally to any and all members of the class.

46.     Defendants have acted or threatened to act on grounds generally applicable to all members of the class, thus making appropriate final relief with respect to the class as a whole.

47.     Questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fair and efficient

13

adjudication of the controversy, because the individual members are deprived of essentially the same rights by defendants' actions and threatened actions, and differ only in collateral aspects of their factual situation.

STATEMENT OF FACTS

A) COVID-19 and FCI Fort Dix: A Timeline of Lockdown, Failure, and Outbreak

48.     America became acquainted with the novel coronavirus 2019, also known as "COVID-19" or "SARS-COV2" as December 2019 turned the page into January 2020.  Americans trapped in besieged parts of China and Europe were flown back to the United States for quarantines as global travel became restricted or suspended to attempt containing the virus' spread.  These initial efforts as containment proved ineffective and within weeks pockets of COVID-19 sickness emerged in American communities.

49.     As COVID-19 continued to spread in February and early March 2020, the Bureau of Prisons instituted a lockdown of its facilities nationwide. Public visitation was cancelled.  Inmate movements on prison compounds were indefinitely suspended.  Transfers of inmates between prisons or to/and from courts were cancelled.  Court proceedings were cancelled.  Prison systems across the country were advised by public health experts to reduce inmate populations to control spread of the deadly virus.  Many did.  Others did not.

50.     At FCI Fort Dix, public visitation was suspended on March 13, 2020. A lockdown--hinted at in early and mid-March--became effective March 23, 2020.

51.     Over the following months, inmates at FCI Fort Dix were locked in their housing units with long periods with no outside recreation, no programming, no classes, and few inmate work details, and only then for essential tasks (e.g. food service, trash disposal, laundry, or facilities maintenance).

14

52.     FCI Fort Dix consists of former military barracks housing on the grounds of Joint Base Maguire-Dix-Lakehurst built in the late 1950s.  In the early 1990s, the BOP leased the buildings from the military to open the prison.

53.     Today, FCI Fort Dix consists of a low-security facility housing 2,593 inmates (as of March 25, 2021) split roughly in half on two compounds (an "East Compound" and "West Compound") and an adjacent minimum-security "Camp" facility housing 168 inmates (as of March 25, 2021).  Comparatively in January 2019, FCI Fort Dix housed 4,290 in its low-security facility and between 300 and 400 in its minimum camp.

54.     Housing units at FCI Fort Dix are notoriously dilapidated and substandard.  At full occupancy, these housing units held upwards of 300-350 inmates and frequently did during 2020-2021.  Housing units are dormitory-styled housing with 2-man, 6-man, and 12-man rooms.  Most inmates are in 12-man rooms and move up to "Preferred" housing in 2- or 6-man rooms after several years of good behavior.  Inmates share limited bathroom facilities and space. These living spaces are poorly ventilated, and are unsafe and unsanitary as trash is removed only 2 or 3 times a day, pipes leak, vermin abound, and cleaning supplies are generally not provided by staff.  At several periods during 2019 to 2021 air-handlers and heating systems were broken for months or for years despite being reported.

55.     Often, inmate living areas are occupied beyond "rated capacity." BOP routinely ignores the population density and square footage per inmate required in its own stated policies and procedures. (See BOP Program Statement 1060.11)  For instance, a 12-man room is 21x26 = 546 square feet.  Per policy,

15

an inmate is accorded 60 square feet of living space. If BOP abided by its enacted policies, a 12-man room should house no more than 9.1 persons. (546 / 60 = 9.1)

56.     Inmates at FCI Fort Dix became understandably anxious as other federal prisons experienced uncontrolled outbreaks and inmates at those facilities began to be severly sickened and died. Names of federal prisons stricken became all too familiar to the general public because of stunning failures of BOP's "Plan" to mitigate COVID-19 spread -- notably FCI Oakdale, FCC Lompoc, FCI Danbury, FCI Terminal Island, and FCI Elkton. Litigation followed.

57.     Congress passed the Coronavirus Aid, Relief, and Economic Stimulus ("CARES") Act, which was enacted on March 26, 2020. The CARES Act enlarged provisions for federal inmates being released on home confinement for the duration of the emergency with a purpose to specifically give BOP the statutory authorization to reduce prison populations to mitigate COVID-19 spread, and reduce risk. Congress had previously passed the First Step Act which opened greater access to Compassionate Release procedures to federal inmates. Inmates were encouraged to petition for these programs and medically vulnerable inmates were to be identified and assessed for consideration for release.

58.     Within days after the CARES Act was enacted Attorney General William Barr issued a memorandum to the BOP director for guidance on implemented provisions of the CARES Act home confinement stating that he did not desire for the federal prisons to become "Petri Dishes" for infection and spread.

59.     FCI Fort Dix Administration resisted efforts of inmates seeking compassionate release, home confinement, furloughs, or other relief under the CARES Act or First Step Act. Warden David E. Ortiz and his subordinates

16

rejected, or ignored every application for compassionate release, home confinement, furloughs, or other relief in Housing Unit 5812, where Plaintiff is/was housed -- often for specious or arbitrary reasons.

60.        FCI Fort Dix Administration later created a one-page form to request consideration for compassionate release putatively based on 18 U.S.C. § 3582(c)(1)(A) and BOP Program Statement 5050.50.  It asked inmates to select one of three categories for consideration: (1) inmates with terminal diseases; (2) elderly inmates; or, (3) inmates with sick relatives without family caretaker.   However, compassionate release provides for a fourth category not on the FCI Fort Dix generated form--the "catch-all" category for "other extraordinary and compelling reasons." See 18 U.S.C. § 3582(c)(1)(A)(i) Ironically, and comparatively, most grants of compassionate release relief by the courts during the COVID-19 emergency have been under this "catch-all" provision.   This form was created to obfuscate the compassionate release process, in an apparent effort by FCI Fort Dix Administration to make inmates think they did not qualify for compassionate release.  Many courts have called this form "misleading" in its criticisms.

61.        Plaintiff has personal knowledge of other inmates' attempts to obtain relief described above within his housing unit (5812) because he has discussed these topics with most inmates in the building and has assisted many inmates in preparing and submitting their filings.  He has kept copious notes and records throughout the course of events described herein.

62.        In the early months of BOP's lockdown, through spring and summer 2020, FCI Fort Dix employees (Named and Unknown Defendants) issued memoranda about mask wearing by staff and inmates, sanitation schedules, availability of personal protective equipment ("PPE") and cleaning supplies but did not follow

17

through. Cleaning supplies promised were routinely not issued. Staff found out PPE & supplies were outdated, damaged, or dry-rotted from long storage. Cleaning supplies to be provided for inmate use was either not issued, too tightly controlled, solutions over diluted or watered-down, and when provided to inmates were routinely seized from inmates by staff. Inmates were thus denied the ability to clean their living space. Cleaning schedules in memoranda could not be performed.

63.      Staff were not issued proper PPE and balked at wearing what little was available or provided. Staff routinely flouted rules. Because BOP did not issue FCI Fort Dix staff adequate face masks, the correctional officers' union provided custom cloth face masks to the Fort Dix officers emblazoned with the Union's logo. Even then, staff have routinely not worn masks and ignored rules. There was absolutely no accountability.

64.      The adminstrative memos, directives, or guidance were meaningless because they were largely ignored and without effective consequences or accountability.

65.      Rules were observed only on rare occasion of an "inspection" by BOP officials from the Northeast Regional Office. Usually these inspections came with days of prior notice, providing staff a few days to get ready to "look the part" and "keep up appearances" until the inspection threat passed. FCI Fort Dix would turn into a "Potemkin Village" to fool inspectors who didn't care anyway. Inmates call this the "Dog-and-Pony Show" because Administration shows inspectors a fake staged lie and keep them from being approached by inmates who want to express their concerns.

66.      Medical staff did not conduct regular assessments of inmates for symptoms and did quick "temperature checks" only from March 2020 until July 2,

18

2020. On July 2nd, temperature checks mysteriously stopped without explanation.

67. At the beginning of the lockdowns we were told staff would be assessed for visible symptoms, that they would be questioned about symptoms, and temperature checked before entering the prison. Staff members frequently told inmates that they weren't checked upon entry and that checks were infrequent. In June 2020 we were told by various staff that these entry checks had ceased without explanation.

68. With inmate movements limited, inmates in 5812 were placed on a "call-out" appointment sheet to be seen by Health Services staff only one day each week. Inmates would frequently wait several weeks after submitting "sick-call request" forms to be seen. Many "sick-call request" forms were ignored.

69. Health Services typically destroys sick-call request forms and does not scan them into medical records. If Health Services kept these forms, it could paint a picture of negligence and medical malpractice or of COVID-19 symptoms ignored.

70. When inmates were seen and mentioned their concerns about symptoms that could be COVID-19, many were coerced into dismissing such complaints. Staff would routinely tell inmates that they "had allergies" when inmates asked about being tested, Health Services staff told them it was not available.

71. During the summer of 2020, Defendant Nicoletta Turner-Foster signed under penalty of perjury a Declaration in another action before this Court, Wragg v. Ortiz, Civil Case No. 20-5496 (RMB), in which she swore to information about inmates being screened, isolated or tested if they complained of various symptoms. Plaintiff asserts that Nicoletta Turner-Foster's Declaration contains numerous examples of perjury and utter falsehood.

19

72.         In April 2020, the adjacent minimum-security camp experienced a COVID-19 outbreak.   Inmates were moved between buildings at the camp as determined by test results, exposure, and symptoms.   Eventually, this strategy failed and 50-60 COVID-19 positive camp inmates were moved onto the low-security West Compound and housed in Building 5851 on the second and third floors.   Those inmates were housed in rooms with open windows overlooking the West Compound Commissary building, and shared a central ventilation system with the West Compound Laundry facility, also located in Unit 5851, which was regularly used by West Compound low-security inmates assigned to the Laundry work detail, and other general population inmates collecting laundry on assigned days.

73.         Health Services did not test low-security inmates en masse at any time from March to October.   While public health experts advised that pro-active testing would be useful to stem off an outbreak, FCI Fort Dix adopted a position experts said was unwise - waiting until people presented with symptoms.   In a dense population like FCI Fort Dix, that is too late.

74.         In late summer (August - September 2020) as public health experts warned of an inevitable "second wave," Named and Unnamed Defendants began "reopening" FCI Fort Dix and acting as if the crisis were over.

75.         In September 2020, BOP began transferring inmates into the facility at FCI Fort Dix.   Reportedly, FCI Fort Dix and FCI Yazoo City had been identified as two federal prisons with capacity for additional inmates.   Rumors began to circulate amongst inmates and staff that FCI Fort Dix would be accepting up to 300 inmates from FCI Elkton, one of the federal prisons hardest hit during the summer with more than 1,000 cases of COVID-19 and nine (9) inmate deaths from the deadly virus.

76.     By midsummer, Defendants had common knowledge from multiple published studies, medical evidence, advice from experts, and multiple media reports that the entry of COVID-19 into prisons was directly tied to the transfer of COVID-19 positive inmates as the primary vector of viral spread and that procedures were not in place to mitigate spread.

77.     On September 28, 2020, the Bureau of Prisons began the first transfers of FCI Elkton inmates to FCI Fort Dix.  On this date, six (6) buses arrived at FCI Fort Dix, and the Elkton inmates were subsequently tested as they were off-loaded onto the West Compound.  Reportedly, two (2) of those inmates test positive for COVID-19 during their intake.  Staff experience their first known exposures to COVID-19 from the Elkton inmates.

78.     On September 30th, FCI Fort Dix Administration notified the inmate population that cases of "Legionnaire's Disease" had been discovered at the prison and a unit on the East Compound was quarantined. (See EXHIBIT -Memorandum, dated Sept. 30, 2020)  On this same date, inmates were moved out of quarantine in Unit 5851, and into Units 5812 and 5811 on the West Compound.

79.     On October 6th, 2020, two inmates from Unit 5812 reported to "Sick-Call" at Health Services because they were both experiencing body aches and headaches.  Inmates Jerome Johnson and Donrigus Carraway informed medical staff that they were experiencing symptoms of COVID-19 and both asked to be tested.  Health Services staff informed Johnson and Carraway that they were likely experiencing a Cold and instructed them both to "go rest."  Neither were tested for COVID-19 until October 20th.

80.     On October 7, 2020, the Bureau of Prisons' "COVID Statistics" website--which was setup to report and track COVID-19 infections, deaths, testing, and recoveries for each of the 122 federal prisons--reports that four

21

(4) inmates at FCI Fort Dix are confirmed "active" cases of COVID-19. These are the first "active" cases at Fort Dix since the outbreak at the Camp in April. This is also 10 days _after_ the two Elkton inmates test positive on the West Compound.

81.     On October 9th the BOP's website updates to report five (5) active cases at FCI Fort Dix. On this date, FCI Fort Dix Administration notifies the inmate population for the first time that there are active cases of COVID-19 on the compound; more than twelve (12) days after the positive tests of the FCI Elkton inmates. (_See_ EXHIBIT - Memorandum, dated Oct. 9, 2020)

82.     On October 13th, David K. Miles, an inmate housed in the Special Housing Unit ("SHU") in building 5846 begins experiencing symptoms of COVID-19. Inmate Miles has been in the SHU under disciplinary segregation since May 8th, and has had zero contact with any FCI Elkton inmates, nor has had contact with any general population inmates. His contact while in the SHU was limited to Correctional Officers and his cellmate, Richard Moquete. Miles experiences symptoms that include: sore throat, headache, chest pains, and loss of taste and smell. He reported his symptoms to Health Services staff during the morning "Pill Line" on October 16th, informing the medical staff member that was experiencing severe symptoms of COVID-19 and wants to be tested. The medical personnel informed Miles that he would be put on "Sick-Call" for the following week to see a doctor or a nurse. No COVID-19 test was performed on David Miles until October 19th.

83.     On October 16th inmate Ian Anderson, living in Unit 5812 on the West Compound, began experiencing symptoms of COVID-19, including: headache, hot and cold flashes, nausea, fever, congestion, and fatigue. At 4:00am the following morning Anderson reported to the 5812 Unit Officer that he is _very_

22

ill and he believes that he has COVID-19. The Unit Officer informs Anderson that he is scheduled to work in Food Service 5810 at 4:30am, and he will need to report his illness to his boss when he arrives at work. Anderson reports to Food Service at 4:30am and immediately notifies Food Service staff members that he is suffering severe symptoms of COVID-19 and that he needs to see Health Services immediately. Anderson is instructed to sit at one of the tables in the Food Service dining room until after all seven (7) West Compound housing units are served the breakfast meal. While Anderson waits, approximately 1,200 inmates file past him to collect their breakfast meal. At approximately 7:30am Anderson is escorted from Food Service (5810) to Health Services (5806). He is seen by Health Services medical staff and evaluated. Anderson reports all of his symptoms and requests to be tested for COVID-19. The Health Services staff member informs Anderson that it is "probably something you ate" and instructs him to return to his unit and "sleep it off." But, Anderson is instead sent back to Food Service 5810 and remains there until lunch is served to the inmate population. He is allowed to return to his 12-man room in Unit 5812 at approximately 11:00am. Anderson will not be tested for COVID-19 until October 20th, at which time he tests positive.

84.      Between October 16, 2020, and October 29, 2020, eighteen (18) of the twenty-five (25) Food Service inmate employees from Unit 5812 will test positive for COVID-19. These inmates served breakfast, lunch, and dinner meals to ALL 1,200 inmates residing on the West Compound of FCI Fort Dix, to include the inmates living in the Special Housing Unit, and inmates in quarantine units.

85.      On October 17, 2020, inmate Robert McCray (Unit 5812) begins experiencing symptoms of COVID-19, including fatigue, hot and cold flashes, headache, and body aches. He registers a 101-degree temperature on October

23

20th and is moved into quarantine in unit 5851.

86.     On October 18th the BOP's COVID tracking website is updated to reflect 9 inmates positive for COVID-19 at FCI Fort Dix along with 5 staff members.  During the AM on this date three inmates from Unit 5812 are exposed to a COVID positive Officer and/or Contractor; Jose Brito, Nelson Rodriguez, and Matthew Grant are instructed to report to work in the SHU / R&D building (Unit 5846) to repair a broken sewage pipe flooding the first floor of the Receiving & Discharge area of the 1st floor of 5846.  They are escorted by a Compound Officer and a Contractor.  Later that evening, those three inmates are notified over the 5812 intercom system to report to the CO's office.  They are then informed that they have been exposed to a sick Officer and/or Contractor and that they have 5 minutes to pack one bag.  They are then escorted to the first floor of unit 5851.  All three were tested for COVID-19 on October 19th and Jose Brito tested positive.  Brito becomes the first inmate of unit 5812 to test positive for COVID-19.  Brito is removed from the 1st floor of 5851, and moved into isolation.

86.     On October 19th, thirteen (13) inmates from unit 5812 are sent to Health Services (5806) to test for COVID-19 prior to their move into the Residential Drug Abuse Program in unit 5852.  Inmate Eric Antonmarchi tests positive and is removed from unit 5812 and placed into quarantine.  Inmate Thomas Traficante reports to the 5812 unit officer that he is experiencing severe symptoms of COVID-19, including nausea, headache, body aches, and complete loss of his taste and smell.  Traficante is removed from 5812 and placed into quarantine.

87.     On October 20th, inmate Nelson Rodriguez, who is still quarantined in 5851, begins experiencing symptoms of COVID-19, including headache,

24.

congestion, and a scratchy throat. Later that morning, Rodriguez and Matthew Grant are instructed to pack their belongings as they will be returning to 5812. Rodriguez informs the officer at that time that he is experiencing symptoms of COVID and does not think it's wise to be returned to 5812. The officer insists that he pack up, as he is going back to 5812. Rodriguez and Grant are moved back to 5812 at 1pm.

88. Also on October 20th, all of the approximate 230 inmates within unit 5812 (including Plaintiff Thieme) are tested for COVID-19. They are informed that this will be a lab test, so it will take 3 to 5 days to obtain the results. The inmates are notified that they will begin "daily vitals checks" immediately. These checks occur daily, without fail, between October 20, 2020 and November 13, 2020. All of the inmates living within the SHU are also tested for COVID-19 on this date.

89. On October 21st, a "Memorandum To Inmate Population" is sent out notifying the inmate population that an inmate in the SHU (David K. Miles) tested positive for COVID-19. (See EXHIBIT - Memorandum, dated 10/21/2020) On this date multiple inmates notify staff that the heat is still nonfunctional in unit 5812. Inmate Derrick Walton reports to the unit officer that he is experiencing symptoms of COVID-19; he is evaluated at 1:00pm by Health Services staff, but is not removed from 5812 until the following afternoon. Inmate David Miles (SHU) is notified on this date that he tested positive for COVID-19 and he is escorted to unit 5851 where 5 inmates from unit 5812 are already quarantined.

90. On October 22nd, five (5) more buses arrive from FCI Elkton and are offloaded onto the West Compound of FCI Fort Dix. Inmates Derrick Walton, Eddie Salazar Pena, and Ruben Rodriguez notify 5812 staff that they are symptomatic and are subsequently moved into quarantine in unit 5851.

25

91.     Late in the PM of October 22nd, inmates Donte Jones and Felix Morales both notify the unit officer that they are experiencing severe cases of COVID-19. The unit officer tells them both that "no medical staff are onsite," and instructs them to "go sleep it off" and "we'll deal with you tomorrow when medical gets here." Morales spends the entire night vomitting and hyperventilating. Both are removed from 5812 at 9:00am on October 23rd.

91.     On October 23rd, inmate Mark Staats begins experiencing hot flashes and shortness of breath. He "blacks-out" and hits his head on the floor causing a large contusion which requires staples. He is removed from unit 5812 and placed into quarantine. The first round of test results come in and ten (10) inmates are removed from unit 5812 and placed into quarantine as they tested positive and/or were experiencing symptoms.

92.     On October 24th, inmate Edgar Acevedo is notified that he tested positive for COVID-19 and he is removed from 5812.

93.     At 2:00am on October 25th, inmate Dontai Cabrera is assisted by two other inmates to the officer's station in 5812, as he is so sick that he cannot walk on his own. The unit officer tells Cabrera that "no medical staff is onsite" and that he needs to "tough it out." Cabrera is assisted back to his room until the afteroon of October 26th.

94.     During the morning of October 25th, the inmates of 5812 are notified that another round of test results are in and that thirty (30) inmates will be notified after lunch that they are positive for COVID-19. Lunch is served at 11:30am, and at 2:00pm inmates are instructed to return to their rooms. Defendant Turner-Foster and her entourage go floor-by-floor yelling names of COVID-positive inmates. This list includes the Plaintiff. Other officers accompanying Turner-Foster enter rooms to locate and confront inmates.

26

Those inmates are told to pack one bag in 20 minutes and be ready to go to quarantine. Those inmates comply with the order, pack, and are moved into the second floor of unit 5851. Inmates find 5851 in shambles, are told to cleanup and make their areas "habitable". Some find beds and bedding soaking wet with sterilization chemicals. Others wait hours for mattresses and bedding.

95.      A "Memorandum To Inmate Population" is sent to the FCI Fort Dix population (See EXHIBIT: Memorandum, dated 10/26/2021) notifying the inmates that 54 confirmed cases of COVID-19 have been identified in unit 5812, and that those inmates have been isolated in unit 5851. This notice also informs the population that another case of COVID-19 has been identified within the SHU, and that inmate has been moved into the Health Services building (Unit 5806).

96.      During the late morning of October 26th, the approximate 180 "healthy" inmates still residing in unit 5812 are notified that the third floor of 5812 is being closed and that all inmates currently living on the third floor are instructed to move into rooms on the first and second floors. Inmates from rooms that previously housed sick inmates are moved into close proximity with inmates who had not previously been exposed. Rooms that had open beds prior to this move are now filled to over-capacity with twelve inmates. Each of these "twelve-man" rooms is rated for approximately 9 inmates each using the BOP P.S. 1060.11. At 2:30pm, the 54 COVID positive inmates from 5812, and the COVID positive SHU inmate (David Miles) move back to unit 5812, and onto the third floor. This third floor "quarantine area" is then locked, and is without any staff, medical supplies, disinfectant or cleaning supplies, and without any means of communication like a phone, computer, or a "panic-button" to signal staff in case of an emergency. During this move the Lieutenant on duty is within 5812 speaking to inmates without <u>any</u> PPE gear. Unit 5812 looks like a "war-zone" in a third world country. Inmates were

27

forced to move lockers, beds, mattresses and personal property in a painstakenly short period of time between floors. There are sick inmates sleeping in the halls and there is garbage, broken lockers, torn mattresses, and inmate property strewn all over the building. There is still no heat functional within unit 5812 and the inmates are cold.

97.     On October 26th, inmate Dontai Cabrera again notifies staff that he is _very_ ill. He is moved to the third floor quarantine area. Cabrera's family begins calling into FCI Fort Dix as they know he is sick and they are very concerned for his well-being.

98.     On the afternoon of October 26th, another bus carrying inmates transferring into the facility arrives at FCI Fort Dix.

99.     The inmates of 5812 begin a campaign to notify every staff member they come into contact with that the building's heat is still broken and the inmates are sick and cold. During the daily vitals checks inmate Thomas Wyatt shows a temperature over 100 degrees, and is moved to the third floor quarantine area. On this date, four (4) officers come onto the third floor quarantine area of 5812 and ransack inmate Cabrera's living space and personal property. This is in apparent retaliation for his family calling into the prison.

100.    On October 27th, Inmate Robert McCray experiences his first "black-out" while quarantined on the third floor of 5812. Luckily, he blacks out while Health Services staff are in the quarantine area for vitals checks. The injuries to his knees and mouth, sustained when he fell unconscious, are evaluated by medical personnel and he is given Acetaminophen to bring his temperature down. He is instructed to "drink more water." No entry of this event is entered into McCray's medical records.

28

101.      On October 28th, the BOP's website is updated to reflect 32 confirmed cases of COVID-19 amongst inmates at FCI Fort Dix, along with 8 staffers.  On this date the inmates of 5812 are notified that they can purchase $25 of basic hygiene items from commissary, but they are not permitted to purchase any food items, coffee, tea, or warm clothing.  Comparatively, all inmates residing in other buildings are allowed to place normal $180 orders of food, hygiene, and clothing.  On this date, seven (7) more buses arrive at FCI Fort Dix, including buses from FCI Elkton.  Three (3) of these Elkton inmates test positive as they offload onto the West Compound of FCI Fort Dix.

102.      At approximately 12:00pm on October 28th, inmate Josh Wairi begins notifying Health Services and Unit staff that he is experiencing severe symptoms of COVID and requests to be placed into quarantine.  He is instructed each time to return to his room on the first floor and that they will "deal with him" later.  He remains in his 12-man room with other "healthy" inmates until the evening of October 29th.

100.      Also on October 28th, inmate Robert McCray experienced his second "black-out" event in the 2-man bathroom of the third floor quarantine area of unit 5812.  At this same time a Health Services doctor is present in the quarantine area, but refuses to see McCray.  The Health Services doctor flees the quarantine area when inmates notify her that McCray is unconscious.  Other inmates in the quarantine area spend the next few hours pounding on the locked stairwell doors and yelling out the windows in an attempt to get medical help for McCray, but it is not until almost 5 hours later before Health Services come into the quarantine area to evaluate him.  Again, Robert McCray's black-out and the subsequent medical evaluation are not recorded into McCray's medical records.

29

104.     On October 29th, the BOP website is updated to reflect 59 confirmed cases of COVID-19 amongst the inmates at FCI Fort Dix, and 8 staffers. Staff are notified multiple times throughout the day that there is no heat in unit 5812, and sick inmates are experiencing hot and cold flashes, as well as fevers. The remaining 175 "healthy" inmates in unit 5812 are given their first "rapid tests" utilizing the Fort Dix Abbott machine. Early test results show that inmate Ron Collins, who was the inmate with the recent open-heart surgery, has tested positive and he is instructed to pack all of his belongings, and move himself to the third floor quarantine area. He is instructed to move all of his property, bedding, and locker, and--because he is positive for COVID-19--he is not allowed any assistance by staff or from other inmates.

105.     During the evening of October 29th the inmates of 5812 are notified over the intercom system that 70 of the remaining 175 inmates in 5812 have tested negative for COVID-19. They are informed that "after dinner" a list of the "healthy 70" will be posted in the 10x10 foot area outside of the 5812 unit team offices, familiarly called "Staff Alley." For more than 1 hour this small area is crammed with inmates, sick and healthy alike, trying to see the name list of healthy inmates. Another announcement is made that all of the healthy inmates have one hour to pack all of their belongings, and all of their bedding, as they'll be moving to quarantine in Health Services (Unit 5806). Under the cover of night, and in a downpouring rain, the "healthy 70" inmates spend two hours carrying all of their property, including mattresses, blankets, pillows, food, hygiene items, and personal items across the West Compound and into unit 5806. When they arrive, they discover that the elevator is locked and that they'll need to climb four flights of stairs with their property and soaked bedding. Inmate Brian Moldover notifies the Lieutenant on duty that two of the inmates are handicapped and need the elevator unlocked: inmate Naroger

30

Carter, who only has one leg and a prosthetic to the knee; and inmate David Vaughn, who is approximately 400 lbs and relies on a walker. The Lieutenant refuses to unlock the elevator and instead, the inmates help to carry Carter and Vaughn up four flights of stairs, as well as all of their property. The inmates are locked onto the third floor of 5806 without chairs, phone, computer, or panic-buttons. They are forced to share 1 shower. They spend the night in wet clothes, on wet mattresses, covered in wet blankets.

106.    On October 30th, the BOP website is updated to reflect 165 inmates with COVID-19 at FCI Fort Dix. On this date the temperature outside drops to mid-50s and the heat is still out in 5812, which now houses 160 inmates sick with COVID-19. Two of the COVID positive inmates residing in 5812, Terry Edwards and Robert Hatcher, are allowed into the basement in an attempt to repair the heating system for the building. There is no functional lighting at that time in the basement and both inmates are injured. They were unable to repair the heating system and the building remains without heat.

107.    Also on October 30th, the massive "clean-up effort" begins in unit 5812. Inmates, who are sick with COVID-19 and cold, are forced to move lockers, bedframes, and mattresses between three floors under the threat of retaliation by Unit staff. One of those threats comes over the intercom system as "if the mess in the building isn't cleaned up by Monday, we'll begin moving people again." On this date inmate Ron Collins, the heart attack victim, is instructed to move all of his property, bedding, and locker from the third floor to the to another room back on the first floor.

108.    On October 31st, the inmates of 5812 continue the massive clean-up effort under the looming threat of retaliation. The temperature outside drops to the mid-40s and inmates throughout 5812 are donning full winter clothing

inside the building, including winter coats, thermals, scarves, and gloves. On this date a staff member tells inmate Taylor Byzdr that the heating system will require an outside contractor to repair, but none want to come onsite to a building full of COVID-positive inmates. At 8:00pm that night two compound officers allow inmates Hatcher and Edwards back into the basement in an attempt to bring the heating system online. During this effort pipes rupture in one of the 12-man rooms on the second floor, and a flood occurs. The Lieutenant on duty discovers that inmates are attempting to repair the heating system and demands the effort stopped. The lieutenant is heard by multiple inmates instructing the compound staff to "Pack your shit and get out of there. I need you doing rounds, not fixing shit." The heat in unit 5812 is still non-functional.

109.     On November 1st, the inmates of 5812 continue the massive clean-up effort. At 1pm, a Unit Team staff calls 40 of the 5812 inmates to Staff Alley, and instructs them to move rooms again. They need to have all of their property, beds, and lockers moved by the 4pm count. Some of these inmates are very sick and need assistance moving their belongings.

110.     During the morning of November 2nd, the Unit Team staff notify an additional 20 of the sick inmates that they need to move all of their property to new rooms throughout unit 5812. On this same day, forty-six (46) of the "healthy 70" are notified that they tested positive for COVID-19 and they will be moving back to unit 5812 after dinner.

111.     On November 3rd, the BOP's website is updated to reflect 210 COVID positive inmates at FCI Fort Dix, along with 10 staffers. Inmate Larry Aiken is transferred to unit 5812 from the SHU as he tested positive for COVID-19. Aiken is moved without any property or bedding and he is forced to sleep on the floor.

32

112.     On November 5th, ten (10) more of the "healthy 70" test positive for COVID-19 and are moved back to unit 5812. There are now only fourteen (14) COVID-negative inmates out of the total 232 inmates of unit 5812.

113.     On November 7th, the BOP's website is updated to reflect 228 cases of COVID-19 at FCI Fort Dix. Unit Team staff notify the inmates of 5812 that unmonitored legal calls for inmates are suspended until the COVID outbreak is over. Also on this date, inmates from 5812 are informed by Defendant Wilk that "Administration has instructed us [Health Services] not to provide you with your medical records without a court order. They know you're all getting into court."

114.     On November 9th, a New Jersey Congressional delegation which included Senators Cory Booker, Bob Menendez, Representative Andy Kim, and ten (10) other Congressmen and Congresswomen, write a letter to Michael Carvajal, the Director of the Bureau of Prisons. (See EXHIBIT: Letters from Congress) In this letter they express "grave concerns regarding the Bureau of Prisons' inadequate protocols for COVID-19 testing and inmate transfers." The Congressmen specifically express concerns about the rapidly growing number of infections within Plaintiff Thieme's housing unit (5812), and how these appear to be the result of inmates transferred into FCI Fort Dix from FCI Elkton. They further state, "it is clear that BOP does not have an effective plan." In this letter the Congressmen demand a moratorium on transfers into FCI Fort Dix.

115.     On November 10th, three more of the "healthy 70" test positive and are notified at approximately 11:00am. They remain with the other "healthy" inmates in 5806 until 5:00pm, at which time they move all of their belongings to Unit 5851. At this same time, the remaining "healthy" inmates are told to pack up all of their bedding and belongings, and they are moved across the

33

compound to Unit 5803.

116.        On November 11th, two more buses arrive at FCI Fort Dix.

117.        On November 12th, Vice Media releases a news article about the outbreak at FCI Fort Dix. (See EXHIBIT - "Federal Prisons Turn Into COVID Nightmares") In this article, investigative reporter Keegan Hamilton reveals that Bureau of Prisons' staff failed to properly test inmates that were being shipped between FCI Elkton and FCI Fort Dix.  In this news article, Hamilton interviews Brian Kokotajlo, the President of the Correctional Officers' Union at FCI Fort Dix.  In that interview, Kokotajlo tells Mr. Hamilton that the BOP never wanted to test the staff at FCI Fort Dix.  He says that they were worried that the test results would reveal a significant number of sick staffers, and that the BOP would not have enough workers to keep the institution running.

118.        In the early morning of November 13th, Unit Team staff wake all of the COVID-positive inmates living in unit 5812 and instruct them to clean the building as quickly as possible as there is a "big inspection" coming through the building sometime during the day.  Inmates from other buildings on the West Compound are brought to the front of unit 5812 to begin removing mounds of trash, broken lockers, broken bedframes, and torn-up mattresses.  New "How to Not Spread COVID-19" signs are put up around 5812, new spray bottles with chemicals are brought to the building, fresh paint markings are put on walkways around the compound, and tape on the floors of the buildings are put down to designate "social distancing" spacing.  Also, during the lunchtime meal all inmates are told to space out, and only 10 men are allowed to pick up lunch at a time.  The "social distancing" limitations are only in place this day, and only during the lunch meal.  In the afternoon, men and women in suits are seen touring the facility.

34

119.     On this same date, Health Services staff notify the inmates living in unit 5812 that, because they have been positive for more than 10 days, they will no longer need to have daily vitals checks. Health Services staff then write more than 20 incident reports against inmates who did not get their daily vitals checks on this day.

120.     On November 16th, all of the inmates living within unit 5812 are tested for COVID-19. Multiple inmates, including Plaintiff Thieme, ask Health Services staff onsite for their medical records and for written results showing their positive test results. The medical staff inform the inmates each time that they can't have their medical records or their COVID test results.

121.     Also on November 16th, inmate Joseph Totoro submits a request to 5812 Unit Team requesting an FTCA claim for Damage, Personal Injury, or Death. Unit Team tells Totoro that "no such form exists." Totoro explains that it does exist, and tells the Unit Team member that it is "Standard Form 95" (SF-95). He is told again that the form doesn't exist and Totoro is kicked out of staff alley.

122.     On November 18th, all inmates living within unit 5812 are tested again for COVID-19.

123.     At 2:00pm on November 18th, inmates Joseph Totoro and Edwin Jimerson bring the FTCA claim form "Standard Form 95 - Federal Tort Claim for Damage, Personal Injury, or Death" into Unit Team requesting that it be copied. The Unit Team member tells Totoro and Jimerson that Unit Team will NOT copy this form without authorization from Fort Dix Administration.

124.     On November 19th, a Unit Team member from building 5841 reportedly tests positive for COVID. Some inmates from that same unit begin to experience

35

symptoms of COVID-19. Unit 5841 is placed on quarantine lockdown and its inmates were tested on November 20th. Over the next month 2/3 of the inmates in 5841 test positive.

125.       On November 23rd, the first results from the November 18th lab tests are in and eight (8) inmates from unit 5812 are told that they still have tested positive. They are NOT removed from 5812. Many of the remaining 5812 inmates don't have results but are still experiencing symptoms of COVID-19.

126.       On November 30th, the BOP's website updates to reflect 303 "active" cases amongst the inmates at FCI Fort Dix, and 28 staffers. Health Services holds a "townhall" meeting within unit 5812. In that meeting 28 inmates are notified that they have tested negative twice, and they will be moved into quarantine on the third floor of 5812. The remaining 195 inmates are still positive and will remain isolated on the first and second floors.

127       At 1:00am on December 1st, another bus arrives at FCI Fort Dix and inmates are offloaded under the cover of darkness. After sundown, at 9:30pm another bus arrives and begins unloading inmates from FCI Fairton.

128.       On December 2nd, the BOP's website updates to reflect 282 positive inmates, along with 28 staff. At 8:30am another bus arrives at FCI Fort Dix, with a second bus arriving at 12:30pm.

129.       On December 3rd, inmates within unit 5802 begin showing symptoms of COVID-19, and one tests positive. Defendants Turner-Foster and Haczynski hold a townhall meeting within 5812. In this meeting the Defendants notify the inmates of unit 5812 that the Administration has "changed their minds" and they will consider all 230 inmates of unit 5812 "recovered" on December 4th. The unit will be immediately removed from quarantine, the inmates will be allowed back onto the West Compound, out into the Food Services 5810 building to pick

36

up their meals, and all 5812 Commissary workers, Food Services workers, and Laundry workers will be expected back at work immediately. When asked at that meeting whether all of the 5812 inmates being considered recovered was a result of the 5802 unit being placed on immediate lockdown, Defendant Turner-Foster states "absolutely not." Until 5802 began testing positive on this date the inmates of unit 5802 were handling all Commissary, Food Service, and Laundry service for the entire compound.

130.     At 3:00pm on December 3rd, the BOP's website updates to reflect 223 "recovered" inmates at FCI Fort Dix, with 144 "active" cases of COVID-19 and 29 staffers. Many of the inmates living within unit 5812 are still experiencing symptoms of COVID-19, and almost 200 of them have not yet tested negative.

131.     On December 4th, the inmates of unit 5812 are allowed outside and into the Food Service 5810 building for breakfast. As they arrive at Food Service they encounter inmates from unit 5811 coming out of the Food Service building. The inmates from both buildings purposefully avoid each other. At 9:00am on this date another bus arrives at FCI Fort Dix.

132.     At lunchtime on December 4th, the 5812 inmate Food Service workers arrive for work at Food Service 5810. Many of the Food Services officers are upset that the 5812 inmates are coming back to work, and many are told to "stay away" and are told that they are "poison." The inmates find out that some of the kitchen staff have also tested positive and are out sick at home. In the afternoon, 13 of the 5812 inmates are told to pack all of their belongings as they are being moved into the Residential Drug Abuse Program housing unit in building 5852. 11 of those 13 inmates tested positive their last test on November 18th, and more than half of those are still experiencing symptoms. Six

37

days later, the inmates of unit 5852 (Drug Unit) begin experiencing symptoms of COVID-19 and that unit goes on quarantine lockdown.

133.     On December 5th, five (5) of the 5812 Food Services workers report to work with "cop-outs" in hand requesting that they be allowed to quit Food Service as they are still sick and showing symptoms of COVID-19.   One of the Food Service officers calls Health Services to report that a significant number of the Food Services inmate workers are still sick and the Food Services officers don't want them working.   The Health Services staff tell the Food Service officer that he's "not a medical expert" and "administration wants those guys working."   Those inmates are not allowed to quit at that time, and are forced to continue working.

134.     On December 8th, the New Jersey Congressional delegation writes another letter to Michael Carvajal, Director of the Bureau of Prisons. (See again EXHIBIT - Letters from Congress)   In this letter, the Congressmen express "serious concerns regarding the Bureau of Prisons' response to the ongoing COVID-19 outbreak at FCI Fort Dix."   The Congressmen are "deeply alarmed" regarding the buses being allowed into and out of FCI Fort Dix during this massive outbreak stating that "BOP is putting at risk the lives of both staff and incarcerated individuals."   They go on to express concern regarding reports of sick inmates not being provided adequate medical care, and want to know about heating problems being reported for some of the housing units at Fort Dix.

135.     On December 23rd, three inmates from unit 5812 are tested for COVID-19 in preparation for transfer to an ICE deportation facility.   All three inmates test positive including Jaquine Terrazos.   Their transfer is canceled and they remain in unit 5812.

136.       On December 28th, the BOP's website updates to reflect 306 "active" cases of COVID-19 at FCI Fort Dix; 295 inmates and 11 staff. On this date, inmate Jaquine Terrazos, along with 35 others living in 5812 are awakened and told to pack their belongings as they are being moved to the East Compound to work in Food Service 5730. They will be preparing and serving breakfast, lunch and dinner for all 1,300 inmates living on that compound. This move is due to the fact that 100% of the housing units on the East Compound are infected with COVID-19 and subjected to a quarantine lockdown. Some of the inmates report to staff that they are still experiencing symptoms of COVID and refuse to get on the bus. Inmates Damon Rivers and Jonathan Middlebrooks are both put in handcuffs and escorted to disciplinary segregation in the SHU.

137.       At 4:00am on December 29th, the 34 inmates from unit 5812 who now reside in unit 5712 on the East Compound are awakened and told to get ready for work in Food Service 5730. Many of these inmates are sick, and they've only had four or five hours of sleep after moving. They work 15 hours that first day, and work each subsequent day 10 to 12 hours until their return to unit 5812 on the West Compound on February 3rd, 2021.

138.       On January 2nd, inmate Larry Aiken (one of the 5812 inmates moved to the East Compound) collapses in unit 5712 after working a 12 hour day in the kitchen. Aiken loses consciousness. Aiken was one of the inmates who tested positive again in December 2020 just before being moved to 5712 to work in the kitchen. Inmate Derek Walton gives Aiken CPR for 45 minutes while inmates attempt to signal staff to get medical help. Aiken is taken by ambulance to the hospital. Aiken is diagnosed as suffering a severe heart attack. He has open-heart triple bypass surgery.

39

139.    On January 2, 2021, the inmates within unit 5812 begin sending letters out to law firms requesting assistance and representation in an upcoming class action lawsuit they are planning to file against the United States of America for personal injury, mental anguish, and anxiety due to gross negligence and reckless disregard of human life on behalf of Federal Bureau of Prisons' officials during the global pandemic of COVID-19. Over the following months family members find that these letters seeking legal assistance can't be tracked on the U.S.P.S. tracking site using tracking numbers. U.S.P.S. reports those numbers have never been picked up and/or scanned. This would indicate that those letters never left FCI Fort Dix and that BOP staff illegally diverted outgoing mail.

140.    On January 3rd, 2021, Plaintiff Thieme writes a letter to this Court which is filed as ECF No. 1 and initiates this above-captioned action.

141.    On January 5th, the BOP's website updates to reflect 604 "active" cases of COVID-19 at FCI Fort Dix; 590 inmates and 14 staff.

142.    On January 7th, 2021, inmate James McGonigle, who is one of the 5812 inmates now working on the East Compound in the kitchen, begins notifying Health Services staff that he has a major infection on his chest and he requests an examination. The skin on his chest is turning purple and is seeping pus. McGonigle is in an extreme amount of pain which is exacerbated by working 10 to 12 hours a day, seven days a week in Food Service 5730. He submits multiple "cop-outs" and "sick-call" forms to Health Services over the next week before he is seen, and at that time he requires surgery. Defendant Kodger ignores McGonigle's email seeking assistance and intervention.

143.    Rumors circulate that more workers are needed on the East Compound in the first two weeks of January. 5812 staff let it be known to 5812 inmates

40

that they would send anyone they want to the East Compound for work and this would be based on petty or arbitrary reasons. Unit Team members use inspections of living spaces to order people transferred. Ten (10) random inmates are chosen for reasons as petty as leaving a book on one's bunk, or not having a pair of shoes perfectly aligned underneath one's bunk. One still symptomatic inmate in Plaintiff Thieme's room was moved to the East Compound and forced to work despite having a clean living area, for briefly leaving his coffee mug on his chair while he used the bathroom. The arbitrary and petty reasons to compel forced labor created unnecessary mental stress and tension and this was Constitutionally abusive.

144.     On January 11th, the BOP's website updates to reflect 824 positive cases of COVID-19 at FCI Fort Dix, this is comprised of 797 inmates and 26 staff.

145.     On January 12th, the New Jersey Congressional delegation writes a letter to Warden David Ortiz at FCI Fort Dix. In this letter the Congressmen demand answers regarding what took place at FCI Fort Dix during the multiple uncontrolled outbreaks of COVID-19. They are now writing the warden of FCI Fort Dix because Michael Carvajal, Director of the Bureau of Prisons, has been ignoring their request for answers.

146.     On January 15th, the New Jersey Congressional delegation writes a letter to Michael Horowitz, Inspector General for the U.S. Department of Justice. (See again EXHIBIT - Letters from Congress) In this letter the Congressmen ask for an investigation into the COVID-19 outbreak at FCI Fort Dix. In this letter the Congressmen write "we are alarmed that BOP has repeatedly failed to contain outbreaks at the facility" and continue "BOP has had ten months to learn how to protect the incarcerated individuals and staff at FCI Fort Dix during this pandemic, and has failed." It is apparent that the

41

Bureau's mitigation strategies at Fort Dix are not working, and medical care was insufficient throughout the pandemic. Senator Bob Menendez says in this letter, "BOP is failing to provide sufficient medical care, and that living conditions inside the facility have steeply deteriorated." He further states, "we are deeply concerned that without additional oversight, BOP will continue to endanger the lives of the incarcerated individuals and staff at FCI Fort Dix."

147.     In the wake of the above-referenced congressional letters and significant public criticisms of mishandling of the Fort Dix outbreaks, on or about January 18th or 19th, 2021, Warden David Ortiz is relieved of his position and reassigned to a desk job at the Northeast Regional Office in Philadelphia. This is a pattern in the BOP hierarchy -- where employees who have failed are shuffled around to other jobs with seemingly no consequences.

148.     In January and February, 2021, various staff and officers are ordered by Administration to conduct retaliatory "inspections" in housing unit 5812. Inmates are told that the searches would not be necessary if they had not "filed paperwork" concerning COVID-19 issues and mishandling of the crisis. Inmates understand this to be retaliation and intimidation for pursuing complaints, administrative remedies, contacting media, Congressmen and other organizations, and pursuing litigation or various court filings.

149.     On February 3rd, the 45 inmates from 5812 forced to work on the East Compound are returned to unit 5812 on the West Compound.

150.     Full unit searches of unit 5812 are conducted on February 19th, 23rd, and 25th. All 5812 inmates are sent to stand outside in inclement winter weather.

42

151.     On February 19th and February 23rd, inmates stand outside in cold rain and wind for over one hour while officers tear apart inmate living areas and toss property. Staff and officers engage in petty retaliations by removing pillows and blankets from inmate rooms, as well as property inmates had previously been permitted to possess and no contravening rule or regulation changed. Many inmates are not given sufficient time to don appropriate clothing or coats for the weather outside, as they are awakened to fire alarms and staff yelling to get out of the building because the building is on fire. It becomes apparent that the "fire" is a ruse to get inmates out of the building quickly, as the inmates rush out of the building into the cold and find more than 20 officers waiting to shake them down. Some of the officers are armed with rifles, bear mace, and wearing full riot gear, while many of the inmates are only wearing shorts and t-shirts.

152.     On February 25, 2021, inmates stand outside on a cold, windy day for more than 3 hours. Similarly, many inmates are not given sufficient time to don appropriate clothing or coats for the weather outside.

153.     Also on February 25th, two inmates living within unit 5812 test positive for COVID-19; one of which, Ruben Rodriguez, is experiencing his second infection of COVID-19. Rodriguez tested positive for COVID-19 originally on October 25, 2020.

154.     On February 26th, unit 5812 goes back on full isolation. All inmates of 5812 have their temperatures taken with none reporting fevers.

155.     On March 1st, the majority of the inmates living within unit 5812 are tested for COVID-19. While some inmates who last tested positive on November 18th were tested on March 1st, some inmates who last tested positive on November 18th are not tested. No explanation for the disparity is given.

43

156.     On March 3rd, the first test results are in and seven inmates are notified that they tested positive and they are moved to an isolation building. Inmate Ron Collins, the open heart surgery inmate, tests positive for a second infection.

157.     On March 4th, Health Services staff inform the inmates of 5812 that all of the lab results are back and only the nine inmates already removed were positive.

158.     On March 22nd, two more inmates in unit 5812 test positive for COVID-19, both of which are reinfections.  Inmates Deshaun Luckett and Cyle Krepps are positive and experiencing symptoms, and both of whom originally tested positive at the beginning of November 2020.

159.     On April 5th, all remaining inmates in unit 5812 are tested again for COVID-19, with one inmate testing positive.

B)  **Plaintiff's Injuries Stemmed from the COVID-19 Outbreak Disaster and Failed Efforts at FCI Fort Dix.**

160.     Plaintiff Thieme has been confined at FCI Fort Dix since April 17, 2019.  He has been at FCI Fort Dix for the entire duration of the BOP's COVID-19 nationwide lockdown starting in March 2020 and for the COVID-19 outbreak starting in October 2020 and continuing to present.  Since April 19, 2019, for all but one day of the last two years, Plaintiff has been housed in housing unit 5812 at FCI Fort Dix.

161.     Plaintiff Thieme was infected with COVID-19 at some time in October 2020 at the time of the FCI Elkton inmate transfers and various staff-inmate contacts without proper precautions in place.

162.     At this time various staff voiced that "COVID is on the compound" and "we'll all be sick soon."

44

163.     On or about October 17, 2020, Plaintiff began experiencing a concerning dry-cough, sore throat, and headaches.

164.     In the afternoon of October 18, 2020, Plaintiff asked the 5812 Unit Officer to call Health Services staff to report his symptoms. The 5812 Unit Officer instructed Plaintiff to "fill out a sick-call request form" and that he would be seen "when medical calls" for him. Plaintiff took a "sick-call" form intending to provide it to Health Services staff at morning pill call the following morning.

165.     Later that evening on October 18, 2020, 5812 was placed on quarantine exposure lockdown. Plaintiff could not submit the "sick-call" form as planned.

166.     On October 19, 2020, 5812 Unit Officer was asked by Plaintiff to contact Health Services regarding symptoms. The officer asked about Plaintiff's symptoms but did not call Health Services. The Officer instructed Plaintiff to go back to his room and "you're all going to be tested anyway."

167.     Plaintiff Thieme was tested, along with approximately 230 unit 5812 inmates on October 20, 2020. Plaintiff advised Health Services staff performing nasal swab tests of his symptoms and was told "we are not removing people from the unit until test results are back."

168.     According to Plaintiff's medical records, the test results were reported on "10/25/2006 00:06."

169.     These test results indicated "Detected" for "Sars CoV 2 RNA (COVID-19)" which is "considered a positive test result."

170.     Plaintiff, along with about 15 other inmates, was removed from unit 5812 at 2:30pm on October 25, 2020. He was told to pack one bag of belongings

45

as he was quarantined on the second floor of housing unit 5851.

171.    Plaintiff asserts Operations and Health Services staff ignored his symptoms for one week prior to his removal from housing unit 5812 which likely contributed to uncontrolled viral spread to other inmates.

172.    Upon arriving at unit 5851, Plaintiff and others were told that they would have to find a bed and clean up the unit. The unit was in shambles and filthy. Many rooms had disassembled beds piled in an intertwined jumble of broken parts. Plaintiff, and other sickened inmates, were compelled to sanitize his living area and spent most of the afternoon lifting bed frames and parts to cobble together several bunk beds. Plaintiff was not provided clean bed linen until later that night.

173.    The next morning, October 26, Plaintiff and others on the second floor of 5851 were instructed to pack up and return to unit 5812. After personally interacting with the Lieutenant (who was not wearing any PPE) for approximately 20 minutes, along with other COVID-19 positive inmates at the "Exit" door of the unit waiting to move out, the inmates were told the move would take place sometime that afternoon.

174.    After moving back to 5812, and locked in on the third floor of the unit. The rushed move of previous third-floor inmates to the buildings first and second floors left behind broken beds, lockers, and other furniture, torn mattresses, debris, trash, and other items. It looked like a bombed-out war zone.

175.    Inmates, including Plaintiff, many severely ill, were forced to once again clean up the unit, this time being threatened with disciplinary charges, disciplinary lockup, or further room moves, if they chose to not comply.

46

176.      Plaintiff and others were required to move beds, lockers, and other heavy items and lift lockers from a second-floor landing, up stairs to the third floor, often unaided.

177.      While on the third floor of 5812, Plaintiff received a once-daily "vital signs" assessment.   For about one minute, Health Services staff took blood pressure, pulse, pulse oxidation, and temperature.   Inmates including Plaintiff were asked to report symptoms.

178.      At this time, Plaintiff's initial symptoms were mild, including cough, headaches, sore throat, and starting October 28, 2020, a loss of taste and smell.

179.      A review of Plaintiff's medical records indicates that Health Services staff did not properly or accurately enter self-reported symptoms into Plaintiff's medical records.

180.      On October 30, 2020, Plaintiff and others were returned to their original bed assignments after a large number of positive cases from October 20, 2020 and October 29, 2020 testing resulted in the quarantine of all 5812 positive inmates and the removal of approximately 70 negative inmates to unit 5806.   Plaintiff was again forced to move his locker and other's lockers, beds, and other furniture, and clean up debris, trash, and various strewn items that made 5812's first and second floors also look like a "war zone" from rushed inmate moves.   Plaintiff returned to room 213 on 5812's second floor where he had resided for 18 months before October 25, 2020.   At this time unit 5812 had issues with heating systems.

181.      In early November 2020, Plaintiff's symptoms worsened dramatically, including chronic feelings of pressure and pain in his chest, severe respiratory spasms, asthma attacks, body aches including bone pain, dizziness

47

and lightheadedness, gastro-intestinal pain, nausea, diarrhea, and severe difficulty breathing. These complaints were frequently acute.

182.     . During this time, Plaintiff repeatedly reported these symptoms to Health Services staff seeking assessment and intervention. Vital sign checks indicated dangerously elevated blood-pressure and pulse readings. The medical staff did not provide sufficient care and ignored obvious needs. Plaintiff asserts that he should have been hospitalized at this time.

183.     In November 2020, Plaintiff began experiencing significant cognitive and sensory symptoms.

184.     Despite repeated "sick-call" forms submitted, and repeated in-person requests for medical attention to Health Services staff, and similar requests directed to Associate Wardens through "electronic requests to staff", Plaintiff was consistently ignored, and his symptoms of COVID-19 were not addressed.

185.     On November 17th, despite testing positive again on November 16th, 2020, vital sign checks stopped.

186.     Plaintiff was not seen by Health Services staff until December 8, 2020 by a physician's assistant or mid-level practioner - 49 days after first testing positive.

187.     Plaintiff was seen by Dr. F. Chinwalla on December 14, 2020. Plaintiff's first and only doctor's appointment in 56 days after testing positive. Chinwalla was advised by Plaintiff of his continuing symptoms but this appointment resulted in no medical interventions and no insight sought into his symptoms.

188.     Chinwalla scheduled Plaintiff for a follow-up appointment on March 15, 2021, and for blood-work labs in February 2021. As of the date

48

undersigned, the March 15, 2021 appointment has been canceled without explanation and without indication when it will be rescheduled.

189. After receiving results of February 2021 blood-work labs, Dr. F. Chinwalla put an "administrative note" on Plaintiff's medical records that Plaintiff, who has previously been diagnosed with chronic kidney disease, needs to be screened for "ARF" an abbreviation for "Acute Renal Failure" due to concerning indicators in those lab results. However, medical still has not consulted or informed Plaintiff of these concerns or treated the Plaintiff accordingly.

190. Plaintiff repeatedly has requested his medical records. His requests for these records to which he is entitled and has a property interest have been ignored by Health Services staff and Defendants named and unnamed. In violation of 5 U.S.C. § 551, § 552a(d)(1), 28 C.F.R. § 513.42, BOP Program Statement P1350.02 Section 14, and several provisions of the Health Insurance Portability and Accountability Act.

191. When Plaintiff in person asked Defendants Turner-Foster and Haczynski for his medical records, he was told that he would not receive them "until after [he] cleared quarantine or unless [he] obtained a court order." They added that Administration had instructed Health Services to deny Plaintiff and others their medical records because "everyone is going to court" for Compassionate Release or to sue.

192. Plaintiff's CJA attorney appointed for his compassionate release motion received Plaintiff's medical records from the U.S. Attorney's office on March 10, 2021. Plaintiff's attorney tried multiple times to obtain Plaintiff's medical records from November to March and was consistently ignored.

49

193.   Plaintiff continues to experience long-term symptoms and likely long-term or life-long damage from his COVID-19 illness due in large part from the failure to obtain medical care or treatment. Health Services staff instructed Plaintiff throughout the COVID-19 outbreak to "lie down" or "take a tylenol" and "it would go away on its own," but did no provide treatment to address his illness or mitigate his symptoms. This was the extent of the "treatment" provided to Plaintiff and many other inmates in 5812. This was inadequate and given the severity and risks of COVID-19, irreparably harmed the Plaintiff.

194.    Plaintiff seems to be experiencing a worsening kidney condition as indicated by lab work that required treatment. This could be caused by or exacerbated by his COVID-19 illness which can cause dangerously acute kidney injuries.

195.    Plaintiff is likely suffering from a "long COVID" which effects 10-30% of COVID patients for months after their illness and after they no longer test positive. "Long COVID" is not well understood, but this does not mean Plaintiff should be ignored and left untreated.

196.    When Plaintiff asked Defendants Turner-Foster and Haczynski on December 3, 2020 if there was any plan to address "Long COVID" or continuing symptoms, Defendants attempted to ignore or deflect Plaintiff's questions.

197.    When Plaintiff, on December 3, 2020 asked when he would be seen by a doctor or receive treatment, Defendants Haczynski told Plaintiff that "sick-call" requests have an 8-week waiting list and that's if they (Health Services staff) "decide to see you." He stated that he would not move to schedule Plaintiff for an appointment despite multiple "sick-call" forms submitted and stated "any time you file another sick-call form you go to the back of the

line."

198.     Plaintiff sought to get medical attention through "electronic request to staff" feature on the Bureau of Prisons' Trulinks messaging system-- essentially an in-house email system--to associate wardens. One Associate Warden, Defendant Kodger, repeatedly responded to Plaintiff with a "form letter" sentence that Plaintiff's concerns would be "referred to the appropriate department" for response. FCI Fort Dix's warden at that time, Defendant Ortiz, was no where to be found or contacted.

199.     Plaintiff, after being ignored for weeks, had family and friends reach out to BOP's Northeast Regional office and Central office to no avail and only received responses after reaching out to Congressional representatives regarding his serious concerns.

200.     Plaintiff asserts his repeated complaints, and symptoms both visible and obvious as well as self-reported should have triggered a heightened duty of care and compelling need for medical attention.

201.     Since December 14, 2020, Plaintiff has only received sporadic temperature checks by Health Services staff after housing unit 5812 experienced a second quarantine lockdown and viral spread starting February 25, 2021 and continuing present. Temperature checks as the only symptom checked are essentially irrelevant for the Plaintiff and other inmates as: (A) Plaintiff never experienced fever or febrile symptoms; and (B) almost all 5812 inmates did not experience fever, or high temperatures in the outbreak; and (C) Plaintiff only knows of 4 or 5 inmates out of more than 300 who have lived in 5812 since October who presented with fever or high temperatures. Further, temperature checks have no use in treating Plaintiff for his medical conditions nor should they be considered an adequate response.

51

202.     On several occasions from October 2020 to present Plaintiff has been subjected to retaliatory searches, urine drug tests, harassment, and attempted intimidation for pursuing access to medical care, and his civil rights. He has received this treatment for seeking his own rights as well as pursuing relief through a broken and dysfunctional administrative remedy system and for helping other inmates to do the same. Plaintiff was frequently searched by staff for contacting a local reporter seeking to investigate and publish information on the FCI Fort Dix outbreak, and Defendant's failures to provide medical care, take proper precautions to protect inmates, and provide safe and sanitary conditions.

203.     Despite being ill, Plaintiff Thieme and others was compelled to forced labor to move heavy lockers, beds and other furniture and remove trash under threats of disciplinary lockup and punishment, and abuse of legal process.

204.     Staff attempted on several occasions to compel Plaintiff to shovel snow during winter of 2020-2021, despite being ill under similar threats described above. Plaintiff observed others being forced to shovel snow during inclement weather despite being obviously ill.

205.     Staff have threatened Plaintiff and others many of whom were still ill. By "making an example" of inmates by forcing them into labor and transporting them to the East Compound of FCI Fort Dix on December 28, 2020, and using arbitrary inspections / searches to harass and intimidate and select other random candidates for forced labor and transportation to the East Compound in the days following, and by punishing those who objected or refused. Such shows of force, sometimes by Officers dressed in riot gear with rifles and bear-mace, were used to instill fear and buttress threats of disciplinary punishments for refusal and non-compliance.

52

206.    Staff have directly told Plaintiff and others "want to go to the East side?" when seeking medical attention or attempting to file administrative remedies through January and February 2021 as a threat and intimidation tactic.

207.    Staff typically use threats of disciplinary punishment to compel inmates to prepare the unit to pass "inspections" by BOP officials to "put on a good show" after months of forcing Plaintiff and other inmates to tolerate and live in unsafe and unsanitary conditions and refusing to provide inmates access to cleaning materials during those months, or ignoring needs to address the general disrepair, sanitation or safety issues at other times.

208.    Defendant Turner-Foster swore before this Court in June 2020 that inmates were receiving new face masks each week. This was not true. Plaintiff received 2 surgical face masks in the last two weeks of March 2020, 3 canvas cloth masks at once in April 202, and 2 additional canvas cloth masks at once in February 2021. These canvas cloth masks were supposed to be "washable" but Defendants have provided no cleaning supplies or safe method for inmates like Plaintiff to wash his masks.

209.    Plaintiff asserts he has personal knowledge that Defendants have caused inaccurate medical information to be added to his and other inmates' medical records that compromises the accuracy and integrity of those records and could impact his or other inmates' property interests in the records or his or their future access to medical care.

210.    Plaintiff has seen and experienced Defendants' acts of not following their own policies, regulations and directives concerning wearing of PPE, protection procedures and quarantine protocols that contributed to the outbreak and rapid of infections at FCI Fort Dix.

53

211.    Plaintiff alleges that Defendants Kodger, Reiser, and Turner-Foster and other Defendants made misrepresentations to the courts in sworn declarations and may have knowingly committed several instances of perjury. These misrepresentations compromised the ability of inmates to get timely relief that could have prevented this outbreak or secured them from being infected or sickened by COVID-19.

212.    Plaintiff alleges Defendants interfered with inmates' attempts to file for compassionate release, Home Confinement or other relief through misrepresentations and deceptions and not following their own established policies, regulations or directives and did so using arbitrary and capricious means or rationales.

213.    Plaintiff has been denied sufficient or adequate medical care, denied access to medical care, denied access to his medical records and has personal knowledge from his own observations of events and the trusted reliable accounts of other inmates with whom he has regularly conversed that they have experienced the same denials.

214.    Plaintiff has observed named administrative Defendants being indifferent to the needs of their own staff, and that this facility has been deliberately understaffed and underprepared or unprepared at times Plaintiff and others faced peril from this outbreak.

215.    Plaintiff asserts that many of the injuries, deprivations, infringements and harms to which he and other inmates have been subjected are directly caused by a perverse prevailing attitude among Defendants that prisoners are subhuman and unworthy of having their rights, privileges, and immunities, legal or constitutional protections, human rights, medical needs or base human needs respected or provided for by Defendants. For this reason FCI Fort Dix is a facility in egregious disrepair subjecting inmates to unsafe

54

conditions, substandard medical care and no one in a position of official authority cares to address it, in defiance of their obligations under 18 U.S.C. § 4042.

## C) SUMMATION

210.     In sum, Federal Bureau of Prisons, FCI Fort Dix, and Defendants named or unnamed have thumbed their noses at the judiciary, Congress, media, advocacy organizations, inmates, their families, and attorneys, and have continued in a course of illegal conduct in the hope of thinking themselves immune from accountability or consequences.

211.     Plaintiff asserts that the unnecessary risks, preventable injuries and constitutional violations he and other inmates in housing unit 5812 experienced are similar to those of inmates in other housing units at FCI Fort Dix.

212.     Plaintiff further asserts that these same unnecessary risks, preventable injuries and constitutional violations are due only to the acts and omissions of the Defendants.

213.     Plaintiff is saddened, angered, and aggrieved that the acts and omissions of the Defendants which jeopardized and injured him as well as several thousand others, and which also led to the wrongful deaths of five (5) fellow inmates so far due to the COVID-19 outbreaks at FCI Fort Dix. Plaintiff has confirmed details of four (4) of these deaths personally and has reason to believe a fifth inmate died last year shortly after release.

214.     Plaintiff asserts, that the mistakes made, risks exposed, harms caused, injuries sustained and constitutional rights violated are the undeniable and indefensible manifestation of a calcified culture of

55

presumptuous arrogance and the callous indifference of absolute power exhibited by the Defendants and other employees of the Federal Bureau of Prisons. In the absence of accountability and oversight and due to structural failures which expose the Federal Bureau of Prisons as egregiously dysfunctional, inefficient, overly bureaucratic, and prone to cruelty.

## CLAIMS FOR RELIEF

215.    For all counts herein, Plaintiff incorporates by reference the allegations set forth in paragraphs numbered 1 through 214 as if fully set forth hereinbelow.

## COUNT ONE
### Civil Rights Violations and Conspiracy

216.    This count raises under the civil rights act, 42 U.S.C. § 1981 et seq, 28 U.S.C. § 1331, and the Constitution of the United States, as enlarged by the Supreme Court in Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971).

217.    Defendants have failed and continue to fail to provide reasonably safe and sanitary conditions in violation of the Plaintiff's Eighth Amendment rights.

218.    Defendants have failed and continue to fail to provide adequate medical care including failing to provide access to adequate care for serious medical needs, in violation of the Plaintiff's Eighth Amendment rights.

219.    Defendants have failed and continue to fail to provide a level of treatment necessary to protect Plaintiff's liberty interest including his liberty and property interests in his right to treatment and medical care and to attain or sustain good health, in violation of Plaintiff's Fifth Amendment rights.

56

220.    Defendants have failed and continue to fail to provide a sufficient number of adequately trained staff to render essential care and treatment during an infectious disease pandemic crisis, in violation of Defendant's Eighth Amendment and Fourteenth Amendment (Equal Protection) rights.

221.    Defendants have failed and continue to fail to ensure patient records contain accurate, up-to-date, and relevant information necessary to enable medical staff and others to provide adequate care or treatment, or to protect Plaintiff's liberty and property interests in such accurate records, and future care or treatment, in violation of the Plaintiff's Fifth and Eighth Amendment rights.

222.    Defendants have acted and continue to undermine Plaintiff's rights to seek redress for grievances and to subsequently pursue redress by access to the courts, in violation of Plaintiff's First, Fifth, and Fourteenth Amendment rights.

223.    Defendants have sought, through intimidation, fear, and threats Plaintiff's and Class Plaintiffs' forced labor and involuntary servitude despite neither Plaintiff or Class Plaintiffs having "compulsory labor" specifically or expressly imposed upon him as a component of sentence by the sentencing court; these acts of Defendants constitute a violation of the Plaintiff's Fifth, Eighth, and Thirteenth Amendment rights.

224.    Defendants have been consciously aware of the factual allegations set forth in this complaint for a substantial period of time; through Defendants' deliberate indifference in policy, customs, acts and divisions, Defendants failed to address adequately the abuses described in this complaint even though they consciously knew of these abuses.

57

225.    Defendants have full power, authority, and control, through color of official right over the affairs of FCI Fort Dix, the living conditions within the facility, and the fates, health, welfare, and conditions of the inmates charged to their care.

226.    The acts and omissions described herein infringe upon Plaintiff's and other inmates' legal rights, and substantive liberty and property interests and constitute resistance to their full enjoyment of rights, privileges and immunities secured or protected by the Constitution and laws of the United States, and deprive Plaintiff and Class Plaintiffs of these rights, privileges, and immunities.

227.    Unless restrained by the Court, Defendants will continue to engage in the conduct and practices set forth that deprive Plaintiff and Class Plaintiffs of the rights, privileges, and immunities secured or protected by the Constitution and laws of the United States and will continue to cause or inflict irreparable harm to and upon the Plaintiff and proposed class.

228.    In light of the above, Plaintiff asks this Court to permanently enjoin Defendants, their agents, employees, subordinates, successors in office, and all those acting in concert or participation with them from continuing the acts, practices, and omissions set forth above.

229.    Plaintiff further asks this Court to enjoin Defendants, their agents, employees, subordinates, successors in office, and all those acting in concert or participation with them to take all actions needed to bring them into compliance with federal law and to provide constitutional standards of care to Plaintiff and other persons who reside at FCI Fort Dix.

230.    Plaintiff asks for other damages and costs as provided by law.

## COUNT TWO
### Rehabilitation Act Violation

231.     This Court arises under the Rebilitation Act, 29 U.S.C. § 794.

232.     Defendant Federal Bureau of Prisons is an agency of the federal government as the term is defined by 5 U.S.C. § 551(1).

233.     By denying adequate medical care as described above, Defendants denied Plaintiff a benefit of a program or activity of an agency or constituent thereof (i.e. FCI Fort Dix) receiving federal funding; and of a program or activity of an executive agency.

234.     Plaintiff asserts he was discriminated against as an inmate with medical conditions who was denied medical care by Defendant Federal Bureau of Prisons and is entitled by statute to sanctions for relief.

## COUNT THREE
### Civil RICO Violations and Conspiracy

235.     This Court arises under the Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.

236.     Plaintiff alleges that Defendants "Federal Bureau of Prisons" and "FCI Fort Dix" are "enterprises" within the meaning of 18 U S.C. § 1961(4) which is engaged in the activities of which affect interstate or foreign commerce.

237.     As set forth above, Named and Unnamed Defendants on multiple occasions engaged in conduct to compel labor by means of force, threats of force, physical restraint, threats of physical restraint; by means of abuse or threatened abuse of law or legal process; or by means of a common scheme, plan, or pattern intended to cause Plaintiff and proposed Class Plaintiffs to believe

59

that if he did not perform such labor he would suffer serious harm or physical restraint.  Such Defendants benefited and received value from such forced labor derived from such threats resulting in a crime of "forced labor" within the meaning of 18 U.S.C. § 1589.

238.      "Forced Labor" constitutes "racketeering activity" as that term is defined in 18 U.S.C. § 1961(1)(B) and satisfies the requirement for a RICO predicate act and for a nexus with interstate commerce.

239.      As set forth above, Named and Unnamed Defendants on multiple occasions recruited, transported, and obtained persons including Plaintiff and other inmates for forced labor or attempted or conspired to do so; resulting in a crime of "trafficking with respect to involuntary servitude and forced labor" within the meaning of 18 U.S.C. § 1590.

240.      "Trafficking with respect to involuntary servitude and forced labor" constitutes "racketeering activity" as that term is defined in 18 U.S.C. § 1961(1)(B) and satisfies the requirement for a RICO predicate act for a nexus with interstate commerce.

241.      As set forth above, Named and Unnamed Defendants on multiple occasions employed extortionate means to obtain the property of another -namely infringements upon Plaintiff's and other inmates' liberty interest and property interests in their civil rights, medical care, and health - by employing threatened force, violence, fear, and did so under color of official right, resulting in a crime of "extortion" within the meaning of 18 U.S.C. § 1951.

242.      "Extortion" constitutes "racketeering activity" as that term is defined in 18 U.S.C. § 1961(1)(B) and satisfies the requirement for a RICO predicate act and for a nexus with interstate commerce.

243.     As set forth above, Named and Unnamed Defendants on multiple occasions employed intimidation, threats, and physical force to tamper with or retaliate against persons including Plaintiff and other inmates to interfere with, delay, or prevent filings and statements at official proceedings including administrative remedies and court motions; acted to induce persons to withhold such filings; and to alter, corrupt, or conceal objects including Plaintiff's and other inmates' medical records and administrative remedies and legal document filings to impair the integrity of their availability for official proceedings; or to evade legal process, resulting in a crime of "tampering with a witness or victim" or "retaliating against a witness or victim" within the meaning of 18 U.S.C. § 1512 and § 1513.

244.     "Tampering with a witness or victim" and "retaliating against a witness or victim" constitute "racketeering activity" as that term is defined by 18 U.S.C. § 1961(1)(B) and satisfies the requirement for RICO predicate acts and for a nexus with interstate commerce."

245.     Defendant's multiple acts as detailed above constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

246.     Defendants and Defendants' agents, associates, employees, subordinates, and all those acting in concert or in participation with them have conducted and have conspired to conduct the affairs of the Federal Bureau of Prisons and FCI Fort Dix through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and (d).

247.     As a direct and proximate result of these violations of 18 U.S.C. § 1962(c) and (d), Plaintiff suffered actual damages as a result of injury to his person and injury to property.  Similar damages were suffered by proposed class plaintiffs.

61

248.     Defendants are liable to Plaintiff for treble damages together with all costs of the action plus reasonable attorney's fees, as provided under 18 U.S.C. § 1964(c).

## COUNT FOUR
### Trafficking Victims Protection Act Violations and Conspiracy

249.     This count arises under the Trafficking Victims Protection Act, 18 U.S.C. § 1581, et seq, and the civil remedies provided under 18 U.S.C. § 1595 and § 1595A.

250.     As set forth above in Count Three, Defendants acts constituted the crimes of "forced labor" within the meaning of 18 U.S.C. § 1589 and "trafficking with respect to involuntary servitude and forced labor" within the meaning of 18 U.S.C. § 1590, and constituted variously the substantive crime, attempt to commit said crimes and conspiracy to commit said crimes.

251.     Plaintiff alleges that he and other inmates were threatened by Named and Unnamed Defendants that they could face punishment by placement, in solitary or disciplinary confinement or lengthened sentences (by loss of 18 U.S.C. § 3624 good conduct time credits) if they refused to work, constituting an abuse or threatened abuse of law or legal process. See 22 U.S.C. § 7102

252.     Plaintiff alleges that Defendants received financial and other valuable benefit by virtue of their employment in the form of an unjust enrichment or economic windfall as a result of uncompensated, under-compensated, or compulsory labor of prisoners confined at FCI Fort Dix.

## COUNT FIVE
### Common Law Civil Conspiracy

253.     All Defendants, Named and Unnamed formed an agreement and engaged in conduct in furtherance of a common scheme, plan, pattern, or course of

62

conduct to undermine, deprive, infringe upon, and injure Plaintiff's and proposed Class Plaintiffs' constitutional rights, liberty interests, and property interests, by acts and omissions set forth above.

COUNT SIX

Privacy Act Violations

254. This count arises under the Privacy Act, 5 U.S.C. § 552a, and provisions of the Health Information Portability and Accountability Act.

255. Employees of Defendant Federal Bureau of Prisons and FCI Fort Dix improperly and illegally withheld the Plaintiff's medical records which were requested in accordance with 5 U.S.C. § 552a(d)(1) to which Plaintiff was entitled to request and receive.

256. Federal Bureau of Prisons and FCI Fort Dix have an obligation under statute to create and maintain accurate and reliable medical records but have failed to do so, which injures Plaintiff's property interest in having accurate medical record and creates risk of irreparable injury and future harm if inaccurate medical records created by Defendants impede his access to medical care or treatment or result in mistreatment in reliance on said inaccurate records.

257. Defendants also released private medical information to other persons without the consent of the Plaintiff.

258. Plaintiff knows inmates in proposed class suffer similar injury and risk described in the previous paragraphs.

259. Plaintiff is entitled to civil remedies under 5 U.S.C. § 552a(g).

COUNT SEVEN

Irreparable Injury

260. Additionally, Defendants have caused substantial and ongoing harm to Plaintiff and has clear long-term consequences for Plaintiff and have caused

63

and continue to cause substantial and ongoing injury to Plaintiff. Similar harm and injury has been and continues to be experienced by the proposed class.

## COUNT EIGHT
### Administrative Procedures Act Claims

261.    This count arises under the Administrative Procedures Act, 5 U.S.C. § 551, §§ 701-706.

262.    Defendants have a mandatory duty under federal law to provide for safe and sanitary living conditions, to provide adequate and timely medical care, and to not employ excessive and unlawful force or threat of force under claim of color of law or color of authority against inmates to intimidate and threaten or retaliate.

263.    Defendants have policies in place to guarantee inmate's access to the courts or to redress for their grievances through its administrative remedy program.

264.    However, Defendants have violated the Administrative Procedures Act by acting arbitrarily and capriciously by ignoring, defying, or disregarding established policies, regulations, statutes, and directives in violation of Plaintiff's and proposed Class Plaintiffs' constitutional rights.

## COUNT NINE
### Declaratory Judgment Act Claims

265.    In order to restore Plaintiff's interests in this controversy, Plaintiff requests that, pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure, this Court declare the respective rights and duties of the parties.

266.     A valid case or controversy exists sufficient for this Court to declare the rights and remedies of the parties in that Defendants are creating and maintaining unsafe and unsanitary conditions at FCI Fort Dix, not abiding by their own COVID-19 protective protocols, denying requisite medical care to inmates, interfering with access to the courts and administrative remedies, and engaging in abusive force, threats, physical restraint, intimidation and retaliation for inmates pursuing their constitutional rights and for demanding proper medical care.

267.     The Plaintiff has requisite standing to request this declaration in that he is presently an inmate at FCI Fort Dix suffering from these injuries and deprivations.

268.     Based on the preceding allegations, there exists between the parties a substantial controversy of sufficient immediacy and reality to warrant declaratory relief. This controversy is ripe for determination at this time.

269.     In this count and counts above, Plaintiff has no adequate remedy at law and unless this Court restrains and enjoins the illegal and unconstitutional conduct described in this complaint, Plaintiff and others will suffer irreparable injury.

**PRAYER FOR RELIEF**

Plaintiff respectfully asks this Court for the following relief:

(A)  That this Court appoint a <u>Special Master</u> in accordance with 18 U.S.C. § 3626 to ensure the protection of inmate constitutional rights and speedy redress for Defendants' violation of the same; to ensure inmate access to sufficient and timely medical care and safe conditions; for processing release of medically

65

vulnerable or otherwise eligible inmates; and to enforce and ensure constitutional administration at FCI Fort Dix.

(B) For relief in the form of a declaration that actions and conduct of the Defendants was in violation of the First, Fifth, Eighth, Ninth, Thirteenth, and Fourteenth Amendments of the United States Constitution;

(C) Enjoin the Defendants, their officers, agents, employees, subordinates, successors in office and all those acting in concert or participation with them from continuing the abusive acts, omissions, and practices set forth in this complaint;

(D) Enjoin the Defendants, their officers, agents, employees, subordinates, successors in office, and all those acting in concert or participation with them to take whatever actions will ensure lawful conditions of confinement are afforded to inmates at FCI Fort Dix.

(E) On all counts and claims for relief, Plaintiff demands judgment in his favor and to award damages jointly and severally for compensation, punitive, exemplary, and future damages, to punish and deter future similar conduct by each Defendant subject to these damages, in an amount NOT LESS THAN five billion dollars (US $5,000,000,000.00).

(F) For expenses and costs of litigation, reasonable attorney's fees and interest, pursuant to 28 U.S.C. § 1920, 28 U.S.C. § 1961, 42 U.S.C. § 1988.

(G) Other relief that the Court may deem appropriate, equitable, and just, or otherwise in the interest of justice, and

(H) Maintain jurisdiction on this action until Federal Bureau of Prisons, FCI Fort Dix and other Defendants HAVE COMPLIED with this Court's orders.

66

## DEMAND FOR A JURY TRIAL

On all facts and claims asserted, Plaintiff demands a trial by jury.

## DECLARATION PURSUANT TO 28 U.S.C. § 1746

I, Christopher Thieme, under penalty of purjury of the laws of the United States of America, declare that the foregoing is true and correct to the best of my knowledge.

Executed on ____April 18____, 2021.

Respectfully submitted,

Christopher Thieme
Plaintiff Pro Se
Reg. No. 69451-050
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640

67

## ENDNOTES

1.  Matt McKillop & Alex Boucher, "Aging Prison Populations Drive Up Costs", The Pew Charitable Trusts (Feb. 20, 2018), https://www.pewtrusts.org/en/ research-and-analysis/articles/2018/02/20/aging-prison-populations-drive-up-costs; USDOJ, Office of Inspector General, "The Impact of an Aging Inmate Population on the Federal Bureau of Prisons" (Feb. 2016), https://www.oversight.gov /sites/default/files/oig-reports/e1505.pdf

2.  ACLU, "COVID-19 Model Fines Nearly 100,000 More Deaths Than Current Estimates, Due to Failures to Reduce Jails" (April 2020), https://www.aclu.org /sites/default/files/field_document/aclu_covid19-jail report_2020-8_1.pdf; also World Health Organization, Regional Office for Europe. "Preparedness, Prevention and Control of COVID-19 in Prisons and Other Places of Detention: Interim Guidance" (March 15, 2020) (explaining prisoners "are likely to be more vulnerable to the [COVID-19] outbreak than the general population because of the confined conditions in which they live together for prolonged periods of time"), https://www.euro.who.it/_data/assets/pdf_file/0019/434026/ Preparedness-prevention and control of COVID-19 in prisons.pdf.

3.  Ibid. also Kevin Johnson "Feds Struggle to Provide Prison Medical Care" USA Today (March 28, 2016), https://www.usatoday.com/story/news/politics/2016/03 /28/bureau-of-prisons-justice-department-review/8233734/; Danielle Ivory "We Are Not a Hospital: A Prison Braces for the Coronavirus". New York Times (March 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html.

4.  Kim Bellware, "Prisoners and Guards Agree About Federal Coronavirus Response: 'We Do Not Feel Safe'" Washington Post (Aug. 24, 2020), https:// www.washingtonpost.com/nation/2020/08/24/prisoners-guards-agree-about-federal-coronavirus-response-we-do-not-feel-safe/

5.  Ibid.; Sens. Durbin and Grassley, Letter to DOJ Inspector General Michael Horowitz (April 21, 2020)

6.  Statement from Press Secretary Regarding President's Coronavirus Task Force (Jan. 29, 2020), https://www.whitehouse.gov/briefings-statements/statement-press-secretary-regarding-presidents-coronavirus-task-force/

7.  Luke Barr, "Bureau of Prisons Coronavirus Response Under Fire: 'Reactive', Not 'Proactive', Inmates, Staff Say", ABC News (Apr. 10, 2020); https://

68

abcnews.go.com/Health/bureau-prisons-coronavirus-response-fire-reactive-proactive-inmates/story?id=70063263

8. Federal Bureau of Prisons, "COVID-19 Action Plan, Agency Wide Operations", https://www.bop.gov/resources/news/20200313_covid-19.jsp; also BOP "Statement from BOP Director" (March 26, 2020), https://www.bop.gov/resources/news 20200326_statement_from_director.jsp

9. United States v. Matthews, Case No. 20-1635, 2021 U.S. App. LEXIS 6944 (6th Cir. March 8, 2021)

10. Barr, supra, note 7

11. David Shortell, Kara Scannell & Manu Raju, "Exclusive: 'I Don't Think Anybody Was Ready For This COVID' Says Head of Federal Prisons", CNN (Apr. 11, 2020). https://www.cnn.com/2020/04/10/politics/exclusive-interview-bop-carvajal/index.html; Janet Reitman "Something Is Going To Explode: When Coronavirus Strikes a Prison". New York Times (April 18, 2020), https://www.nytimes.com/2020/04/18/magazine/oakdale-federal-prison-coronavirus.html. Also, an associate warden nonetheless asserted that "[t]he BOP's response has been swift and now appears to be proving effective". Juan E. Segovia Decl. Para. 3, Livas v. Myers, 20-CV-422 (W.D.La. Apr. 10, 2020), ECF No. 8-1.

12. For Example, in April 2020, Attorney General Barr acknowledges "the dangers that COVID-19 poses to our vulnerable inmates" as well as "significant levels of infection at several of our facilities", Office of Attorney General (DOJ), Memorandum for Director of Bureau of Prisons (Apr. 3, 2020).

13. Tonya Simpson & Luke Barr, "As Coronavirus Spreads Through Nation's Jails and Prisons, Lawmakers Demand More Transparency on Toll", ABC News, Aug. 6, 2020, https://abcnews.go.com/Politics/coronavirus-spreads-nations-jails-prisons-lawmakers-demand-transparency/story?id=72213761



U.S. Department of Justice
Federal Bureau of Prisons
Federal Correctional Institution
P.O. Box 38
JBMDL, New Jersey 08640

---

RECEIVED

MAY - 3 2021

AT 8:30_____M
WILLIAM T. WALSH
CLERK

October 9, 2020

MEMORANDUM FOR INMATE POPULATION

FROM:      LCDR Ronell Copeland, RN, QIICN

SUBJECT:      COVID-19 Update


Please be advised, there are currently inmates at FCI Fort Dix who tested positive for COVID-19 and have been placed in isolation.

Continue to observe infection prevention and control measures including maintaining social distancing, sanitizing high touched surfaces, frequent handwashing, avoid touching your eyes, nose and mouth. Also, be sure to cover your cough using a tissue and immediately dispose of the used tissue. Report the following symptoms to health services: fever, cough, shortness of breath, new-onset trouble speaking/difficulty breathing/loss of taste or smell, fatigue, muscle or body aches, sore throat, stuffy/runny nose and GI upset. Finally, it is mandatory that you wear your face covering provided by staff.

Be assured, all inmates being treated for COVID-19 will not be returned to general population until they are medically cleared.

COVID-19 is a respiratory illness spread from person to person through the respiratory droplets of an infected person. There is no vaccine or antiviral medication to treat this disease therefore, prevention is key.

# NOTICE TO INMATE POPULATION (AMENDED)
## October 16, 2020
## Cancellation of Inmate Visiting

Due to a recent increase in the number of positive COVID-19 cases both in the community and the institution, all social visits will be cancelled immediately. Although we value visitation as an essential part of rehabilitation, at this time we must make the difficult decision in order to protect the health and wellness of all who live, work and visit this institution.

Please contact your visitors to inform them of the change. While this suspension of visitation will be temporary, we recognize the immediate impact this decision may have on individuals throughout the institution.

We encourage you to use other means and resources available such as TRULINCS and mail to remain connected to your loved ones. During this difficult time, the FCI Fort Dix staff appreciates your patience and understanding as we continue to face this virus together. We will inform you of any changes affecting this matter.

5812



U.S. Department of Justice
Federal Bureau of Prisons
Federal Correctional Institution
P.O. Box 38
Joint Base MDL, New Jersey 08640

October 21, 2020

MEMORANDUM TO INMATE POPULATION

FROM:      LCDR Ronell Copeland, RN, QIICN

SUBJECT:   Notice to Inmate Population

Please be advised, an inmate housed in SHU tested positive for COVID-19 and was isolated in 5851, 1st floor. A second inmate who exhibited symptoms of COVID-19, despite his negative test result, was isolated in Health Services on the West Compound upon arrival from FCI Elkton.

For Information Purposes:

The virus called Coronavirus (COVID-19), probably emerged from an animal source, is a respiratory disease which spread from person to person via respiratory droplets when an infected person sneezes or coughs. Symptoms including fever, cough, shortness of breath, new-onset trouble speaking/loss of taste or smell, fatigue, muscle or body aches, sore throat, and stuffy/runny nose, which may occur within 2 to 14 days of exposure. There is no vaccine or antiviral medications to treat this disease, prevention is key.

5812



U.S. Department of Justice
Federal Bureau of Prisons
Federal Correctional Institution
P.O. Box 38
Joint Base MDL, New Jersey 08640

October 26, 2020

MEMORANDUM TO INMATE POPULATION

FROM:    LCDR Ronell Copeland, RN, QIICN

SUBJECT: Notice to Inmate Population

Please be advised, 54 confirmed cases of COVID-19 identified in unit 5812 have been isolated in unit 5851, 2nd floor. A confirmed case of COVID-19 identified in SHU is being isolated in Health Services, West Compound.

For Information Purposes:

The virus called Coronavirus (COVID-19), probably emerged from an animal source, is a respiratory disease which spread from person to person via respiratory droplets when an infected person sneezes or coughs. Symptoms including fever, cough, shortness of breath, new-onset trouble speaking/loss of taste or smell, fatigue, muscle or body aches, sore throat, and stuffy/runny nose, which may occur within 2 to 14 days of exposure. There is no vaccine or antiviral medications to treat this disease, prevention is key.

# Congress of the United States
## Washington, DC 20515

December 8, 2020

Mr. Michael Carvajal
Director
Federal Bureau of Prisons
320 First Street N.W.
Washington, DC 20534

Dear Mr. Carvajal,

We write today to again share our serious concerns regarding the Bureau of Prison's (BOP's) response to the ongoing COVID-19 outbreak at FCI Fort Dix, and to follow up with additional questions. In particular, we are deeply alarmed that BOP lifted the transfer moratorium for FCI Fort Dix on November 24, 2020. By resuming transfers of incarcerated individuals into and out of the facility in the midst of a severe outbreak, BOP is putting at risk the lives of both staff and incarcerated individuals. We urge you to reinstate the transfer moratorium for FCI Fort Dix until there are no active cases at the facility.

In light of these concerns, we respectfully request that BOP provide detailed answers to the following questions no later than Monday, December 14, 2020.

1. On November 24, 2020, BOP lifted the moratorium on transferring incarcerated individuals in and out of FCI Fort Dix despite the still-growing outbreak at the facility at that time. To reiterate the request from our previous letter, will BOP commit to halting all transfers of incarcerated individuals to FCI Fort Dix until the current COVID-19 outbreak at the facility has ended and there are no active cases among incarcerated individuals or staff? If not, please explain why BOP will not make such a commitment.

2. During the month of November, the number of COVID-19 cases among incarcerated individuals and staff at FCI Fort Dix spiked to more than 300. In light of the failure to contain the spread of COVID-19 at FCI Fort Dix during this most recent and still ongoing outbreak, has BOP updated infection control protocols, including protocols related to personal protective equipment, cleaning, testing, or the movement of incarcerated individuals? If not, please explain why BOP has not updated such protocols.

3. In the Attorney General's memo on April 3, 2020, he instructed BOP to prioritize home confinement for incarcerated individuals in facilities with the most severe outbreaks. In light of the severe ongoing outbreak at FCI Fort Dix, is BOP currently screening incarcerated individuals at FCI Fort Dix for potential home confinement? If not, when will BOP begin doing so?

4. In various media reports,[1] incarcerated individuals have alleged that FCI Fort Dix is not providing sufficient medical treatment to individuals infected with COVID-19. Please respond to these reports.

5. Please provide a detailed summary of BOP's current plans for allocating and administering COVID-19 vaccines for staff and incarcerated individuals. How does BOP plan to prioritize vaccines when limited supplies are available?

6. When an incarcerated individual at FCI Fort Dix tests positive for COVID-19, are they still able to communicate with family members? If not, please explain the rationale behind such a policy.

7. Please provide a detailed summary of how conditions have changed for incarcerated individuals at FCI Fort Dix during the current COVID-19 outbreak. For example, what facilities are now closed to incarcerated individuals at FCI Fort Dix? What resources are unavailable to incarcerated individuals? Are any additional resources available to incarcerated individuals?

8. We have heard reports that the heat is not functioning in all facilities at FCI Fort Dix that are currently housing incarcerated individuals. Is this accurate, and if so, what is BOP doing to ensure an appropriate climate inside the facility?

Thank you for your prompt consideration of this urgent matter.

Sincerely,

Robert Menendez
United States Senator

Cory A. Booker
United States Senator

Frank Pallone, Jr.
Member of Congress

Bill Pascrell, Jr.
Member of Congress

Donald M. Payne, Jr.
Member of Congress

Donald Norcross
Member of Congress

---

[1] https://gothamist.com/news/240-prisoners-sick-with-covid-inside-fort-dix-prison

Bonnie Watson Coleman
Member of Congress

Josh Gottheimer
Member of Congress

Andy Kim
Member of Congress

Mikie Sherrill
Member of Congress

Tom Malinowski
Member of Congress

# Congress of the United States
## Washington, DC 20515

November 9, 2020

Mr. Michael Carvajal
Director
Federal Bureau of Prisons
320 First Street N.W.
Washington, DC 20534

Dear Mr. Carvajal,

We write today to express grave concerns regarding the Bureau of Prison's (BOP's) inadequate protocols for COVID-19 testing and inmate transfers. Specifically, we are concerned that BOP recently transferred COVID-19 positive inmates to FCI Fort Dix, which is now facing a second, and potentially severe, COVID-19 outbreak. We strongly urge you to extend the recently enacted moratorium on inmate transfers to FCI Fort Dix to also cover FCI Fairton, and that you continue the moratorium until BOP eradicates the new COVID-19 outbreak at the facility and formulates an effective and accurate testing strategy to protect both staff and inmates from future outbreaks.

Prior to October, BOP had not reported any recent COVID-19 cases among inmates or staff at FCI Fort Dix. However, in early October, BOP reportedly alerted staff at FCI Fort Dix that their facility would begin receiving inmate transfers from FCI Elkton in Ohio. FCI Elkton has been severely affected by COVID-19, with nearly 1,000 known cases among inmates and staff to date.[1] Despite the known risks of inmate transfers during a pandemic,[2] BOP transferred more than 150 inmates from FCI Elkton to FCI Fort Dix in recent weeks. On October 28, 2020, BOP confirmed in an email to congressional staff that 54 inmates tested positive for COVID-19 in the 5812 unit of FCI Fort Dix, which is reportedly the unit into which the FCI Elkton inmates were transferred. On October 29, 2020, BOP confirmed that five FCI Elkton inmates who were transferred to FCI Fort Dix on the evening of October 28, 2020 had rapid-tested positive for COVID-19 upon arrival and were placed in isolation.

While the situation is rapidly evolving, it is clear that BOP does not have an effective plan to ensure COVID-19 positive inmates are not transferred between facilities. The outbreak is now spreading within FCI Fort Dix, and as of November 9, 2020, there are at least 228 active COVID-19 cases among inmates and ten active COVID-19 cases among staff members.[3] The FCI Fort Dix employees responsible for transporting the FCI Fort Elkton transfers may have been exposed to COVID-19 in transit. All FCI Fort Dix inmates, staff, and the surrounding communities are now at increased risk for contracting COVID-19, with potentially deadly consequences.

[1] https://www.bop.gov/coronavirus/
[2] https://www.bop.gov/coronavirus/covid19_status.jsp
[3] https://www.bop.gov/coronavirus/

In light of the rapidly escalating crisis at FCI Fort Dix, we urge you to immediately test all FCI Fort Dix inmates and staff for COVID-19. We appreciate that BOP has instituted a temporary moratorium on transfers into FCI Fort Dix until November 23, 2020. However, rather than using an arbitrary date, we urge BOP to halt all transfers to FCI Fort Dix until BOP institutes an effective and accurate testing strategy for inmates and staff and there are no active cases at the facility. Given that BOP does not currently have an effective strategy for safe inmate transfers, we also request that BOP extend this moratorium to New Jersey's other facility, FCI Fairton.

In regards to an effective COVID-19 testing strategy, we strongly urge you to institute a plan to test all FCI Fort Dix inmates and staff on at least a biweekly basis. FCI Fort Dix's employees are frontline federal workers, and it is unacceptable that BOP is not providing them with regular COVID-19 testing. By failing to test FCI Fort Dix's employees, BOP is needlessly endangering not only these employees but their families, all inmates, and the entire surrounding community.

Additionally, we request that BOP provide detailed answers to the following questions no later than Friday, November 20, 2020:

1) Will BOP commit to halting all inmate transfers to FCI Fort Dix and FCI Fairton until the current COVID-19 outbreak at the facility has ended and there are no active cases among inmates or staff?
2) During the FCI Fort Dix transfer moratorium, will BOP also commit to halting any inmate transfers to FCI Fairton?
3) What is BOP's plan for addressing the current COVID-19 outbreak at Fort Dix, including information on testing, safety protocols, notifications to staff and inmates, as well as any future outbreaks at FCI Fort Dix and ensuring the safety of both inmates and staff?
4) In an email to congressional staff, BOP indicated that inmates who had tested positive for COVID-19 in the previous 90 days and were asymptomatic were not retested before being transferred from FCI Elkton to FCI Fort Dix. Can you verify that all FCI Elkton inmates who previously tested positive for COVID-19 received two negative COVID-19 test results before their transfer to FCI Fort Dix? Please describe, in detail, the process for testing the FCI Elkton inmates prior to their transfer to FCI Fort Dix.
5) What is BOP's overall, long-term COVID-19 testing strategy for FCI Fort Dix? How will BOP update the COVID-19 testing strategy at FCI Fort Dix in light of the recent outbreak?
6) Will BOP begin providing COVID-19 testing to FCI Fort Dix employees? If so, how often will such testing occur?
7) How has FCI Fort Dix spent the CARES Act (P.L. 116-136) funding that has been allocated the facility? Please provide a detailed breakdown.

Thank you for your prompt consideration of this urgent matter.

Sincerely,

Robert Menendez
United States Senator

Cory A. Booker
United States Senator

Frank Pallone, Jr.
Member of Congress

Bill Pascrell, Jr.
Member of Congress

Albio Sires
Member of Congress

Donald M. Payne, Jr.
Member of Congress

Donald Norcross
Member of Congress

Bonnie Watson Coleman
Member of Congress

Josh Gottheimer
Member of Congress

Mikie Sherrill
Member of Congress

Andy Kim
Member of Congress

Tom Malinowski
Member of Congress

# United States Senate

WASHINGTON, DC 20510

January 12, 2021

Warden David Ortiz
Bureau of Prisons
FCI Fort Dix
5756 Hartford & Pointvile Road
Joint Base MDL, New Jersey 08640

Dear Warden Ortiz,

We write today with serious concerns regarding the use of home confinement, as well as overall conditions at FCI Fort Dix, especially in light of the alarming rate of COVID-19 cases at the facility in recent weeks. On March 26, 2020, in an effort to protect incarcerated individuals who were at greater risk of contracting the deadly coronavirus, Attorney General William Barr issued a Memorandum[1] to the Director of the Bureau of Prisons (BOP) to ensure that the agency prioritizes the home confinement program to protect the health and safety of incarcerated individuals and BOP employees. The following week, Attorney General Barr issued a subsequent Memorandum[2] that urged BOP administrators at facilities significantly impacted by the virus to immediately maximize transfers of individuals to home confinement.

In June 2020, during a Senate Judiciary Committee hearing, Senator Booker pressed Director Michael Carvajal about the difficulty of obtaining critical data on.individuals who were released to home confinement in New Jersey. While Director Carvajal assured Senator Booker that he would attempt to get his office this important information,[3] the requested data has still not been received. While we appreciate you and your staff briefing our offices on the COVID-19 outbreaks at FCI Fort Dix, and for your continued correspondence on some of the outstanding facts and figures our offices have requested, there are still questions to be answered in addition to those raised by the two subsequent letters we sent to Director Carvajal.[4]

---

[1] Attorney General William Barr, Memorandum for Director of Bureau [sic] Prisons, Prioritization of Home Confinement As Appropriate in Response to COVID-19 (Mar. 26, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf.

[2] Attorney General William Barr, Memorandum for Director of Bureau of Prisons, Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (Apr. 3, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf.

[3] *Examining Best Practices for Incarceration and Detention During COVID-19, Before the S. Comm. on the Judiciary*, 116th Cong. (2020), https://www.judiciary.senate.gov/meetings/examining-best-practices-for-incarceration-and-detention-during-covid-19.

[4] Letter from Sen. Robert Menendez, Sen. Cory Booker et al. to Director Michael Carvajal, Bureau of Prisons (Nov. 9, 2020), *available at* https://www.menendez.senate.gov/imo/media/doc/Senator%20Menendez%20Letter%20on%20FCI%20Fort%20Dix%20COVID19%20Outbreak%2011.9.20%20Updated.pdf.

1

The conditions at facilities in New Jersey, specifically your facility, have grown increasingly worrisome. We are still very concerned for the safety and well-being of individuals behind bars in New Jersey and across our country. It is critical that you prioritize the use of your statutory authorities to grant home confinement to as many eligible people as possible. To better understand your institution's implementation of the congressionally approved home confinement program, as well as Attorney General Barr's orders to prioritize home confinement to protect individuals behind bars and staff from the deadly coronavirus, we request that you respond to the following questions:

**Home Confinement Program:** The Attorney General's Memorandum laid out discretionary factors to be considered when assessing an individual's eligibility for home confinement and called for BOP officials to make broad, extensive use of the program for all eligible individuals. It remains to be seen, however, whether federal prisons have implemented the program as Congress and the Attorney General intended.

1. On November 9, 2020, you estimated that between April 16 and November 9, 2020, FCI Fort Dix had released approximately 97 people to home confinement under the CARES Act. At the time, this constituted less than 3.5% of the total incarcerated population at FCI Fort Dix, which is a low and minimum security prison. Among the 97 released individuals, 66% were white, 29% were Black, 3% were Asian, 2% were Native American. According to information from BOP, the overall makeup of the population of FCI Fort Dix is 51% white, 47% Black, 1% Asian, and .4% Native American. How do you explain these discrepancies?

2. How many individuals are currently eligible to be transferred to home confinement?

3. In your assessment of an individual's eligibility for release under the home confinement program, you mentioned that factors such as disciplinary history, PATTERN score, and their living conditions upon release weigh into your decision. Please share the underlying offense for every individual denied release, as well as their disciplinary history, PATTERN score, and their stated living condition upon release anonymized to protect the privacy of incarcerated individuals.

4. How many individuals at FCI Fort Dix are ineligible for home confinement?

5. You informed our office that 1,036 incarcerated individuals have a "history of violence", and 588 have an "instant offense of violence". Please provide an explanation for both terms and the difference between the two. How does your facility weigh these classifications for purposes for determining eligibility for home confinement?

5. I understand that you received a list from BOP of individuals to initially screen for home confinement.

    a. How many individuals were on that list?

2

b. How many of those individuals were approved for home confinement?

c. How many of those individuals were denied transfer to home confinement?

d. What is the process for an individual to appeal their denial for home confinement?
e. How many initial applicants that were rejected appealed?

f. What is the success rate on appeal?

6. What is the process for any individual who feels they may be eligible for home confinement, but was not included on the initial list provided by BOP?

7. We have heard from constituents at FCI Fort Dix that it could take months to be approved and then transferred to home confinement. On average, how much time does it take to identify, review, and release an individual under the home confinement program?

8. How many individuals at your facility have been transferred to home confinement from March 2020 until the present?

a. How many individuals have been denied home confinement during that period? Please provide our offices with a report on the age, race, and offense(s) of the individuals who were denied home confinement.

9. Are individuals who are transferred to home confinement provided with reentry resources to connect to local agencies and nonprofits? If so, please provide additional details on what resources are provided to individuals transferred to home confinement.

**Medical Care at FCI Fort Dix:** The Centers for Disease Control and Prevention guidance says to avoid large gatherings and social distance, however, the conditions of confinement do not allow incarcerated individuals to engage in many of the recommended precautions necessary to propery protect themselves. In fact, we know that individuals are grouped in cohorts that could include hundreds of people in close proximity to each other throughout the day. Due to the ease and speed with which COVID-19 can spread, we must ensure that facilities are safe and clean for those who aren't released to home confinement. For those individuals who have tested positive for the virus and require medical care, we have serious concerns about whether the medical care available on-site can adequately treat this complex virus.

1. How often do incarcerated individuals and staff receive new PPE?

2. What is the protocol at your facility to ensure that there is enough PPE, hand sanitizer, and soap for individuals and staff?

3. How much PPE do you currently have in stock?

4. Has FCI Fort Dix taken measures to allow for proper social distancing and minimization of contact between groups of incarcerated indviduals in line with CDC guidance?

3

5. On a prior call with some of our staff, you mentioned dormitory style arrangements on each floor that grouped individuals into cohorts. Some floors house about 100 individuals, while other floors could have as many as several hundred individuals.

    a. Please elaborate on this set-up in more detail.

    b. At the present time, how many cohorts of individuals are on each floor, in each compound?

6. What are you doing to ensure that all individuals in cohorts are COVID-19 negative?

    a. What is the procedure for re-testing individuals in cohorts for COVID-19?

7. What is your procedure for quarantining individuals who have tested positive for COVID-19?

    a. Please describe the space and conditions in which COVID-19 positive individuals are isolated.

    b. Are individuals under medical isolation placed in the segregated housing units? If so, how are you ensuring that medical isolation is *operationally and noticeably distinct* from those who are placed in segregated housing units?

    c. How often do individuals in medical isolation have access to medical staff?

8. Please describe the types of treatments and care available to individuals who have tested positive for COVID-19.

    a. Are they treated on site or are they transferred to an outside treatment center? If they are transferred to an outside treatment center, please detail where individuals are transferred to?

    b. If an individual experiences symptoms (e.g., low oxygen levels) that may require critical care, are they treated on site or transferred to a local hospital?

    c. What kind of drugs are administered to incarcerated patients who are suffering from COVID-19?

    d. Are local officials provided updates on conditions within the facility to ensure public safety? If so, please describe how often and what kind of information is shared and with whom.

This pandemic is challenging for us all, including those who are incarcerated and their loved ones. We urge you to use your authority to transfer individuals who are at risk of suffering complications from the virus to home confinement.

4

Thank you for your time and consideration. We look forward to your prompt attention to this matter.

Sincerely,

Cory A. Booker
United States Senator

Robert Menendez
United States Senator

5

## Congress of the United States
### Washington, DC 20515

January 15, 2021

The Honorable Michael E. Horowitz
Inspector General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Dear Inspector General Horowitz,

We write today to thank you for your oversight of the Bureau of Prisons (BOP) to date during the COVID-19 pandemic, and to urge you to expand your ongoing investigations to include Federal Correctional Institute (FCI) Fort Dix. Earlier this week FCI Fort Dix once again had the most severe COVID-19 outbreak of all federal prisons, and we are alarmed that BOP has repeatedly failed to contain outbreaks at the facility. Additional oversight is urgently required to protect the safety of incarcerated individuals and staff at FCI Fort Dix.

More than 300 incarcerated individuals and 29 staff members at FCI Fort Dix have active COVID-19 cases.[1] This is not the first severe outbreak at the facility, as FCI Fort Dix has faced several waves of COVID-19 infections in recent months. BOP reports that nearly 1,100 incarcerated individuals and 45 staff members at FCI Fort Dix have recovered from the virus, which means that in total more than half of the incarcerated population at the facility has been infected with COVID-19 to date.[2] Even still, these figures may not capture the full picture of COVID-19 infections due to the lack of consistent and universal testing at FCI Fort Dix. In short, BOP has had ten months to learn how to protect the incarcerated individuals and staff at FCI Fort Dix during this pandemic, and has failed.

In response to the outbreaks at FCI Fort Dix, as Members of New Jersey's congressional delegation we have repeatedly called on BOP to improve its strategies for testing and infection control at the facility, including via letters sent to the BOP Director on November 9, 2020 and December 8, 2020. In response, BOP has continued to insist that the situation at FCI Fort Dix is under control. In his response letter dated December 16, 2020, BOP Director Michael Carvajal noted that "the efficacy of the Bureau's mitigation strategies can be seen in the very low number of hospitalized inmates." However, the recent surge in COVID-19 cases at the facility indicates that the BOP's mitigation strategies at FCI Fort Dix are not working. We have also heard reports from constituents with incarcerated family members that BOP is failing to provide sufficient medical care, and that living conditions inside the facility have steeply deteriorated.

In light of the concerns described above, we urge you to immediately investigate the COVID-19 response at FCI Fort Dix, including infection control and testing procedures, access to medical care, impacts on living conditions, and transfers to home confinement. We are gravely

---

[1] https://www.bop.gov/coronavirus/
[2] https://www.bop.gov/locations/institutions/ftd/

concerned that without additional oversight, BOP will continue to endanger the lives of the incarcerated individuals and staff at FCI Fort Dix. Thank you for your consideration of this urgent matter, and we look forward to your prompt reply.

Sincerely,

Robert Menendez
United States Senator

Cory A. Booker
United States Senator

Andy Kim
Member of Congress

Frank Pallone, Jr.
Member of Congress

Bill Pascrell, Jr.
Member of Congress

Donald M. Payne, Jr.
Member of Congress

Donald Norcross
Member of Congress

Bonnie Watson Coleman
Member of Congress

Josh Gottheimer
Member of Congress

Mikie Sherrill
Member of Congress

## Congress of the United States
### Washington, DC 20515

March 3, 2021

Mr. Michael Carvajal
Director
Federal Bureau of Prisons
320 First Street N.W.
Washington, DC 20534

Dear Mr. Carvajal,

We write today seeking information about BOP's reported decision not to provide CARES Act funding to FCI Fort Dix. FCI Fort Dix has faced several disastrous COVID-19 outbreaks. As you develop a spending plan for the additional COVID-19 emergency response funding that Congress recently allocated to BOP, we urge you to ensure that FCI Fort Dix has sufficient resources to protect its staff and all of the incarcerated individuals in its care.

On March 27, 2020, then-President Trump signed the CARES Act (P.L. 116-136) into law. Included in the law was $100 million in emergency funding for BOP to respond to COVID-19. According to the Department of Justice's June 25, 2020 report to the Pandemic Response Accountability Committee, BOP planned to use the CARES Act funding for personal protective equipment (PPE), cleaning supplies, Residential Reentry Centers (home confinement), and other relevant expenses.[1] However, in a letter to our offices dated December 3, 2020, BOP Regional Director N.C. English indicated that BOP did not provide any CARES Act funding to FCI Fort Dix. As a rationale, Director English explained that BOP allocated the CARES Act funding to "those institutions with the most need" and that "FCI Fort Dix has been able to manage its operations without additional CARES Act funding."

Unfortunately, it is clear that FCI Fort Dix did have serious unmet needs related to COVID-19 prevention and mitigation, and that the facility has been unable to safely manage its operations. There have been multiple outbreaks among both staff and incarcerated individuals at the facility in recent months, with the most severe peak to date occurring on January 12, 2021. On that date, 797 incarcerated individuals at FCI Fort Dix – nearly one-third of the facility's incarcerated population – had an active case of COVID-19.[2] Over the course of the pandemic, more than sixty-six percent of the facility's incarcerated population has contracted COVID-19.[3] Tragically, an incarcerated individual at FCI Fort Dix died of complications from COVID-19 on January 22,

---

[1] https://www.pandemicoversight.gov/sites/default/files/2020-06/DOJ%20CARES%20Act%20Report%20to%20PRAC%2020200625.pdf
[2] https://experience.arcgis.com/experience/ab22fb4c564e4f4b986e257c685190e8/page/page_2/
[3] Ibid.

2021.[4] The long-term health effects for the hundreds of incarcerated individuals and staff who contracted COVID-19 at FCI Fort Dix remain unclear.

While BOP has certainly faced many difficult decisions while responding to the COVID-19 pandemic, it is distressing that a hard-hit facility such as FCI Fort Dix purportedly did not receive the supplemental resources it clearly required. Going forward, we request that FCI Fort Dix has the necessary resources to more effectively protect its staff and incarcerated population for the remainder of the pandemic. On December 27, 2020, then-President Trump signed into law a year-end spending bill and COVID-19 relief package (P.L. 116-260), which included an additional $300 million in emergency supplemental funding for BOP. In light of the concerns detailed above and the availability of additional funding, we respectfully request that you respond to the following questions no later than Friday, March 12, 2021:

1. BOP Regional Director N.C. English stated in her December 3, 2020 response to an inquiry from our offices that "…BOP determined to maintain CARES Act funding centrally and allocate the funding to those institutions with the most need. FCI Fort Dix has been able to manage its operations without additional CARES Act funding." Please explain, in greater detail, when and by what metric BOP determined that FCI Fort Dix was managing its operations and did not require CARES Act funding.
2. As COVID-19 cases began to rise at FCI Fort Dix from October 2020 onward, did BOP at any point revisit the decision not to provide CARES Act funding to the facility?
3. Does BOP have a spending plan for the $300 million in emergency funding included in the Consolidated Appropriations Act of 2021? If so, please enclose a copy in your response. If not, please provide a detailed summary of how BOP plans to use this funding.
4. How is BOP determining facilities' allocations from the emergency funding included in the Consolidated Appropriations Act of 2021?
5. Has or will FCI Fort Dix receive funding or resources from the emergency funding included in the Consolidated Appropriations Act of 2021? If so, will this funding meet the full needs of FCI Fort Dix?
6. As of March 3, 2021, BOP's website indicates that FCI Fort Dix has fully inoculated 161 incarcerated individuals at the facility against COVID-19 out of a total incarcerated population of 2,751.[5] Please provide a detailed timeline for the COVID-19 vaccination program at FCI Fort Dix for both incarcerated individuals and staff.
7. In your letter to our offices dated December 16, 2020, you stated that FCI Fort Dix has "significant supplies of personal protective equipment…" Are masks currently available, free of cost, to all incarcerated individuals at FCI Fort Dix?
8. Is BOP offering any additional resources or support, including via programs authorized by the First Step Act (P.L. 115-391), to formerly incarcerated individuals who contracted COVID-19 at FCI Fort Dix and are now suffering from long-term health effects from the virus?

Thank you for your prompt consideration of this urgent matter.

---

[4] https://www.bop.gov/resources/news/pdfs/20210125_press_release_ftd.pdf
[5] https://www.bop.gov/coronavirus/

Sincerely,

Robert Menendez
United States Senator

Cory A. Booker
United States Senator

Frank Pallone, Jr.
Member of Congress

Bill Pascrell, Jr.
Member of Congress

Donald M. Payne, Jr.
Member of Congress

Donald Norcross
Member of Congress

Bonnie Watson Coleman
Member of Congress

Andy Kim
Member of Congress

Mikie Sherrill
Member of Congress

Tom Malinowski
Member of Congress

CC:
The Honorable Monty Wilkinson
Acting Attorney General
U.S. Department of Justice



CHRISTOPHER
REG. NO. 69451-050
FCI FORT DIX
FEDERAL CORRECTIONAL INSTITUTION
POST OFFICE BOX 2000
JOINT BASE MDL, NJ 08640

7020 1290 0001 7020 3288

U.S. POSTAGE PAID
PM 2-Day
JOINT BASE MDL, NJ
06640
APR 29 21
AMOUNT
$0.00
R2305M146429-18

1028    08101

RECEIVED
MAY -3 2021
AT 8:30
WILLIAM T. WALSH
CLERK

RECEIVED BY MAILROOM STAFF
DATE: 04282021 TIME: 900AM

CLERK
U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
MITCHELL H COHEN U.S. COURTHOUSE
4TH & COOPER STREETS - ROOM 1050
CAMDEN, NJ 08101-2797

SPECIAL MAIL
LEGAL CORRESPONDENCE