Lawrence S. Lustberg, Esq.
Ethan J. Kisch, Esq.
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102
(973) 596-4500
llustberg@gibbonslaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CHRISTOPHER THIEME, JACOB SILVA, SIDDEEQ WILLIAMS, and ROBERT SPEED,<br><br>individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, MICHAEL CARVAJAL, in his individual capacity and his capacity as Director of the Bureau of Prisons, NICOLE ENGLISH, in her individual capacity and her capacity as Northeast Regional Director, DAVID E. ORTIZ, in his individual capacity and his capacity as Warden of the Federal Correctional Institution, Fort Dix, LAMINE N'DIAYE, in his individual capacity and his capacity as Warden of the Federal Correctional Institution, Fort Dix, and KIMBERLY KODGER, in her individual capacity and her capacity as Associate Warden of the Federal Correctional Institution, Fort Dix,<br><br>Defendants. | Case No. 1:21-cv-00682 (RMB) (AMD)<br><br><br>**<u>SECOND AMENDED COMPLAINT</u>** |

Plaintiffs, by and through their Court-appointed attorneys, Gibbons P.C., allege as follows:

1

## INTRODUCTION

1. Life in the United States changed dramatically when the COVID-19 pandemic began. To avoid spreading the deadly virus, protective face coverings became essential, frequent hand washing and use of hand sanitizer and cleaning products became standard protocol, and social distancing became a recommendation in nearly all settings.

2. Throughout the COVID-19 pandemic, society at large was guided by medical and scientific experts who stressed the importance of vigorously adhering to safety protocols in order to slow the spread of COVID-19 and save lives. Adhering to these protocols did just that. Unfortunately, however, the inmates who are in the prison population at the Federal Correctional Institution in Fort Dix, New Jersey (hereinafter, "Fort Dix") were unprotected and were unable to protect themselves because Defendants failed to adhere to safety protocols that would have protected prisoners from COVID-19.

3. The Defendants named here ignored public outcry demanding that they protect Plaintiffs and contravened federal guidelines by transferring hundreds of federal prisoners without adequate safety protocols from the Federal Correctional Institution Elkton (hereinafter "FCI Elkton") an institution in the midst of a massive COVID-19 outbreak, into Fort Dix, from September 28, 2020 to October 28, 2020, and failed to implement basic health guidance once COVID-19 entered the Fort Dix facility, which resulted in nearly 2,000 prisoners contracting the virus in the four months following the FCI Elkton transfers.

4. As has been widely reported in the press and noted by multiple federal courts, Defendants' actions and inaction caused significant public health crises as COVID-19 spread unchecked at Fort Dix for months. Many were left wondering if Defendants did anything to protect

the prisoners at Fort Dix. Defendants engaged in a number of practices that negligently exposed Fort Dix prisoners to unacceptable risks to their health, including but not limited to:

a. Transferring prisoners into Fort Dix without adequate measures to prevent the spread of COVID-19;
b. Failing to separate or quarantine COVID-19 positive prisoners and newly arrived transferees;
c. Transferring prisoners between units at Fort Dix without adequate measures to prevent the spread of COVID-19;
d. Declining to enforce mask mandates for staff and prisoners;
e. Declining to provide medically necessary treatments, including appropriate screening tests;
f. Routinely delaying prisoners' access to evaluation, treatment, and specialty care; and
g. Failing to ensure that Plaintiffs' medical needs were addressed in their follow-up care, work requirements, cell conditions, and other aspects of confinement.

5. Because Defendants failed to take adequate measures to control the spread of COVID-19 and denied prisoners who contracted the virus medical treatment, the prison population at Fort Dix has and continues to suffer. Accordingly, Plaintiffs Christopher Thieme, Siddeeq Williams, Jacob Silva, and Robert Speed, on behalf of themselves and a class of all persons who contracted COVID-19 at Fort Dix as a result of Defendants' negligent actions bring this suit, pursuant to *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for violations of their constitutionally protected rights under the Eighth Amendment of the United States Constitution, and pursuant to 28 U.S.C. § 2674, the Federal Tort Claims Act ("FTCA"), for the negligent an wrongful acts of the United States and its agents and employees.

**JURSIDICTION AND VENUE**

6. The Plaintiffs bring this action pursuant to the Eighth Amendment under *Bivens*, 403 U.S. 388, and as against the United States pursuant to the FTCA.

7. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b)(1) for relief from conditions of confinement that are in violation of the Eighth Amendment and the FTCA.

3

8.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2) because it is the judicial district wherein the acts and omissions complained of occurred.

**PARTIES**

9.     Plaintiffs and the Plaintiff Class are individuals who contracted COVID-19 while imprisoned at Fort Dix following four prisoner transfers from FCI Elkton September 28, 2020 to October 28, 2020.  The named Plaintiffs each contracted COVID-19 and each have or have had medical needs that have gone untreated, undertreated, or mistreated by Defendants, causing them damage.

10.     Plaintiff Christopher Thieme, BOP Register Number 69451-050, is a 41-year-old man housed in the West compound of Fort Dix.  Plaintiff Thieme suffers from hypertension, asthma, kidney disease, and is severely obese.  He tested positive for COVID-19 on October 20, 2020 while housed in unit 5812.  As a result of his COVID-19 infection, Plaintiff Thieme has experienced nausea, diarrhea, dizziness, shortness of breath, and has had numerous asthma attacks. Plaintiff Thieme repeatedly sought medical treatment for his symptoms.  He received nothing more than Tylenol and cough medicine to treat his COVID-19 infection.  His requests for medical care for his lingering COVID-19 symptoms have routinely been denied, including but not limited to access to an inhaler.  Further, Plaintiff Thieme's medical records indicate that he is suffering from chronic kidney disease but Fort Dix medical staff neither informed him of this diagnosis nor treated him for the disease.  Because Defendants and their agents did not follow COVID-19 protocols or protect Plaintiff Thieme from COVID-19 and caused him severe harm, on November 30, 2020 he filed an administrative complaint pursuant to the FTCA.

11.     Plaintiff Siddeeq Williams, BOP Register Number 71042-050, is a 43-year-old man housed in the West compound of Fort Dix.  Plaintiff Williams is obese.  He tested positive for

4

COVID-19 on October 21, 2020 while housed in unit 5812. As a result of his COVID-19 infection, Plaintiff Williams has suffered from body aches, hot and cold flashes, back pain, diarrhea, sore throat, and kidney pain. Plaintiff Williams received nothing more than Acetaminophen, a moderate pain reliever similar to Tylenol, to treat his COVID-19 infection. Additionally, he has routinely been denied medical care for his lingering COVID-19 symptoms. Since contracting COVID-19, Plaintiff Williams has suffered from lingering COVID symptoms, including ear aches, headaches, and trouble breathing. Fort Dix treated Plaintiff Williams with antibiotics, which did not address his medical condition. Plaintiff Williams continued to complain about his lingering symptoms, but Fort Dix provided no additional care. After complaining about his ear for seven months, an off-site doctor finally examined his ear and removed a foreign object from his left ear canal. By this time, however, his left eardrum was severely damaged. Because Defendants and their agents did not follow COVID-19 protocols or protect Plaintiff Williams from COVID-19 and caused him severe harm, on December 12, 2020 he filed an administrative complaint pursuant to the FTCA.

12. Plaintiff Jacob Silva, BOP Register Number 04261-049, is a 41-year-old man housed in the West compound of Fort Dix. He suffers from generalized anxiety for which he receives medication, has an elevated Body Mass Index (BMI), and suffers from asthma. On October 26, 2020 Plaintiff Silva reported COVID-19 symptoms to Fort Dix staff but was denied a COVID-19 test and forced to remain on his unit. Three days later, Plaintiff Silva tested positive for COVID-19 while housed in unit 5812. In March 2020, Health Services identified an unknown biomass at the back of Plaintiff Silva's skull and ordered a biopsy, a simple procedure that did not occur for nearly 13 more months. Further, Health Services prematurely declared Plaintiff Silva recovered from COVID-19 and he was accordingly forced to work while still recovering from

COVID-19.  Because Defendants and their agents did not follow COVID-19 protocols or protect Plaintiff Silva from COVID-19 and caused him severe harm, on July 28, 2021 he filed an administrative complaint pursuant to the FTCA.

13.     Plaintiff Robert Speed, BOP Register Number 56145-054, is a 54-year-old man housed in the West compound of Fort Dix.  Plaintiff Speed has suffered from mental health issues relating to COVID-19 and is diagnosed with epilepsy.  On or about October 20, 2020, Plaintiff Speed tested negative for COVID-19, but thereafter, Fort Dix transferred numerous inmates in and out of his unit.  On November 2, 2020, Plaintiff Speed tested positive for COVID-19.  As a result of his COVID-19 infection, Plaintiff Speed suffered from body aches that were so bad that he was unable to walk, and experienced headaches, lower abdomen pain, and fevers.  Further, while still undergoing treatment for COVID-19, Health Services declared Plaintiff Speed recovered from COVID-19 and he was subsequently transferred to the East Side forced to work in the Commissary.  While working on the East Side, Plaintiff Speed continued to experience COVID-19 symptoms, but he was still required to work.  Because Defendants and their agents did not follow COVID-19 protocols or protect Plaintiff Speed from COVID-19 and caused him severe harm, on August 27, 2021 he filed an administrative complaint pursuant to the FTCA.

14.     Defendant David E.  Ortiz was the Warden at Fort Dix from January 2020 until February 2021.  As Warden, Defendant Ortiz was responsible for and oversaw all day-to-day activity at Fort Dix.  He was in charge of all aspects of the operations and functions of Fort Dix.  His responsibilities included ensuring the safety of all prisoners and staff at the institution and ensuring that the institution operated in an orderly fashion.  Defendant Ortiz was aware of and adopted and enforced policies that left Plaintiffs and all those similarly situated exposed to infection, severe illness, and death due to COVID-19.

6

15. Defendant Lamine N'Diaye is the Warden at Fort Dix and on information and believe was the acting Warden at Fort Dix from February 2021 to March 2021. As Warden, Defendant N'Diaye is responsible for overseeing the day-to-day activities at Fort Dix. He is in charge of all aspects of the operations and functions of Fort Dix. His responsibilities include ensuring the safety of all prisoners and staff at the institution and ensuring that the institution is operated in an orderly fashion. Defendant N'Diaye is aware of and has adopted and enforced policies that leave Plaintiffs and all those similarly situated exposed to infection, severe illness, and death due to COVID-19.

16. Defendant Kimberly Kodger was, at all times relevant to this Complaint, an Associate Warden at Fort Dix. As Associate Warden, Defendant Kodger managed and oversaw the day-to-day activities at Fort Dix. She was responsible for administering Fort Dix policies and procedures and supervising housing, security and facility operations. Defendant Kodger was aware of and adhered to policies that left Plaintiffs and all those similarly situated exposed to infection, severe illness, and death due to COVID-19.

17. Defendant Nicole English was, at all times relevant to this Complaint, the Director of the Northeast Region of the Federal Bureau of Prisons. As Northeast Regional Director, Defendant English oversaw the operations of 19 Bureau of Prisons facilities, including Fort Dix. Defendant English was responsible for the oversight and management of more than 21,000 prisoners. Her responsibilities included ensuring the safety of all prisoners and staff in the institutions she oversaw and ensuring that the institutions operated in an orderly fashion. Defendant English was aware of and adopted and enforced policies that left Plaintiffs and all those similarly situated exposed to infection, severe illness, and death due to COVID-19.

18. Defendant Michael Carvajal was, at all times relevant to this Complaint, the Director of the Federal Bureau of Prisons. As Director, Defendant Carvajal was responsible for all BOP policies implemented at Fort Dix, including those pertaining to prisoner transfers and COVID-19 protocols. His responsibilities included ensuring the safety of all prisoners and staff in BOP system and ensuring that institutions operated in an orderly fashion. Defendant Carvajal was aware of and has adopted and adhered to and/or enforced policies that left Plaintiffs and all those similarly situated exposed to infection, severe illness, and death due to COVID-19.

19. The United States, as sovereign, is immune from suit except as it consents under the FTCA's limited waiver of sovereign immunity permitting lawsuits against the United States for torts perpetrated by government employees. At all times material hereto, Defendant United States owned and operated Federal Correctional Institution Fort Dix, in New Jersey and is accordingly the appropriate Defendant under the FTCA.

**FACTUAL ALLEGATIONS**

**I.      THE COVID-19 PANDEMIC POSED A GRAVE RISK TO HEALTH.**

20. The highly contagious novel coronavirus, and its resulting infection, COVID-19, has led to a global pandemic causing the spread of the disease worldwide. COVID-19 spreads primarily through droplets of saliva or discharge from the nose which are inhaled or transferred from surfaces.[1] Studies demonstrate that infected persons may never show symptoms, but can nevertheless transmit the virus to others.[2]

---

[1] Centers for Disease Control and Prevention, *Scientific Brief: SARS-CoV-2 Transmission*, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html (last accessed January 25, 2022).
[2] Katherine Harmon Courage, *How People Are Spreading Covid-19 Without Symptoms*, Vox (April 22, 2020), https://www.vox.com/2020/4/22/21230301/coronavirus-symptom-asymptomatic-carrier-spread.

8

21.     The Centers for Disease Control and Prevention ("CDC") explain that COVID-19 can be spread through airborne or aerosolized transmission and that "fine droplets… can remain suspended in the air for minutes to hours."[3]  The "[r]isk of transmission" of fine COVID-19 droplets "is greatest within three to six feet of an infectious source where the concentration of these very fine droplets and particles is greatest."[4]  While scientists still have questions about the transmission of COVID-19, "the available evidence continues to demonstrate that existing recommendations to prevent [COVID-19] transmission remain effective."  That is, "physical distancing, community use of well-fitting masks… adequate ventilation, and avoidance of crowded indoor spaces" will all "reduce the transmission" of COVID-19.[5]

22.     As of January 25, 2022, there have been nearly 349 million reported COVID-19 cases and 5.6 million deaths resulting from the virus.[6]

23.     The first known case of COVID-19 was reported in the United States on January 21, 2020.  Since that time, 70 million COVID-19 cases have been reported in the United States, and 866,968 people have died.[7]

---

[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] World Health Organization, *Coronavirus (COVID-19) Dashboard*, https://covid19.who.int/ (last accessed January 25, 2022).
[7] Centers for Disease Control, *United States COVID-19 Cases, Deaths, and Laboratory Testing (NAATS) by State, Territory, and Jurisdiction*, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last accessed January 26, 2022).

24. New Jersey has reported 1,791,664 COVID-19 cases and over the course of the pandemic, over 30,799 people in New Jersey have succumbed to the virus.[8] Of the total reported cases in New Jersey, 77,830 have been reported in Burlington County, where Fort Dix is located.[9]

25. The virus poses a grave risk of severe illness, including lung tissue damage, sometimes leading to permanent loss of respiratory capacity.[10] It can also cause acute respiratory distress syndrome, affect cardiac functions, lead to severe damage to other organs, and cause life-threatening blood clots.[11]

26. Persons over the age of 50 are particularly at risk (accounting for 95% of COVID-19 deaths), as are those with certain underlying conditions, most commonly, hypertension, obesity, diabetes, lung disease, and cardiovascular disease.[12] "Adults of any age" with underlying conditions are "more likely to get severely ill from COVID-19."[13] That is, they may need "hospitalization," "intensive care," "a ventilator to help them breathe," and "they may even die."[14]

27. A mild or moderate COVID-19 infection usually "lasts about two weeks" but others experience "lingering health problems even when they have recovered from the acute phase of the

---

[8] New Jersey Health, *New Jersey COVID-19 Dashboard*, https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml (last accessed January 25, 2022).

[9] *See id.*; *see also* Fed. Bureau of Prisons, *FCI Fort Dix*, https://www.bop.gov/locations/institutions/ftd/ (last accessed January 12, 2022).

[10] Simon Balogun, Oyeronke Williams and Olusegun Ojo, *Pulmonary Fibrosis In COVID-19 Survivors: Predictive Factors And Risk Reduction Strategies,* Hindawi Journal (August 11, 2020), https://www.hindawi.com/journals/pm/2020/6175964/.

[11] Declaration of Dr. Jonathan Louis Golob, *Dawson v. Asher*, Case No. 2:20-cv-00409-JLR-MAT (D. Or. Filed March 16, 2020), ECF No. 5.

[12] Centers for Disease Control and Prevention, *Medical Conditions,* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed January 24, 2022).

[13] *Id.*

[14] *Id.*

illness."[15] People who have "long-term COVID-19" will test negative for COVID-19, "but they might be severely debilitated nonetheless."[16] While there is a clear link between severe COVID-19 illness and people with certain underlying conditions, "there isn't a clear link" between underlying health conditions and "long-term problems."[17] Rather, "long [COVID-19] can happen in people who have mild symptoms" and no underlying health conditions.[18]

28. The CDC reports that "the most common lasting [COVID-19] symptoms are fatigue, shortness of breath, cough, joint pain and chest pain."[19] But other symptoms include depression, muscle pain, headache, intermittent fever, and cognitive problems.[20]

29. Numerous studies reveal extremely high rates of post-traumatic stress disorder ("PTSD"), depression, anxiety, substance abuse, and suicidal thoughts in adults who have contracted COVID-19. One study of 381 patients who recovered from COVID-19 found that four months after their recovery, 30.2% (115 participants) suffered from PTSD, 17.2% (66 participants) from depression, 7% (27 participants) from anxiety disorder, and 0.2% (one participant) were considered psychotic.[21] Another study, which surveyed 5,186 people who had recovered from COVID-19, revealed that 33% (1,710 participants) had "anxiety or depressive symptoms," 29.6%

---

[15] Tae Chung, Amanda Morrow, Emily Birgham, *et al.*, *COVID 'Long Haulers': Long-Term Effects Of COVID-19,* John Hopkins Medical (April 1, 2021), https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/covid-long-haulers-long-term-effects-of-covid19.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] Centers for Disease Control and Prevention, *Post-COVID Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects.html (last accessed January 24, 2022).

[20] *Id.*

[21] Delfina Janiri, Angelo Carfi, Georgio Kotzalidis, *et al.*, *Posttraumatic Stress Disorder In Patients After Severe COVID-19 Infection*, JAMA Psychiatry (February 18, 2021), https://jamanetwork.com/journals/jamapsychiatry/fullarticle/2776722.

(1,536 participants) "reported symptoms of disorders stemming from coronavirus-related trauma," and 11.9% (618 participants) indicated that "they had seriously considered suicide."[22]

30.     More severe long-term COVID symptoms include lung-related issues, which cause "severe weakness and exhaustion,"[23] and lasting kidney damage, which can lead to the need for dialysis.[24]   Additionally, COVID-19 can leave many people with heart problems: one study showed that 60% of people who recovered from COVID-19 had signs of ongoing heart inflammation, which can lead to the common symptoms of shortness of breath, palpitations and rapid heartbeat.   This inflammation appeared even for those who had had mild cases of COVID-19 and who had no medical issues before they got sick.[25]

31.     In December 2020, the U.S.   Food and Drug Administration (FDA) issued Emergency Use Authorizations (EUAs) for COVID-19 vaccines developed by Pfizer-BioNTech and Moderna, and subsequently approved a Johnson & Johnson vaccine as well.[26]

---

[22] Mark Czeisler, Rashon Lane, Joshua Wiley, *et al.*, *Follow-Up Survey Of US Adults Reports Of Mental Health, Substance Use, And Suicidal Ideation During The COVID-19 Pandemic, September 2020*, JAMA (February 19, 2021), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2776559.

[23] Centers for Disease Control and Prevention, *supra* note 19.

[24] Chung, Morrow, Birgham, *et al.*, *supra* note 15.

[25] Valentina O. Puntmann; M.  Ludovica Carerj; Imke Wieters, *et al.*, *Outcomes Of Cardiovascular Magnetic Resonance Imaging In Patients Recently Recovered From Coronavirus Disease 2019 (COVID-19)*, JAMA (July 27, 2020), https://jamanetwork.com/journals/jamacardiology/fullarticle/2768916.

[26] Press Release, U.S. Food & Drug Administration, *FDA Approves First COVID-19 Vaccine* (August 23, 2021), https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine; Press Release, U.S. Food & Drug Administration, *FDA Takes Additional Action in Fight Against COVID-19 By Issuing Emergency Use Authorization For Second COVID-19 Vaccine* (December 18, 2020), https://www.fda.gov/news-events/press-announcements/fda-takes-additional-action-fight-against-covid-19-issuing-emergency-use-authorization-second-covid; Press Release, Johnson & Johnson, *Johnson & Johnson COVID-19 Vaccine Authorized By U.S. FDA For Emergency Use- First Single-Shot Vaccine In Fight Against Global Pandemic* (February 27, 2021), https://www.jnj.com/johnson-johnson-covid-19-vaccine-authorized-by-u-s-fda-for-emergency-usefirst-single-shot-vaccine-in-fight-against-global-pandemic.

32. Vaccines have proven effective against the spread of COVID-19.[27] However, even fully vaccinated people can contract COVID-19 and spread the virus.[28] When vaccinated people do contract COVID-19 they can experience COVID-19 symptoms and may require hospitalization.[29] Moreover, fully vaccinated people who contract COVID-19 can also experience long-term COVID-19. One study of breakthrough COVID-19 infections in 39 of 1,497 fully vaccinated Israeli healthcare workers, demonstrated that 19% of breakthrough cases experienced long-haul symptoms.[30]

33. Given the possibility of COVID-19 infection, even among the fully vaccinated, experts emphasize that other preventive measures such as social distancing (*i.e.*, physically isolating oneself from any other person at a minimum of six feet) and masking remain essential.[31]

---

[27] Centers for Disease Control and Prevention, *COVID-19 Key Things To Know,* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html (last accessed January 25, 2022).

[28] Lindsey Tanner, Mike Stobbe, and Philip Marcelo, *Study: Vaccinated People Can Carry As Much Virus As Others,* Associated Press (July 30, 2021), https://apnews.com/article/science-health-coronavirus-pandemic-d9504519a8ae081f785ca012b5ef84d1.

[29] Deidre McPhillips & Christina Maxouris, *About 99.999% Of Fully Vaccinated Americans Have Not Had A Deadly COVID-19 Breakthrough Case, CDC Data Shows,* CNN Health (August 2, 2021), https://www.cnn.com/2021/07/31/health/fully-vaccinated-people-breakthrough-hospitalization -death/index.html.

[30] Moriah Bergwerk, Tal Gonen, Yaniv Lustig, *et al.*, *COVID-19 Breakthrough Infections In Vaccinated Health Care Workers,* The New Eng. J. Med (July 28, 2021), https://www.nejm.org/doi/full/10.1056/NEJMoa2109072?query=featured_home.

[31] Lauren Mascarenhas, *Masks, Social Distancing Still Important Even With COVID-19 Vaccinations, Study Suggests,* ABC (June 1, 2021), https://abc30.com/covid-restrictions-social-distancing-face-mask-rules-where-are-fact-masks-required/10728722/.

## II. INCARCERATED PEOPLE ARE AT HEIGHTENED RISK DURING THE COVID-19 PANDEMIC.

34. The incarcerated population is especially vulnerable to becoming seriously ill or dying from COVID-19.[32] One study found that the COVID-19 infection rate among those in federal and state prisons has been three times higher, and the mortality rate twice as high, than for those outside prison.[33] This reality reflects what the CDC has called "[a] growing body of evidence indicat[ing] that COVID-19 transmission is facilitated in confined settings," with "high transmissibility of COVID-19 in enclosed spaces."[34]

35. Indeed, prisons become "ticking time bombs" in a pandemic, as "[m]any people crowded together, often suffering from diseases that weaken their immune systems, form a potential breeding ground and reservoir for diseases."[35] Epidemiological research overwhelmingly "shows that mass incarceration raises contagion rates for infectious disease—both for people in jails, and for the community at large."[36]

36. This heightened danger of transmission, serious illness, and death reflects two basic realities. First, as the Chief Medical Officer at Rikers Island in New York City candidly acknowledged, individuals in carceral settings "cannot socially distance" while "living in a dorm,

---

[32] Kevin Schnepel, *COVID-19 In U.S. State And Federal Prisons*, Council on Criminal Justice (December 2020) https://cdn.ymaws.com/counciloncj.org/resource/resmgr/covid_commission/COVID-19_in_State_and_Federa.pdf.

[33] *Id.*

[34] Kenji Mizumoto & Gerado Chowell, *Estimating Risk For Death From Coronavirus Disease, China, January-February 2020*, Emerging Infectious Diseases (June 2020), https://www.cdc.gov/eid/article/26/6/20-0233_article.

[35] St. Louis Univ., *"Ticking Time Bomb': Prisons Unprepared For Flu Pandemic,* Science Daily (2006), https://www.sciencedaily.com/releases/2006/09/060915012301.htm.

[36] Sandhya Kajeepeta and Seth J. Prins, *Why Coronavirus In Jails Should Concern All Of Us,* The Appeal (March 24, 2020), https://theappeal.org/coronavirus-jails-public-health/.

sharing a bathroom."[37]  Second, the risk presented by crowded and confined facilities is compounded by the almost continuous foot traffic of individuals from in and out of individual facilities.[38]  That is, the virus can easily enter prisons through daily staff movements, visitors, transfers of incarcerated people from other prisons, and outside contact through court hearings and off-site medical appointments.  Accordingly, prisons are a hotbed for COVID-19 transmission. Any of the revolving door of prison staff can be asymptomatically carrying and transmitting COVID-19.[39]

### A. THE GRAVE RISK OF HARM POSED BY THE COVID-19 PANDEMIC REQUIRED EMERGENCY RESPONSES AND MEDICAL CARE IN DETENTION FACILIITIES.

37.  From the very beginning, it was clear that prisons would be epicenters for transmission of COVID-19.  Approximately one month into the pandemic in the province of Hubei, China over half of the newly reported COVID-19 cases were from jails.[40]  Further, in mid-March 2020, the jail at Rikers Island in New York City had not had a single confirmed COVID-19 case.  By March 30, 167 detainees, 114 correction staff, and 20 health workers at Rikers tested

---

[37] Katie Shepherd, *'Trapped On Rikers': Jails And Prisons Face Coronavirus Catastrophe As Officials Slowly Authorize Releases*, The Washington Post, (March 23, 2020), https://www.washingtonpost.com/nation/2020/03/23/coronavirus-rikers-island-releases/.

[38] Gregory Hooks and Wendy Sawyer, *Mass Incarceration, COVID-19, And Community Spread*, Prison Policy Initiative (December 2020), https://www.prisonpolicy.org/reports/covidspread.html.

[39] *See* Linda So & Grant Smith, *In Four U.S. State Prisons, Nearly 3,300 Inmates Test Positive For Coronavirus—96% Without Symptoms,* Reuters (April 25, 2020), https://www.reuters.com/article/us-health-coronavirus-prisons-testing-in/in-four-u-s-state-prisons-nearly-3300-inmates-test-positive-for-coronavirus-96-without-symptoms-idUSKCN2270RX.

[40] Zi Yang, *Cracks In The System: COVID-19 In Chinese Prisons,* The Diplomat (March 9, 2020), https://thediplomat.com/2020/03/cracks-in-the-system-covid-19-in-chinese-prisons/.

positive for COVID-19; two correction staff members had died and multiple detainees had been hospitalized.[41]

38.    An equally gruesome pattern devastated the federal prison system.  At the end of March 2020, FCI Lompoc, located in California, reported no active COVID-19 cases.  And yet, by April 16, 2020, it reported 69 positive cases among prisoners and 25 among prison staff.[42]  And by May 7, 2020, BOP reported that 599 prisoners at FCI Lompoc had tested positive for COVID-19.[43]  Similarly, on March 30, 2020, BOP reported two active COVID-19 cases among prisoners at FCI Elkton, a BOP facility in Ohio.[44]  By May 14, 2020, 169 prisoners had tested positive for the virus[45] and by July 21, 2020, 1,000 prisoners detained in FCI Elkton had contracted COVID-19.[46]  For these reasons, from the early days of the pandemic, medical and public health experts urged emergency action to fight the spread of COVID-19 in carceral settings, including decarceration, improved access to medical care, compliance with CDC guidelines, and more.[47]

---

[41] Jan Ransom & Alan Feuer, *'We're Left For Dead': Fears Of Virus Catastrophe At Rikers Jail*, N.Y. Times  (March 30, 2021), https://www.nytimes.com/2020/03/30/nyregion/coronavirus-rikers-nyc-jail.html.

[42] *See* Richard Winton, *Coronavirus Outbreak At Lompoc Prison Is the Worst In The Nation: 69 Inmates, 25 Staff Infected*, L.A. Times (Apr. 16, 2020), https://www.latimes.com/california/story/2020-04-16/coronavirus-outbreak-at-lompoc-federal-prison-is-worst-in-nation-with-69-inmates-25-staff-infected.

[43] *Id.*

[44] Stan Boney, *Union President Wants Change After 2 Elkton Prison Inmates Test Positive For COVID-19*, WKBN (March 30, 2020), https://www.wkbn.com/news/coronavirus/2-positive-cases-of-covid-19-confirmed-at-columbiana-county-prison/.

[45] *See United States v. Brooks*, 07-CR-20047-JES-DGB, 2020 WL 2509107, at *2 (C.D. Ill. May 15, 2020).

[46] *See* Deanne Johnson, *Prison Still Yields Largest Share Of COVID-19 Cases*, Morning Journal (July 21, 2020), https://www.morningjournalnews.com/news/local-news/2020/07/prison-still-yields-largest-share-of-covid-19-cases/.

[47] *See, e.g.,* Brad Lander, *Doctors In NYC Hospitals, Jails, And Shelters Call On The City To Take More Aggressive Action To Combat The Spread of Coronavirus*, Medium (Mar.  12, 2020), https://medium.com/@bradlander/doctorsin-nyc-hospitals-jails-and-shelters-call-on-the-city-totake-more-aggressive-action-to-fb75f0b131c2; Letter from Faculty Members of the Johns Hopkins Bloomberg School of Public Health, School of Nursing, and School of Medicine to

39.     Indeed, as COVID-19 began to spread across the United States, correctional officials around the country agreed that particular care was required to stop the spread of COVID-19 within the nation's prisons.[48]  For example, Leann Bertsch, the Director or the North Dakota Department of Corrections and Rehabilitation, concluded that "ignoring the health of those living and working inside the walls of our nation's correctional facilities poses a grave threat to us all," and that "putting public health first is the best, and only, way to effectively achieve [a department of corrections'] public safety mission during the COVID-19 pandemic."[49]

40.     In recognition of the ongoing public health crisis, the CDC issued guidance in an effort to at least slow the spread of COVID-19 within detention facilities.[50]  Other organizations, including public health agencies, academic institutions, and advocacy groups published similar protocols.[51]  These publications provided comprehensive guidance for personal hygiene, cleaning,

---

Governor Larry Hogan (Mar. 25, 2020), https://bioethics.jhu.edu/wp-content/uploads/2019/10/Johns-Hopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf.

[48] *See, e.g.,* Brie Williams & Leann Bertsch, *A Public Health Doctor And Head Of Corrections Agree: We Must Immediately Release People From Jails And Prisons*, The Appeal (March 27, 2020), https://theappeal.org/a-public-health-doctor-and-head-of-corrections-agree-we-must-immediately-release-people-from-jails-and-prisons/; Press Release, Colorado Department of Corrections, *Department of Corrections Provides Updates on COVID-19 Prevention Plan* (March 23, 2020), https://drive.google.com/file/d/1CRNKVcdx8xNBDD8wy-8Qgq6fPVc1Xb21/view; Brianna Bailey, *DOC Stops Accepting Newly Sentenced State Prisoners*, The Frontier (March 22, 2020), https://www.enidnews.com/news/local_news/doc-stops-accepting-newly-sentenced-state-prisoners/article_ea6a42a4-47c1-5dbc-9446-5dec46032c5d.html.

[49] Williams and Bertsch, *supra* note 48.

[50] Centers for Disease Control and Prevention, *Interim Guidance On Management of Coronavirus Disease 2019 (COVID-19) In Correctional And Detention Facilities* (Published March 23, 2020, updated June, 9 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[51] *See, e.g.*, NYC Health, *Coronavirus Disease 2019 (COVID-19) Guidance For Correctional Facilities,* NYC (March 19, 2020), https://www1.nyc.gov/assets/doc/downloads/contracting/Guidance-for-Correctional-Facilities_072202007CPD.pdf; Justice Round Table, *Recommendations To Save Lives By Protecting Incarcerated Youth And Adults During The COVID-19 Pandemic* (May 29, 2020), https://justiceroundtable.org/wp-content/uploads/2020/05/JR_Summary-of-COVID19-Recs_FINAL_May-29-2020.pdf; *COVID-19 In Correctional Facilities: Medical Isolation,*

17

social distancing, symptom response, and the use of medical isolation and quarantine, among

others.  Specifically, the CDC recommended, *inter alia*, that correctional facilities:

- "Clean and disinfect surfaces and objects that are frequently touched, especially in common areas," including, *e.g.*, doorknobs, recreation equipment, telephones, and computer equipment "several times per day";
- "Ensure adequate supplies to support intensified cleaning and disinfection practices," including by providing cleaning supplies to inmates for disinfection in their cells;
- "Provide masks at no cost to incarcerated/detained individuals and launder them routinely";
- "Implement social distancing strategies to increase the physical space between incarcerated/detained individuals" to the extent possible, including in "common areas," "recreation," "meals," "group activities," "housing," "work details," and "medical." This includes utilizing not only physical distancing but also alternate scheduling practices to minimize the number of individuals in any place at one time;
- "Limit transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation";
- Perform "pre-intake symptom screening and temperature checks for all new entrants," whether inmate or staff;
- Implement "randomized testing of asymptomatic staff without known COVID-19 exposure for early identification";
- "Provide" and "ensure that staff wear adequate protective equipment";
- "Restrict non-essential vendors, volunteers, and tours from entering the facility";
- Conduct "vigilant symptom screening", which includes testing  "symptomatic and asymptomatic" individuals for COVID-19 because many individuals infected with [COVID-19] do not display symptoms";
- For any individual who either reports symptoms or has come into close contact with an infected individual, "administer quarantine and monitoring for at least 14 days";
- For any individual suspected or confirmed positive for COVID-19, "notify public health authorities," "administer or request any necessary medical care", and perform "contact tracing";
- Ensure that quarantined individuals receive adequate time out of cell and stimulation so that quarantine housing does not resemble conditions of administrative segregation, or "solitary confinement," so as not to deter reporting of symptoms;
- Separate those with confirmed COVID-19 from those with suspected COVID-19 in distinct quarantine areas;
- Retest individuals in quarantine periodically, and discontinue quarantine only after individual has surpassed specific number of days without symptoms or fever-for those not autoimmune compromised, 10 days without symptoms and 24 hours without fever; for autoimmune compromised, 20 days and 24 hours;

University of California San Francisco (2020), https://amend.us/covid-19-in-correctional-facilities-medical-isolation/.

- Discontinue quarantine for individuals who are not autoimmune compromised when "at least 10 days have passed since symptoms onset and at least 24 hours have passed since the resolution of a fever";
- Discontinue quarantine for individuals who are autoimmune compromised when "at least 20 days have passed since symptoms onset"; and
- Quarantine all "close contacts testing negative…for 14 days from their last exposure."

41. To be clear, however, the CDC's guidance was not an exhaustive catalogue of what was medically required to protect people's lives during a pandemic. Nor was it a repudiation of the CDC's scientific guidance that social distancing is required to stop the transmission of the virus.

42. According to the World Health Organization ("WHO"), prisoners "should have access to testing as soon as they present symptoms." And in order to prevent COVID-19 outbreaks, all prisoners "suspected or confirmed" to have [COVID-19] should be given "access to health care, including urgent, specialized care, without undue delay," in particular for respiratory isolation and treatment.[52]

43. As well, in response to the need for immediate action, jails and prisons released inmates in order to prevent community outbreaks of severe illness and death from COVID-19. For example, in March 2020 New Jersey released 1,000 people,[53] and after identifying the need to

---

[52] Inter-Agency Standing Committee, WHO and OHCHR, Interim Guidance, COVID-19: Focus on Persons Deprived of Their Liberty, at 4. (March 2020), https://interagencystandingcommittee.org/system/files/2020-11/IASC%20Interim%20 Guidance%20on%20COVID-19%20-%20Focus%20on%20Persons%20Deprived% 20of%20Their%20Liberty_0.pdf; WHO, Regional Office for Europe, *Preparedness, prevention and control of COVID-19 in prisons and other places of detention: Interim guidance*, para 6.4, https://apps.who.int/iris/bitstream/handle/10665/336525/WHO-EURO-2020-1405-41155-55954-eng.pdf?sequence=1&isAllowed=y.
[53] Tracey Tully, *1,000 Inmates Will Be Released From N.J. Jails to Curb Coronavirus Risk*, N.Y. Times (Mar. 23, 2020), https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html.

further reduce prison populations, New Jersey released 2,258 prisoners on November 11, 2020.[54]

Los Angeles County, California released more than 3,500 people in April 2020,[55] and in May 2020

Cuyahoga County, Ohio released more than 900 people.[56]

44.     Moreover, courts across the country recognized "that [COVID-19] could promptly

and critically threaten" lives and accordingly ordered the release of prisoners.[57]   Indeed, numerous

courts released prisoners detained at Fort Dix as a result of COVID-19.[58]

45.     States and other local jurisdictions likewise made changes to carceral policies in

response to the COVID-19 pandemic, including eliminating medical co-pays for incarcerated

people.[59]  Others required facilities to distribute and make available sanitation supplies and hand

---

[54] Tracey Tully, *2,258 N.J.  Prisoners Will Be Released In A Single Day,* N.Y. Times  (November 4, 2020), https://www.nytimes.com/2020/11/04/nyregion/nj-prisoner-release-covid.html.

[55] CBS Los Angeles, *Los Angeles, Ventura County Jails Releasing Inmates To Cut Risk Of Coronavirus Exposure*,
(April 15, 2020), https://losangeles.cbslocal.com/2020/04/15/coronavirus-jails-releasing-inmates-los-angeles-county-ventura-county/.

[56] Ronnie Dahl, *Will Reduced Crowding At Cuyahoga County Jail Continue After The Coronavirus Crisis?*, 19 News (April 23, 2020), https://www.cleveland19.com/2020/04/23/will-reduced-crowding-cuyahoga-county-jail-continueafter-coronavirus-crisis/.

[57] *United States v. Perdigao,* CR 07-103, 2020 WL 1672322, at *1 (E.D. La. Apr. 2, 2020) (granting compassionate release to prisoner detained at the Pollock Federal Penitentiary); *see also United States v.  Rodriguez*, 451 F. Supp. 3d 392, 402 (E.D. Pa. 2020) (granting compassionate release to prisoner held at FCI Elkton); *United States v. Hernandez*, 451 F. Supp. 3d 301, 306 (S.D.N.Y. 2020) (granting compassionate release to federal prisoner held Brooklyn); *United States v. Jepsen*, 451 F. Supp. 3d 242, 248 (D. Conn. 2020) (granting compassionate release to prisoner detained in Washington).

[58] *United States v. Avery*, 2020 WL 6728781, at *1 (S.D.N.Y. Nov. 16, 2020) (granting compassionate release to prisoner held at Fort Dix); *United States v. Fernandez*, 2020 WL 7647459, at *3 (S.D.N.Y.  Oct.  14, 2020) (granting compassionate release to prisoner held at Fort Dix); *United States v. Vega*, 2020 WL 7060153, at *3 (E.D.N.Y. Dec. 2, 2020) (granting compassionate release to prisoner due to prison's "failure ...  to prevent and control a COVID-19 outbreak at Fort Dix"); *United States v. Staats*, 2020 WL 6888224, at *2 (E.D. Pa. Nov. 24, 2020) (granting compassionate release to prisoner held at Fort Dix).

[59] *Warren, Pressley, Haaland Lead Bicameral Group of Lawmakers Requesting Information on Medical Copays in Prisons and Their Impact on the Spread of COVID*-19, Senator Elizabeth Warren (November 19, 2020), https://www.warren.senate.gov/ oversight/letters/warren-pressley-haaland-lead-bicameral-group-of-lawmakers-requesting-information-on-medical-copays-in-

sanitizers, arranged for the immediate evaluation and treatment of anyone with symptoms, and enacted screening procedures for everyone who entered prisons.[60] And several jurisdictions suspended visits from family members and lawyers.[61]

## III. THE EFFORTS OF THE BUREAU OF PRISONS AND ITS AGENTS WERE INADEQUATE.

46. At all relevant times, Defendants and their agents failed to respond effectively to the COVID-19 pandemic. They failed to anticipate and prepare for the magnitude of the threat posed by COVID-19 to its own staff and the people BOP detains; failed to respond in any meaningful way to initial signs of uncontrolled outbreaks at several of its facilities across the country, including and especially Fort Dix; and continued to fail to implement even the baseline measures that would assure the safety of BOP's own staff, of Plaintiffs and their fellow class members and others incarcerated by BOP, and of the communities into which staff and others travel on a daily basis. Defendants' primary failure was their unwillingness to implement social distancing measures, despite clear public health guidance that it was and is necessary to prevent COVID-19 infection.

47. In fact, Defendants' preparations were inadequate from the very beginning. Initial guidance from Defendant Carvajal was not issued until March 9, 2020, at which point it addressed only the possibility of telework for some employees at an agency where the vast majority of

---

prisons-and-their-impact-on-the-spread-of-covid-19 (noting that BOP waived medical co-pay from March 2020 to October 1, 2020).

[60] *See, e.g.*, Indiana Dep't of Corr., *Preparedness and Response Plan (Adult and Juvenile)* 5–8 (2020), https://www.in.gov/idoc/files/IDOC%20Pandemic%20Response%20Plan%203-3-2020.pdf#response%20plan.

[61] The Marshall Project Staff, *How Prisons In Each State Are Restricting Visits Due To Coronavirus*, The Marshall Project (March 17, 2020), https://www.themarshallproject.org/2020/03/17/tracking-prisons-response-to-coronavirus.

employees must be physically present at facilities to do their jobs, and it mentioned restrictions only for people who had traveled to already-impacted countries.[62]

48. Moreover, as late as March 26, 2020—weeks after many cities and states had closed restaurants and non-essential businesses, restricted travel, and ordered people to shelter in place—Defendant Carvajal announced that BOP had merely taken an inventory of soap, but had not distributed.[63]

49. Given Defendant Carvajal's failure to take action to prepare for or confront the threat of COVID-19, BOP faced criticism for endangering its employees, as well as the prisoner population.[64] Press accounts highlighted the impending storm.[65]

50. Among other failures that contributed to the spread of COVID-19 at BOP facilities, officers reported that, for example, they were initially given only gloves—not masks, face shields, or other PPE—when interacting with prisoners sick enough to require transport to the hospital.[66]

---

[62] *See* Fed. Bureau of Prisons, *BOP Memorandum* (March 9, 2020), https://cdn.govexec.com/media/gbc/docs/pdfs_edit/031020cb.pdf.

[63] Fed. Bureau of Prisons, *Statement From BOP Director*, (March 26, 2020) (BOP Director issued statement that "all cleaning, sanitation, and medical supplies have been inventoried. Ample supplies are on hand and ready to be distributed or moved to any facility as deemed necessary"), https://www.bop.gov/resources/news/20200326_statement_from_director.jsp

[64] *See Letter to Bureau of Prisons*, Senators Elizabeth Warren & Cory Booker, *et al.*, (March 9, 2020), https://www.warren.senate.gov/imo/media/doc/2020-03-09%20Senator%20Warren%20Letter%20to%20BOP%20re%20Coronavirus.pdf; *see also* American Fed. Of Gov. Employees, *Testimony To House Oversight Committee*, (March 11, 2020), https://www.afge.org/globalassets/documents/congressional-testimony/2020/afge-sfr-house-committee-on-oversight-and-reform-coronavirus-preparedness-and-response.pdf

[65] *See, e.g.*, Michael Balasamo & Michael R. Sisak, *Federal Prisons Struggle To Combat Growing COVID-19 Fears*, AP (March 27, 2020), https://apnews.com/724ee94ac5ba37b4df33c417f2bf78a2.

[66] *See* Joseph Neff & Keri Blakinger, *Federal Prisons Agency "Put Staff In Harm's Way" Of Coronavirus: Orders At Oakdale In Louisiana Help Explain COVID-19 Spread*, The Marshall Project (April 1, 2020), https://abcnews.go.com/Health/federal-prisons-facing-shortages-resources-amid-coronavirus-outbreak/story?id=69920966.

Those same officers were ordered back to the job, contrary to CDC guidance that called for self-isolation of correctional staff who had been exposed to COVID-19.[67]

51.     Moreover, Defendants and their agents did not begin distributing masks to prisoners until April 2, 2020, nearly a month after Former President Trump declared a state of national emergency in response to the COVID-19 pandemic.[68]  And despite knowing for months that masks were vital to prevent the spread of COVID-19, in August 2020 federal prisoners reported that they were given "non-reusable masks" and required to use those masks for upwards of four months.[69]

52.     Across facilities, Defendant Carvajal scrambled to address staffing and resource needs.  Despite this, BOP continued to limit the number of contractors who supplied PPE and failed to secure COVID-19 testing kits.  In fact, the agency was sued by its own staff members for requiring them to work in hazardous conditions.[70]

53.     Working conditions within BOP facilities were so dire that BOP employees—including corrections officers—filed a complaint with the Occupational Safety and Health Administration ("OSHA") alleging unsafe conditions at numerous federal prisons, including Fort Dix.  Among other things, the officers' OSHA complaint pointed to BOP having "directed staff

[67] *Id.*

[68] *See* Harry August & Alex Garnick, *'The Situation Here Is Dire': How An Upstate New York Prison Failed To Contain A COVID-19 Outbreak*, The Appeal (April 16, 2020), https://theappeal.org/coronavirus-upstate-new-york-prison-failed-to-contain-outbreak/;  Kevin Liptak, *Trump Declares National Emergency—And Denies Responsibility For Coronavirus Testing Failures*, CNN Politics (March 13, 2020), https://www.cnn.com/2020/03/13/politics/donald-trump-emergency/index.html.

[69] Kim Bellware, *Prisoners And Guards Agree About Federal Coronavirus Response:* '*We Do Not Feel Safe*,' N.Y. Times (August 24, 2020), https://www.washingtonpost.com/nation/2020/08/24/prisoners-guards-agree-about-federal-coronavirus-response-we-do-not-feel-safe/.

[70] Luke Barr, *Federal Prisons Facing Shortages Of Resources Amid Coronavirus Outbreak*, ABC News (April 1, 2020), https://abcnews.go.com/Health/federal-prisons-facing-shortages-resources-amid-coronavirus-outbreak/story?id=69920966.

throughout the Bureau of Prisons who have come in contact with, or been in close proximity to, individuals who show or have shown symptoms of COVID-19, to report to work and not be self-quarantined for 14 days per the CDC guidelines." It also complained of BOP having failed to undertake any workplace or administrative controls to address transmission, to require social distancing or other measures in the CDC guidance, or to provide sufficient PPE.[71]

54. In response, BOP released a short document titled "Correcting Myths and Misinformation about BOP and COVID-19."[72] Attempting to rebut the assertions that staff who had been in contact with prisoners who showed symptoms of COVID-19 still had to come to work, BOP simply required them to work, but with masks on.[73] Due to BOP's actions, during the pandemic 9,321 BOP employees have been sickened with COVID-19.[74]

55. The Coronavirus Aid, Relief, and Economic Security (CARES) Act, signed into law on March 27, 2020, made funding available for federal prisons to purchase PPE and test kits for COVID-19 and authorized the Department of Justice to lengthen the maximum amount of time that a prisoner can be placed in home confinement during the pandemic.[75] Pursuant to that authority, then Attorney General William Barr made a finding that emergency conditions were

---

[71] *See* Notice of Alleged Safety or Health Hazards (March 31, 2020), https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-form-national-complaint.pdf. (OSHA Complaint).

[72] *See* Fed. Bureau of Prisons, *Correcting Myths And Misinformation About BOP And COVID-19*, (April 11, 2020), correcting_myths_and_misinformation_bop_covid19.pdf.

[73] *Id.* at 3 ("In keeping with CDC 'Guidance for Safety Practices for Critical Infrastructure Workers Who May Have Had Exposure to a Person with Suspected or Confirmed COVID-19,' BOP performs pre-screening of all employees reporting to work and requires exposed workers to wear a mask for 14 days after last exposure. They are also expected to perform regular self-monitoring for symptoms, practice social distancing and to disinfect and clean their work spaces. Anyone who develops signs or symptoms of illness are sent home.")

[74] *See* Fed. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last accessed January 25, 2022).

[75] CARES Act, Pub. L. NO. 116-136 § 12003(b), 134 Stat. 281 (2020).

materially affecting the functioning of BOP, and on April 3, 2020 directed Defendant Carvajal to review prisoners with COVID-19 risk factors to determine their eligibility for home confinement; at that time, Barr admitted that BOP's efforts to prevent COVID-19 from entering BOP facilities and infecting prisoners had "not been perfectly successful at all institutions."[76]

56.     On April 22, 2020, BOP issued a memo purporting to interpret then Attorney General Barr's guidance, but instead substantially limited the number and types of people who might qualify for home conferment under the Attorney General's memo.[77]   Despite Attorney General Barr's guidance, *i.e.* to "immediately maximize appropriate transfers to home confinement."[78]

57.     Indeed, Defendant Carvajal's April 22, 2020 guidance gave wardens virtually unchecked discretion to deny a request for release and imposed unnecessary and impractical barriers on prisoners seeking release.  For example, pursuant to BOP's guidance, to be released prisoners could have no disciplinary infraction of any kind for 12 months, had to provide verification that they would have a lower risk of contracting COVID-19 outside the prison than inside of it, and, for those with any on-going medical care, were required to show that their medical needs could be met outside the prison, and that they had a 90-day supply of prescribed medications.[79]

---

[76] Memorandum: Increasing the Use of Home Confinement at Institutions Most Affected by COVID-19, Attorney General William Barr to Director Michael Carvajal (April 3, 2020), https://www.justice.gov/file/1266661/download.
[77] Memorandum from Correctional Programs Division Acting Assistant Director Andrew Matevousian & Reentry Services Division Assistant Director Hugh J. Hurwitz to Chief Executive Officers (April 22, 2020), https://famm.org/wp-content/uploads/bop-memo-4.23.2020.pdf.
[78] Memorandum from Attorney General Barr, *supra* note 76.
[79] *Id.*

58.     Rather than proactively addressing the conditions that place people in BOP custody at risk of illness or death, Defendant Carvajal focused on spending money purchasing hydroxycloroquine, an unproven remedy that medical authorities did not believe could effectively treat COVID-19.[80]

59.     During the first three months of the pandemic, Defendant Carvajal "rejected or ignored more than 98 percent of the compassionate release requests," including many from medically vulnerable prisoners.[81]  From March 2020 to May 2020, "wardens approved 1.4% of release applications," but "central office rejected most of those, with [Defendant Carvajal] ultimately approving just 0.1%."[82]

60.     Subsequent BOP data "shows officials approved fewer" compassionate release applications "during the [first year of the] pandemic than they did the year before."[83]  "The downturn in approvals came even as the number of people seeking compassionate release skyrocketed…."[84]  From March 2020 to April 2021, 31,000 federal prisoners sought compassionate release but Defendant Carvajal approved only 36 requests.[85]  "By comparison, federal judges approved 21% of compassionate release requests they considered in 2020."[86]

---

[80] Lachlan Markay, *The Bureau Of Prisons Just Bought A Ton Of Hydroxychloroquine, Trump's COVID-19 Miracle Drug,* The Daily Beast (April 7, 2020), https://www.thedailybeast.com/the-bureau-of-prisons-just-bought-a-ton-of-hydroxychloroquine-trumps-covid-19-miracle-drug.
[81] Keri Blakinger & Joseph Neff, *31,000 Prisoners Sought Compassionate Release During COVID-19. The Bureau Of Prisons Approved 36*, The Marshall Project (June 11, 2021), https://www.themarshallproject.org/2021/06/11/31-000-prisoners-sought-compassionate-release-during-covid-19-the-bureau-of-prisons-approved-36.
[82] *Id.*
[83] *Id.*
[84] *Id.*
[85] *Id.*
[86] *Id.*

61.     The consequences of Defendant Carvajal's failure to employ any of the preventive measures that would have protected prisoners from COVID-19 have been dramatic. Nationwide nearly 50,000 prisoners in BOP custody tested positive for the virus. That is, two out of every seven prisoners within the care and custody of BOP contracted COVID-19.[87]

62.     Federal facilities all over the country were overrun with the virus, including but certainly not limited to:

a.  FCI Elkton: 710 prisoners currently detained in the facility have recovered from COVID-19;
b.  FCI Fort Dix: 1,583 prisoners currently detained in the facility have recovered from COVID-19;
c.  Texarkana FCI: 633 prisoners currently detained in the facility have recovered from COVID-19;
d.  Marion United States Penitentiary ("USP"): 644 prisoners currently detained in the facility have recovered from COVID-19;
e.  Seagoville FCI: 1,003 prisoners currently detained in the facility have recovered from COVID-19;
f.  Tucson USP: 831 prisoners currently detained in the facility have recovered from COVID-19;
g.  Florence FCI: 573 prisoners currently detained in the facility have recovered from COVID-19;
h.  Leavenworth USP: 669 prisoners currently detained in the facility have recovered from COVID-19;
i.  Beaumont Low FCI: 923 prisoners currently detained in the facility have recovered from COVID-19; and
j.  Big Spring FCI: 661 prisoners currently detained in the facility have recovered from COVID-19.[88]

63.     As startling as these figures are, they are most certainly an undercount. Indeed, BOP has repeatedly understated the scope of the problem and refused to take steps to accurately assess the situation or provide information about it. For example, on April 6, 2020, BOP reported

---

[87] The Marshall Project, *A State-By State Look at 15 Months Of Coronavirus In Prisons,* (July 1, 2021), https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons.
[88] *See* Fed. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (as of January 13, 2022).

that only eight prisoners in FCI Elkton had tested positive for the virus. However, on that same day, press accounts reported that medical capacity had fallen to 50% within the prison and that three prisoners had already died from the virus.[89] And as of January 14, 2022, BOP reported that of the 1,614 COVID-19 tests conducted at FCI Elkton only 519 have come back positive, which stands in stark contrast to the nearly 1,000 confirmed positive cases that BOP previously reported.[90]

64. Further, BOP's website has consistently understated the impact of COVID-19. BOP has "a policy of removing cases and deaths from its" public reporting,[91] which explains why from March 2021 to November 2021, the number of inmates who contracted COVID-19 while in BOP custody decreased from 46,986 to 42,670—an illogical trend for a number that presumably can only increase over time.[92]

65. Moreover, BOP's online COVID-19 information dashboard only contains data among prisoners who are "currently incarcerated."[93] Thus, if a prisoner tests positive for COVID-19 and is subsequently released from BOP custody, BOP subtracts that prisoner's positive test from the total number of confirmed COVID-19 cases because he is no longer incarcerated. One

---

[89] *Ohio Gov. Mike DeWine Authorized Ohio National Guard To Assist Elkton Prison*, WKYC (April 6, 2020), https://www.wkyc.com/article/news/health/coronavirus/ohio-gov-mike-dewine-authorizes-ohio-national-guard-to-assist-elkton-prison/95-d620f3c6-c560-486f-9eac-ebce7c09d4e7.

[90] *See United States v. Babbitt*, 496 F. Supp. 3d 903, 912 (E.D. Pa. 2020) ("[T]here have been 922 reported cases of COVID-19 among inmates at FCI Elkton, and 54 among staff.")

[91] The Marshall Project, *supra* note 87.

[92] *See* Fed. Bureau of Prisons, *supra* note 88 (as of January 13, 2021); *see also* Joshua Manson and Liz Dewolf, *The Federal Bureau of Prisons Is Even Less Transparent Than We'd Thought*, UCLA LAW Behind Bars Data Project, (April 2, 2021) (noting that on March 1, 2021 BOP reported that 46, 989 inmates had tested positive for COVID-19), https://uclacovidbehindbars.org/blog/bopdata. Even as of the date of filing, and despite a massive outbreak of COVID-19 across BOP facilities over the last month, according to BOP data only 45,556 BOP prisoners have recovered from COVID-19; Fed. Bureau of Prisons, *supra* note 88 (as of January 26, 2022).

[93] Manson and Dewolf, *supra* note 92.

report found that "dozens of BOP facilities have removed [COVID-19] cases from their total counts almost every day since at least as far back as October 2020."[94]

66.     Similarly unreliable is BOP's facility-specific data. While BOP claims to maintain data for individuals who are currently incarcerated—a disturbing practice that obscures the true toll of COVID-19 in federal prisons—the facility-specific data does not include reliable counts. For example, on January 14, 2022, BOP reported that there were 923 prisoners currently incarcerated at Beaumont Low FCI who had recovered from COVID-19, but at the same time that there had only been 660 detected infections at the facility.[95] BOP ignored inquiries into this data discrepancy and "[i]t is therefore, unclear whether BOP adjusts total cases when transferring people who have been infected between its facilities, and whether it treats all variables similarly with respect to those who are infected and then released."[96] What is clear, however, is that BOP's data significantly undercounts the toll that COVID-19 has had within its facilities.

67.     Even in the midst of the virus's first rapid spread across the country, Defendant Carvajal persisted in transferring prisoners between prisons. In their OSHA complaint, BOP employees reported that BOP "authorized movement of infected inmates, inmates suspected of being infected, [and] inmates who [had] been in close contact or proximity to infected inmates, to areas of the country that [did] not have any rate of infection, or to facilities that otherwise [had] not shown signs of any introduction of the virus, thus introducing the virus into [] uninfected area[s]."[97]

---

[94] *Id.*
[95] *See* Fed. Bureau of Prisons, *supra* note 88.
[96] Manson and Dewolf, *supra* note 92.
[97] OSHA complaint, *supra* note 71.

68. As the pandemic ravaged through BOP facilities, Defendants continued to flout CDC guidelines. Defendant Carvajal allegedly "ordered a halt of prisoner movement on March 13, but there is evidence that [prisoners] were still being shipped around the country well into April."[98] And despite the rapid increase in COVID-19 cases within BOP facilities, BOP "resumed transfers in late May" 2020.[99] BOP guidance said that prisoners were supposed to be tested and strictly quarantined during transfers, but according to prison union officials BOP ignored that guidance and shoved "Tylenol and Motrin in [prisoners] so they [didn't] have a fever," and then put "them on a plane."[100]

69. Even after prisoner transfers were linked to numerous COVID-19 outbreaks in both State and Federal prisons, Defendants and their agents continued to transfer prisoners between federal facilities.[101] According to a federal corrections officers, well into 2021, Defendants and their agents were still transferring prisoners between federal prisons who were not "adequately screen[ed] or quarantined" prior to or after the transfer, which resulted in a COVID-19 outbreak at the intake facility.[102]

---

[98] Keri Blakinger & Keegan Hamilton, *"I Begged Them To Let Me Die": How Federal Prisons Became Coronavirus Death Traps*, The Marshall Project (June 18, 2020), https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-became-coronavirus-death-traps.

[99] *Id.*

[100] *Id.*

[101] *See* Cary Aspinwall and Ed White, *Moving People— And Coronavirus— From Prison to Prison*, The Marshall Project (December 21, 2020), https://www.themarshallproject.org/2020/12/21/moving-people-and-coronavirus-from-prison-to-prison.

[102] Joshua Ceballos, *Prison Staff Warn of Potential COVID-10 Outbreak In Miami Detention Center*, Miami New Times (July 29, 2021), https://www.miaminewtimes.com/news/staffers-warn-of-covid-19-outbreak-at-miami-federal-prison-12630429.

70.     Defendant Carvajal "did not institute a policy requiring staff to wear face masks until August 27, 2020, and even that guidance contemplated religious exemptions, medical exemptions, and outright refusals to comply with the mask mandate."[103]

71.     The consequences of the Defendant Carvajal's failure to heed guidance was deadly. As of January 26, 2022, at least 282 federal prisoners have died from COVID-19.[104]

## IV.     DEFENDANTS WERE AWARE THAT SOCIAL DISTANCING WOULD BE DIFFICULT AT FORT DIX.

72.     On April 11, 2020, just days after BOP reported that the first prisoner at Fort Dix had tested positive for COVID-19, Defendant Ortiz warned prisoners at Fort Dix that "social distancing is not possible in this environment."

73.     Perversely, the design of Fort Dix means that, while those confined there are designated by BOP as among the least dangerous prisoners, its exact design exposed them to a heightened risk of contracting COVID-19.[105]

74.     Except for disciplinary and medical isolation, Fort Dix has no separate one-person housing cells.[106]

---

[103] *United States v. Brown*, CR 13-176-1, 2020 WL 5801494, at *3 (E.D. Pa. Sept. 29, 2020).

[104] Fed. Bureau of Prisons, *supra* note 88 (as of January 13, 2022). While this number is startlingly, it is worth noting that it too is most certainly an undercount. The number of deaths within BOP facilities does not include individuals who contracted COVID-19 while in BOP custody and were subsequently released; thus, the true death toll is likely much higher than BOP reports. *See* Maura Turcotte, Rachel Sherman, Rebecca Griesbach and Ann Hinga Klein, *The Real Toll From Prison Covid Cases May Be Higher Than Reported*, N.Y. Times (July 30, 2021), https://www.nytimes.com/2021/07/07/us/inmates-incarcerated-covid-deaths.html.

[105] BOP institutions are operated at five different security levels: minimum, low, medium, high, and complex. Fed. Bureau of Prisons, *About Our Facilities*, https://www.bop.gov/about/facilities/federal_prisons.jsp. Minimum security facilities "have dormitory housing" and low security facilities have "mostly dormitory or cubicle housing." *Id.* Fort Dix is a low-security institutional and has an adjacent minimum security satellite camp. BOP Program Statement P5100.08 (September 12, 2006), https://www.bop.gov/policy/progstat/5100_008.pdf.

[106] PREA Audit: Auditor's Summary Report (May 31, 2014), https://www.bop.gov/locations/institutions/ftd/FTD_prea2.pdf.

75. People confined at Fort Dix are housed together in group quarters. Those at the Camp are divided into two communal dorms, referred to as A-wing or (A-unit) and B-wing (or B-unit). Each wing typically houses approximately 150 people in a grid of bunk beds two to three feet apart.[107] Inmates in the bunks are so close that they can reach out and touch those in the bunks on both sides; in some places, the bunks are arranged three-deep--that is, inmates sleep not only with bunks to their left and right, but also at their head and feet.[108]

76. The main facility is divided into East and West Compounds, with approximately five buildings on each side that can house more than 300 people each. The buildings are three stories high and consist mostly of 12-person rooms, with a smaller number of two-person rooms. The 12-person rooms can be as small as 500 square feet. Within that space are six two-person bunk beds, 12 lockers, and a card table. Prisoners maintain free movement within their building, sharing common TV rooms, computers, telephones, and bathrooms.

77. The bathrooms at Fort Dix are communal. In both the main facility and the Camp, prisoners share a limited number of sinks, showers, and toilets with dozens of other prisoners within just a few feet. In the Camp, for example, a single bathroom with shared sinks and toilets is used by some 150 people.[109]

78. Because the prisoners at Fort Dix have nowhere else to go, many have spent the pandemic under their covers, quite literally hiding from the virus. Even then, most are still within arm's reach of other people in the bunk above or below them, and the beds to the left and right. Thus, the impossibility of social distancing is not just a warden's warning; it is a fact.

---

[107] Declaration of Michael Scronic, *Wragg v. Ortiz*, Case No. 1:20-cv-05496 (D.N.J Filed May 4, 2020), ECF No. 1 at ¶ 4.
[108] *Id.*
[109] *Id.* at ¶ 6.

79. The fundamental structure of the low and minimum security Fort Dix facility makes it a COVID-19 deathtrap. It is not possible for people to engage in social distancing or self-quarantine precautions as recommended by the CDC. As Dr. Joe Goldenson, the former Director of the Jail Health Services of the Sand Francisco Department of Public Health, explains, Fort Dix's communal set-up makes the social distancing essential to preventing the spread of infection "impossible."[110]

## V. DEFENDANTS FAILED TO TAKE PROPER PRECAUTIONS AND VIOLATED PLAINTIFFS' CONSTITUTIONAL RIGHTS.

80. Defendants' and their agents' actions to protect prisoners from COVID-19 were wholly inadequate. Although BOP purported to impose a nationwide quarantine on April 1, 2020, Defendants Ortiz and Kodger failed, in fact, to impose effective quarantine measures. For example, Defendants Ortiz and Kodger did not distribute masks to prisoners until early April, and not all prisoners received masks at that time. Correctional officers, who live throughout the central New Jersey and greater Philadelphia area, continued to move in and out of Fort Dix each day without sufficient medical screening or protective equipment. They moved between the Camp and main facility during the pandemic, spreading the virus between various areas of the prison. And prisoners continued to move between wings of the Camp and within buildings in the main facility. Indeed, prisoners report that from the very beginning, Defendants Ortiz and Kodger moved prisoners between units without testing them for COVID-19. In sum, there was no quarantine whatsoever.

81. BOP reported the first confirmed COVID-19 case at Fort Dix, an infected staff member, on March 30, 2020.

---

[110] Declaration of Dr. Joe Goldenson, *Wragg v. Ortiz*, Case No. 1:20-cv-05496 (D.N.J Filed May 4, 2020), ECF No. 1 at ¶ 36.

82. That same day, Defendant Ortiz sent a notice prohibiting prisoners from "enter[ing] the kitchen on either the East or West compounds for meals with their faces concealed with makeshift masks due to COVID-19 concerns."[111] For a week following this, staff told prisoners that they could not wear masks that were not issued by the prison.[112]

83. On April 7, 2020, BOP reported Fort Dix's first COVID-positive prisoner on its website. On April 9, it reported its second case. That same day, a memorandum from the facility's medical staff announced that "a second [C]amp offender has been determined to be positive for COVID-19 and a third Camper has been isolated for evaluation of symptoms and is awaiting COVID-19 test results. . . . [I]t is strongly recommended that you [wear] your surgical mask upon issue."[113]

84. By April 11, 2020, BOP reported that four prisoners at Fort Dix had contracted the virus and Defendant Ortiz told prisoners: "In order to maintain the health of staff and inmates, the following is expected from all inmates: wear your surgical masks! Since social distancing is not possible in this environment, masks will help keep you and others from spreading viruses."[114]

85. From April 2020 to March 2021, Fort Dix prisoners received approximately seven face masks, two disposable surgical masks, and four to five cloth masks, and prisoners were not given additional soap to wash their masks so they had to use their personal allotment of soap to ensure that their masks were cleaned.

86. Defendant Ortiz and Kodger failed to enforce masks mandates or social distancing protocols. Thus, prison staff routinely failed to wear masks or other protective equipment and

---

[111] Scronic Decl., *supra* note 107 at ¶ 8.
[112] *Id.*
[113] *Id.* at ¶ 10.
[114] *Id.* at ¶ 11.

forced prisoners to disregard social distancing guidelines by making them line up to get meals. Indeed, it appears that staff only enforced COVID-19 protocols when lawmakers and federal auditors came to visit the prison.

87. Defendant Ortiz, N'Diaye, and Kodger never instituted a policy to test prison staff or guards for the virus; thus, those who came into contact with COVID-19 positive people have been able to spread the virus. In fact, in November 2020, as COVID-19 devastated the prison population at Fort Dix, Defendant Carvajal "refused to provide on-site testing to staff at any federal prison," including Fort Dix. Even prison staff spoke publicly about the lack of testing at Fort Dix, saying that Fort Dix likely "never wanted to test staff" because they were "concerned about how the heck they would run [Fort Dix]."[115]

88. From March to October 2020, Defendants never tested the prisoner population as a whole. Further, Fort Dix's Health Services refused even to test prisoners who complained of COVID-19 and instead typically instructed them to just go and rest.

89. Indeed, at all times relevant to this Complaint, Defendants did not have a policy to test all prisoners, even those who came into contact with COVID-19 positive staff or prisoners.

90. Fort Dix's Health Services also ceased temperature checks of incoming prison staff without explanation in June 2020, and stopped checking prisoner temperatures at around that same time.

91. Further, Defendants Ortiz and Kodger deliberately placed COVID-19 negative prisoners in danger by forcing them into COVID-19 positive units. For example, on December 28, 2020, Joseph Alexander, a prisoner who had recently transferred into Fort Dix, was placed in

---

[115] Keegan Hamilton, *Federal Prisons Keep Turning Into COVID Nightmares: 'Everyone Looks Like Death,'* Vice News (November 12, 2020), https://www.vice.com/en/article/n7vba8/federal-prisons-keep-turning-into-covid-nightmares-everyone-looks-like-death.

a COVID-19 positive housing unit, unit 5812, despite testing negative for the virus a few days prior. Mr. Alexander was under the impression that he was being placed in a COVID-19 negative housing unit, however, when he arrived there were eight active COVID-19 cases in his unit. When Mr. Alexander complained of his placement, he was told that his unit had achieved herd immunity and that he should not worry.[116]

92. Additionally, Defendants Ortiz's, N'Diaye's, and Kodger's failures to contain movement by prisoners and staff throughout otherwise separate areas of Fort Dix ensured that once an infected person arrived, he would not be confined to particular areas, and the result would be that the virus could and would spread to other areas, as in fact happened.

93. On April 8, 2020 Defendants Ortiz and Kodger converted the B-wing of the Camp facility into a makeshift quarantine for 63 people who believed they were being considered for potential release on home confinement pursuant to the CARES Act.[117] Those 63 people were pulled from both A and B-wings. The remaining prisoners, approximately 160 people, were packed into the A-wing, but Fort Dix did not test any of them or attempt to limit mingling among groups of people who had previously been exposed to COVID-19.[118]

---

[116] "Herd immunity occurs when a large portion of a community (the herd) becomes immune to a disease, making the spread of disease from person to person unlikely." The Mayo Clinic, *Herd Immunity And COVID-19 (Coronavirus): What You Need To Know*, https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/herd-immunity-and-coronavirus/art-20486808 (August 28, 2021). The percentage of a community that needs to be immune in order to achieve herd immunity varies from disease to disease, however, "the more contagious a disease is, the greater the proportion of the population that needs to be immune to the disease to stop the spread." *Id.* "Experts estimate that in the U.S., 70% of the population – more than 200 million people – would have to recover from COVID-19" in order to achieve herd immunity. *Id.*

[117] CARES Act, Pub. L. NO. 116-136 § 12003(b), 134 Stat. 281 (2020).

[118] Scronic Decl., *supra* note 107 at ¶ 16.

94.     As a result of Defendants Ortiz's and Kodger's failure, by May 6, 2020, 40 prisoners in Camp and three staff members had tested positive for the virus.[119]

95.     This trend continued and resulted in nearly 2,000 prisoners at Fort Dix contracting COVID-19 by March 13, 2021.[120]

### A. FCI Elkton Transfers

96.     Defendants did not learn from the initial COVID-19 outbreak.  Rather, they continued to ignore the relevant guidance and disregard pertinent policies with impunity.

97.     From September 28, 2020 to October 30, 2020, Defendant Carvajal and English "transferred a large number of inmates from [FCI Elkton] known to be in the midst of a serious COVID-19 outbreak to Fort Dix without an effective plan in place to avoid spreading the virus from transferring inmates to staff and inmates at Fort Dix."[121]  Indeed, in four waves—on September 28, October 6, 21 and 28—Defendant Carvajal and English transferred 298 prisoners from FCI Elkton to Fort Dix.[122]

---

[119] Colleen O'Dea, *COVID-19 Horror Stories Prompt ACLU-NJ To File For Temporary Release Of Medically Fragile Prisoners,* NJ Spotlight News (May 6, 2020), https://www.njspotlight.com/2020/05/covid-19-horror-stories-prompt-aclu-nj-to-file-for-temporary-release-of-medically-fragile-prisoners/.

[120] Joe Atmonavage, *2 Inmates Begged For Release From Federal Prison In N.J. Where Coronavirus Raged. They Both Died Of COVID.*, N.J. com (March 13, 2021), https://www.nj.com/coronavirus/2021/03/2-inmates-begged-for-release-from-federal-prison-in-nj-where-coronavirus-raged-they-both-died-of-covid.html.

[121] *United States v. Newell*, 1:13-CR-165-1, 2021 WL 3269650, at *2 (M.D.N.C. July 30, 2021).

[122] Joe Atmonavage, *There Is 'No-Evidence' That Transferring Sick Inmates to N.J. Prison Led To Covid-19 Outbreak, Official Says*, NJ. Com (Nov.  11, 2020), *available at* https://www.nj.com/news/2020/11/there-is-no-evidence-that-transferring-sick-inmates-to-nj-prison-led-to-covid-19-outbreak-official-says.html.

98.     According to Defendant Kodger, the prisoners at FCI Elkton were brought to Fort Dix—a facility where social distancing was already impossible—"in order to increase the opportunities for inmates to practice social distancing" at FCI Elkton.[123]

99.     Defendant Kodger claimed that FCI Elkton transferees were tested upon arrival, quarantined in a private unit on the East Side of Fort Dix's main compound, and never came into contact with any other prisoners.[124] Defendant Kodger's claims were untrue. Indeed, COVID-19-negative prisoners from the FCI Elkton transfers were almost immediately mingled with the prisoner population.

100.    Further, at the time of the FCI Elkton transfers "Fort Dix [did] not test staff," even those who came in contact with COVID-19 positive prisoners.[125]

101.    Following the FCI Elkton transfers, COVID-19 ravaged Fort Dix for nearly four months, infecting approximately 2,000 prisoners.

102.    Specifically, on September 20, 2020, there were no reported cases of COVID-19 at FCI Fort Dix.[126]

103.    On September 28, 2020, Defendants Carvajal and English transferred 64 prisoners from FCI Elkton to Fort Dix, six of whom tested positive for COVID-19.[127] These active cases were not reported by BOP as present at either Elkton or Fort Dix.

---

[123] Declaration of Kimberly Kodger, *United States v. Rodriguez,* 16-CR-07 (AJN) (S.D.N.Y. Filed November 20, 2020), ECF No. 59 at ¶ 2.
[124] *Id.* at ¶¶ 3-14.
[125] *Id.* at ¶ 8.
[126] *United States v. Tubbs*, CR 2:14-00135-KD-N, 2020 WL 5733199, at *4 (S.D. Ala. Sept. 24, 2020), *appeal dismissed sub nom. United States v. Van Tubbs*, 20-13988-G, 2021 WL 1608747 (11th Cir. Apr. 16, 2021).
[127] Kodger Decl., *supra* note 123 at ¶ 9.

104. On October 6, 2020, Defendants Carvajal and English transferred an additional 65 prisoners from FCI Elkton to Fort Dix, six of whom tested positive for COVID-19.[128] These active cases were also not reported by BOP as present at either of the two facilities.

105. On October 9, 2020, BOP publicly reported that there were no active COVID-19 cases at Fort Dix.[129] However, on that same day, Fort Dix's Health Services sent a memorandum to the prison population advising them that prisoners "at FCI Fort Dix…tested positive for COVID-19."[130]

106. Despite these acknowledged COVID-19 cases, Fort Dix staff, including medical personnel, still declined to administer COVID-19 tests to prisoners who reported COVID-19 symptoms, including Plaintiffs Thieme, Williams, Speed, and Silva. Several prisoners, including Ian Anderson, were forced to work in Food Services after reporting COVID-19 symptoms.

107. Finally, on October 20, 2020, all of the prisoners in unit 5812 were tested for COVID-19, including Plaintiffs Thieme, Williams, Speed, and Silva.

108. On October 21, 2020, BOP transferred an additional 92 inmates to Fort Dix, none of whom tested positive for the virus.[131]

109. On October 22, 2020, as a result of the increase in COVID-19 positive cases, Defendant Ortiz wrote to Defendant English, BOP director for Northeast Region, requesting a "temporary moratorium" on all transfers into Fort Dix through November 23, 2020. In so doing,

---

[128] *Id.* at ¶ 10.

[129] *See* Joe Atmonavage, *Lawmakers Have 'Grave Concerns' Over how Officials Are Handling COVID-19 Outbreak At N.J. Prison*, NJ. com (November 9, 2020), https://www.nj.com/news/2020/11/lawmakers-have-grave-concerns-over-how-officials-are-handling-covid-19-outbreak-at-nj-prison.html (describing the rise in positive cases at Fort Dix, where there were "no cases of the virus on October 9").

[130] *See* Exhibit A, October 9, 2021 Memorandum For Prison Population.

[131] Kodger Decl., *supra* note 123 at ¶ 1.

Defendant Ortiz stated that Fort Dix was "concerned that bed space for isolation and exposure quarantine [would] be inadequate."[132]

110. On October 23, 2020, Defendant English sought a moratorium on all incoming transfers to Fort Dix from Defendant Carvajal and/or his agent. However, and despite the increase in COVID-19 cases, Defendant English requested that the moratorium not begin until October 29, 2020, a week after it was requested.[133]

111. On information and belief, Defendant English refrained from seeking an immediate moratorium on transfers in order to complete the fourth FCI Elkton transfer as scheduled.

112. On October 25, 2020, approximately 40 to 50 prisoners in unit 5812, including Plaintiffs Thieme and Williams, were informed that they had contracted COVID-19. These cases were not reported by BOP until October 29 and the actions of Defendants Ortiz and Kodger that followed ensured that the number of cases would rise quickly.

113. Specifically, Defendants Ortiz and Kodger forced prisoners, including COVID-19 negative and positive prisoners, to move between floors in their units, as a result of which prisoners who had previously tested negative for the virus were quickly infected and began testing positive shortly thereafter.

114. For example, Plaintiff Silva tested negative for the virus on October 20, 2020; subsequently, however, on October 26, 2020, Fort Dix officials forced Plaintiff Silva to move into a 12-man room, which was previously occupied by COVID-19 positive prisoners and was not cleaned prior to him being transferred into that room. Predictably, Plaintiff Silva contracted the virus and tested positive for the virus just three days later.

---

[132] Exhibit B, October 22, 2020 Letter From Defendant Ortiz.
[133] Exhibit C, October 23, 2020 Letter from Defendant English.

115.    Similarly, Plaintiff Speed contracted COVID-19 after being transferred from unit 5812. Fort Dix staff tried to get Plaintiff Speed to move floors within unit 5812 just as they had with Plaintiff Silva, but Plaintiff Speed refused to be moved to a different floor for fear of contracting COVID-19 and because Plaintiff Speed is epileptic and thus could not sleep on the top bunk to which he had been assigned. Plaintiff Speed received a "write up" for refusing to move into the infected room. On or about October 26, Plaintiff Speed was notified that he was negative for COVID-19 and was subsequently transferred into the medical unit, unit 5806, where he was mingled with prisoners who had previously tested positive for the virus. On November 2, Plaintiff Speed tested positive for COVID-19.

116.    Prisoners who were positive for COVID-19 were not properly quarantined, including Plaintiffs Thieme and Williams.

117.    On October 25, 2020, Plaintiffs Thieme and Williams were moved out of unit 5812 after testing positive for COVID-19. Defendants required Plaintiffs Thieme and Williams, and the other COVID-19 positive prisoners, many of whom were actively suffering from COVID-19 symptoms, to carry a bag of their belongings from unit 5812 to a quarantine unit. Their time in quarantine, however, was short-lived. Less than 24 hours later, Defendants moved Plaintiffs Thieme and Williams, and the other COVID-19 positive prisoners, back to unit 5812 when they decided to turn the third floor of the unit into a quarantine unit. Thus, when the COVID-19 positive prisoners returned from their one-day quarantine, they were placed in new cells on the third floor, to which they carried their mattresses and bagged belongings.

118.    The other prisoners in unit 5812 called their unit the "war-zone"; the guards gave the prisoners 20 minutes to move into new cells. The beds were not cleaned prior to the move and prisoners were accordingly forced to move into beds that had just housed COVID-19 positive

41

prisoners. Staff made the prisoners carry their mattresses, bedding, and personal belongings to their new cells, which were filthy unsanitary units. This move was so haphazard that sick prisoners, who had no place to go, slept in halls with garbage and torn mattresses around them.

119. With cases climbing, Defendants Carvajal and English continued with the FCI Elkton transfers as planned.[134] Accordingly, and despite clear evidence that transfer protocols had failed to prevent the spread of COVID-19, on October 28, 2020, Defendants Carvajal and English transferred another 77 prisoners from FCI Elkton to Fort Dix, five of whom tested positive for COVID-19.[135]

120. Over the next week, COVID-19 "spread rapidly" through Fort Dix. On October 29, 2020, BOP reported that there were approximately 59 active COVID-19 infections among prisoners at Fort Dix.[136] And on November 3, 2020, as confirmed by the data from BOP, 166 prisoners at "Fort Dix [had] tested positive for COVID-19[.]"[137]

121. Based upon the fact that "BOP recently transferred COVID-19 positive incarcerated individuals to FCI Fort Dix, which [was] facing a second, and potentially severe, COVID-19 outbreak," on November 9, 2020, lawmakers expressed "grave concerns regarding the [BOP's] inadequate protocols for COVID-19 testing and transfers of incarcerated individuals."[138]

---

[134] *See* Kodger Declaration, *supra* note 123 at ¶ 14.

[135] *Id.*

[136] George Woolston, *Cases Of COVID-19 Nearly Triple At FCI Fort Dix*, Burlington County Times (October 31, 2020), https://www.burlingtoncountytimes.com/story/news/2020/10/31/cases-covid-19-fci-fort-dix-nearly-triple/6103081002/.

[137] *United States v. Mongelli*, 02-CR-307 (NGG), 2020 WL 6449237, at *2 (E.D.N.Y. Nov. 3, 2020).

[138] *See* Senators Robert Menendez & Cory Booker, NJ Delegation Call to Halt Transfers to Fort Dix Amidst Continuing COVID-19 Outbreak," Newsroom (November 9, 2020), https://www.menendez.senate.gov/newsroom/press/menendez-booker-lead-delegation-call-to-prevent-covid-19-spread-at-fort-dix.

122. By November 10, 2020, Defendants reported that 229 prisoners at Fort Dix were positive for COVID-19.[139] Nonetheless Defendants still refused "to provide on-site testing to staff" at Fort Dix.[140]

123. At this same time, Defendants Ortiz and Kodger prepared for an on-site visit from high ranking BOP officials. In preparation for this visit, guards and staff at Fort Dix forced prisoners to clean their units, cells, and common areas in ways that had not been done before. For example, prisoners were required to wax the floors as opposed to the usual mopping. Moreover, Fort Dix sprayed several units, including unit 5711, with disinfectant, which had not been done in the three weeks prior to the visit.

124. Despite this one cleaning, the number of COVID-19 positive prisoners continued to rise. By November 19, 2020, there were 238 confirmed COVID-19 positive cases at Fort Dix.[141] By November 23, 2020, 246 prisoners at Fort Dix had tested positive for COVID-19.[142]

125. Lawmakers strongly urged Defendants Carvajal and English "to extend the recently enacted moratorium on transferring incarcerated individuals to FCI Fort Dix… until [the] BOP eradicate[d] the new COVID-19 outbreak at the facility."[143]

126. Ignoring COVID-19 guidelines, public outcry, and requests from members of Congress, on November 24, 2020, Defendant Carvajal lifted the transfer moratorium and resumed

---

[139] *See* Atmonavage, *supra* note 129.
[140] Hamilton, *supra* note 115.
[141] *United States v. Elliott*, 3:17-CR-00051 (PGS), 2020 WL 6874869, at *2 (D.N.J. Nov. 23, 2020) ("As of November 19, there are 238 positive cases among inmates and 18 among staff.").
[142] *United States v. Staats*, 502 F. Supp. 3d 958, 961 (E.D. Pa. 2020) ("As of November 23, 2020, 246 incarcerated people and 18 staff have contracted the disease.").
[143] *See* Senators Menendez & Booker, *supra* note 138.

"transfers of incarcerated individuals into and out of [Fort Dix]" while the facility was "in the midst of a severe outbreak."[144]

127. By November 30, 2020, 303 Fort Dix prisoners had active COVID-19 cases.[145]

128. At this time, the Fort Dix's COVID-19 outbreak "was named the worst prison coronavirus outbreak in the nation."[146]

129. On December 3, 2020, nearly all of the prisoners who had tested positive for COVID-19 in unit 5812, including Plaintiffs Thieme and Silva, were suddenly declared "recovered" from COVID-19.[147]

130. Several of the prisoners, including Plaintiff Speed, were still being seen by medical personnel at Fort Dix for COVID-19 related symptoms when they were declared recovered.

131. Meanwhile, although COVID-19 was still wreaking havoc at Fort Dix, unit 5812 went back to business as usual. For example, prisoners in unit 5812 were forced to begin working in the food service, laundry, and the commissary almost as soon as they were declared recovered.

132. This same day, prisoners in building 5802, which until this date had housed prisoners working in food services, laundry, and the commissary, began testing positive for COVID-19.

---

[144] *See id.*

[145] *United States v. Scronic*, 18-CR-43 (CS), 2020 WL 7048245, at *2 (S.D.N.Y. Nov. 30, 2020) ("303 are currently positive, according to the BOP website.").

[146] David Cruz, *Dangers At Fort Dix As Nearly 600 Inmates Test Positive For COVID-19*, NJ Spotlight News (January 6, 2021), https://www.njspotlight.com/video/dangers-at-fort-dix-as-nearly-600-inmates-test-positive-for-covid-19/.

[147] *See Irby*, CR ELH-14-0511, 2020 WL 7230586, at *8 (noting that "266 inmates and 6 staff have recovered" from COVID-19 "at [Fort Dix]").

133. On information and belief, Defendants Ortiz and Kodger needed workers from unit 5812 because all of the prisoners in unit 5802 had been exposed to or were positive for COVID-19.

134. On December 5, 2020, Defendants Ortiz and Kodger had tested less than 50% of the prisoner population.[148] And they still failed to enforce the mask mandate.

135. On December 8, 2020, a delegation of 12 New Jersey lawmakers, including U.S. Senators Robert Menendez and Cory Booker, submitted a letter to Defendant Carvajal expressing "serious concerns regarding the Bureau of Prisons' [] response to the ongoing COVID-19 outbreak at FCI Fort Dix."[149]

136. On December 10, 2020, a prisoner at Fort Dix tested positive for COVID-19 for the second time.[150] That same day, several prisoners were transferred into Fort Dix, including Joseph Alexander, from a federal holding center.

### B. The East Side Outbreak

137. From September 2020 through December 2020, Defendants and their agents transferred prisoners from within and outside of Fort Dix to the East Side.

138. For example, on September 29, 2020, just one day after transferring six COVID-19 positive prisoners into Fort Dix, Defendants transferred several people into unit 5711, which is on the East Side of the facility. Meanwhile, Defendants Ortiz and Kodger continued to transfer

---

[148] *See United States v. Irby*, CR ELH-14-0511, 2020 WL 7230586, at *8 (D. Md. Dec. 8, 2020) (noting that Fort Dix had only "completed 1,343 [COVID-19] tests")
[149] *See* Senators Menendez & Booker, *supra* note 138.
[150] Noah Goldberg, *Prisoners At Risk Of Catching COVID-19 A Second Time Behind Bars Asking To Be Released*, NY Daily News (January 10, 2021), https://www.nydailynews.com/new-york/ny-covid-second-cases-among-prisoners-20210111-tedyjcpwznajzh3xa4hbgjiiqi-story.html.

prisoners between units on the East Side, including transferring prisoners from unit 5703, the quarantine unit, into other units.

139. On or about December 18, 2020, a prisoner housed in unit 5752, which is located in the East Side compound, fainted in the common area. Despite being aware that the aforementioned prisoner had COVID-19, Defendants and their agents did not test the other prisoners in unit 5752 until approximately three days later. When Defendants did test the approximately 220 prisoners in unit 5752, approximately 185 tested positive for the virus.

140. In the month that followed, every unit on the East Side was forced into lockdown as a result of the number of COVID-19 cases.

141. Prisoners on the East Side were, as acknowledged by Defendants Ortiz, *see* ¶ 72, unable to socially distance from one another. Indeed a majority of prisoners remained in 12-person rooms and several prisoners who had tested negative for the virus were mingled with those who were positive for COVID-19.

142. East Side prisoners who required medical care were told to "get rest" and "social distance" from one another. Several prisoners were bed-ridden but Defendants and their agents provided nothing more than Tylenol.

143. East Side prisoners who worked in the commissary, kitchen, and laundry were all exposed to COVID-19 and were thus unable to work. Indeed, several prisoners who worked in the kitchen on the East Side were bed-ridden as a result of their COVID-19 infection.

144. As a result, on December 28, 2020, the Fort Dix Defendants transferred Plaintiff Silva, Plaintiff Speed and approximately 40 other prisoners by gunpoint from the West Side compound to the East Side compound to work in essential services.

145. Plaintiffs Silva and Speed were not tested prior to the December 28, 2020 transfer and on information and belief, neither were the other prisoners.

146. Among the 40 prisoners being transferred to the East Side was Joaquin Terrazas. On December 23, Mr. Terrazas was scheduled to be transferred to a detention center operated by the U.S. Immigration and Customs Enforcement ("ICE"), but that transfer was cancelled because Mr. Terrazas tested positive for COVID-19. Despite this positive test, Mr. Terrazas was transferred to the East Side where he could potentially spread the virus to prison staff and the prison population.

147. On December 29, 2020, the West Side transferees were required to work in essential services on the East Side, including food services, laundry services, and the commissary. Plaintiff Silva had to work in food services and Plaintiff Speed worked in the commissary.

148. Accordingly, on that day, Plaintiff Silva prepared hundreds of meals for East Side prisoners and came into contact with many prisoners who were under "quarantine" but still forced to go get meals for their unit. Similarly, Plaintiff Speed worked in commissary and came into contact with several East Side prisoners. Further, on information and belief, Plaintiffs Silva and Speed were forced to work next to several prison guards who were positive for COVID-19.

149. On December 30, 2020, just one week after reporting only 20 active cases at Fort Dix,[151] the "BOP report[ed] that 318 inmates and 11 staff members [had] active cases of COVID-19."[152]

---

[151] *United States v. Gianelli*, CR 05-10003-NMG-1, 2020 WL 7646933, at *1 (D. Mass Dec. 23, 2020), *reconsideration denied*, CR 05-10003-NMG-1, 2021 WL 1340970 (D. Mass. Apr. 9, 2021) (noting that "[a]s of December 23, 2020, only 20 of the approximately 2,700 inmates at Fort Dix are positive for COVID-19).

[152] *United States v. Barndt*, CR 13-72-LPS, 2020 WL 7771038, at *2 (D. Del. Dec. 30, 2020).

150. By January 6, 2021 "590 [prisoners] and 14 staff" at Fort Dix had active COVID-19 cases and "348 [prisoners] and 45 staff" had recovered from the virus.[153]

151. As of January 8, 2021"Fort Dix had 789 positive [prisoner] cases, and 23 positive staff cases, at the facility, the most of any federal institution documented on [] BOP's web[site]."[154]

152. By this time, Courts were ordering the release of prisoners at Fort Dix who sought compassionate release citing Fort Dix's inability to "control the spread of the virus."[155]

153. On January 12, 2021, Senators Menendez and Booker again wrote to BOP "with serious concerns" about the "conditions at FCI Fort Dix… in light of the alarming rate of COVID-19 cases."[156]

154. Nonetheless, on January 21, 2021, BOP falsely reported that only 120 prisoners were positive for COVID-19.[157]

[153] *United States v. Edison*, CR 12-225 (DWF/FLN), 2021 WL 51031, at *1 (D. Minn. Jan. 6, 2021).

[154] *United States v. Hancock*, 3:12-CR-00015 (VAB), 2021 WL 71451, at *6 (D. Conn. Jan. 8, 2021).

[155] *Id.* (granting compassionate release due in part to "[t]he prison conditions [at FCI Fort Dix]"); *see also United States v. Tazewell,* No. 07 Cr. 1035 (RMB), 2021 WL 21980, at *4 (S.D.N.Y. Jan. 3, 2021) (Granting compassionate release citing the "significant rise and outbreak of COVID-19 at FCI Fort Dix"); *Vega*, 2020 WL 7060153, at *3 (granting compassionate release to prisoner due to prison's "failure ... to prevent and control a COVID-19 outbreak at Fort Dix"); *United States v. Clem*, CR RDB-14-0405, 2021 WL 82947, at *3 (D. Md. Jan. 11, 2021) (granting compassionate release "given the uniquely serious outbreak at Fort Dix").

[156] *See* Senators Robert Menendez & Cory Booker, Letter to Bureau of Prisons (January 12, 2021), booker.senate.gov/imo/media/doc/1.12.21%20-%20BOP%20Letter%20to%20Fort%20Dix%20COVID-19%20Outbreak%20FINAL%20SIGNED.pdf.

[157] *See United States v. Sulik*, CR 5:18-019-DCR, 2021 WL 232588, at *2 (E.D. Ky. Jan. 22, 2021).

155. And by January 25, 2021, BOP reported that just 73 prisoners were positive for virus.[158] On that same day BOP reported that a prisoner at Fort Dix had died from COVID-19 complications.[159]

156. Despite the shocking number of COVID-19 cases, the West Side transferees were still working in essential services on the East Side and continued to work there until February 3, 2021, at which point they were sent back to the West Side, specifically unit 5812.

157. On information and belief, the West Side transferees were transferred back to their unit because Defendants N'Diaye and Kodger had declared nearly all of the 800 prisoners who were positive for the virus less than a month before "recovered" from COVID-19 and as such, cleared them for work.

158. Plaintiffs Silva and Speed were not tested prior to being sent back to the West Side and, on information and belief, neither were any of the other West Side transferees.

159. Plaintiffs Silva and Speed were not quarantined prior to being transferred back to the West Side and, on information and belief, neither were any of the other West Side transferees.

160. Plaintiffs Silva and Speed were not quarantined upon arrival back to the West Side and, on information and belief, neither were any of the other West Side transferees.

161. On February 25, 2021, a prisoner in unit 5812 tested positive for COVID-19.

162. Over the next month, approximately 20 more prisoners in unit 5812 tested positive for the virus, several of whom, including Cycle Krepps, tested positive for the second time while

---

[158] *See United States v. Parrello*, 16-CR-522 (RJS), 2021 WL 242426, at *3 (S.D.N.Y. Jan. 25, 2021).

[159] George Woolson, *FCI Fort Dix Sees First Inmate Death Due To COVID, Officials Report*, Burlington County Times (January 25, 2021), https://www.burlingtoncountytimes.com/story/news/2021/01/25/fci-fort-dix-sees-first-inmate-death-due-covid-19-coronavirus-federal-prison-south-jersey/6701369002/.

in Defendants' custody.  Mr. Krepps was among the 40 prisoners from unit 5812 who were required to work on the East Side.

163.    Despite the increasing number of COVID-19 cases, Defendants N'Diaye and Kodger did not test all of the prisoners in unit 5812 at this time.[160]  However, they did authorize prisoners to use hand sanitizer.[161]

164.    On March 25, 2021, a second prisoner at Fort Dix succumbed to COVID-19.  This prisoner had previously been declared "recovered" from COVID-19 by BOP on December 22, 2020.[162]

### C. Fort Dix Failed to Provide Adequate Medical Care to Prisoners Who Contracted COVID-19.

165.    As was widely reported, Defendants and their agents did little to address prisoners' COVID-19 symptoms.[163]  Prisoners were given Tylenol and told to lay down.  Several prisoners fainted while in the presence of medical staff, but medical staff did nothing.  And others suffered from body aches that were so bad they could barely walk, but were turned away when they sought medical treatment or care.

---

[160] Exhibit D, Siddeeq William's Email to Warden.

[161] *Newell*, 1:13-CR-165-1, 2021 WL 3269650, at *2.

[162] George Woolston, *2nd Inmate At FCI Fort Dix Dies From COVID-19 Complications*, Burlington County Times (April 7, 2021), https://www.burlingtoncountytimes.com/ story/news/2021/04/07/2nd-inmate-fci-fort-dix-dies-covid-19-complications/7069721002/.

[163] *See* Karen YI, *"There're Praying Nobody Dies": 240 Prisoners Sick With COVID Inside Fort Dix Prison*, Gothamist (November 19, 2020), https://gothamist.com/news/240-prisoners-sick-with-covid-inside-fort-dix-prison; George Woolson, *FCI Fort Dix Officials Deny COVID Outbreaks Began With Inmate Transfers*, Burlington County Times (November 19, 2020), https://www.burlingtoncountytimes.com/story/news/2020/11/19/fci-fort-dix-officials-deny-covid-outbreak-began-inmate-transfers/6344172002/; Joe Atmonavage, *'Absolute Chaos And Terrifying.' The Coronavirus Is Running Rampant Through N.J.  Prison Again*, N.J.com (January 6, 2021), https://www.nj.com/news/2021/01/absolute-chaos-and-terrifying-the-coronavirus-is-running-rampant-through-nj-prison-again.html; *see also* Hamilton, *supra* note 115; Senators Menendez & Booker, *supra* note 156.

166. Prisoners who contracted the virus were left alone with no way to access medical care should an emergency arise.

167. For example, one prisoner in the quarantine unit fainted and hit his head when he hit the ground. Because there was no mechanism (*e.g.*, a panic button or phone) for prisoners in the quarantine unit to call for help, those who were able screamed for help but medical attention was not forthcoming for hours.

168. Often, Health Services failed to even assess prisoners' COVID-19 symptoms let alone treat them. Plaintiff Thieme, for example, suffered from numerous symptoms as a result of contracting COVID-19. Though his symptoms were initially mild, consisting of a sore throat, persistent dry cough, headaches, and loss of taste and smell, Plaintiff Thieme's condition dramatically worsened about two weeks after the onset of illness. He began experiencing chronic feelings of pressure and pain in his chest, respiratory spasms, asthma attacks, body aches including bone pain, dizziness and light-headedness, and gastro-intestinal pain.

169. In approximately nine separate requests for medical treatment, none of which were documented by Health Services, Plaintiff Thieme complained of the aforementioned COVID-19 symptoms but was not seen by a member of the medical staff until December 8, 2020. In other words, Plaintiff Thieme, who suffers from numerous medical conditions that increase his risk of severe illness from COVID-19, was not seen by medical until 49 days after he contracted the virus.

170. Similarly, after contracting COVID-19, Plaintiff Williams suffered from body aches, diarrhea, hot and cold flashes, sore throat, back pain, kidney pain, sleep deprivation, mental anguish and emotional distress. After waiting weeks to treat Plaintiff Williams for his COVID-19 infection, Health Services told him that he had allergies and prescribed him allergy medicine, which he had to purchase himself from the commissary.

171. Plaintiff Silva likewise sought treatment for his COVID-19 infection but was not seen by medical staff until approximately four weeks after he was infected with the virus. Numerous other prisoners sought treatment and were inexplicably denied access.

172. Defendants and their agents randomly closed the medical unit and cancelled "pill call" and in doing so, denied medication to prisoners who were experiencing COVID-19 symptoms.

173. Further, Health Services inexplicably declared prisoners recovered from COVID-19, even those who were still receiving treatment.

174. Plaintiff Speed experienced COVID-19 symptoms following his infection and was prescribed medication by Health Services to treat those symptoms. However, when he was requested to work on the East Side, Health Services declared him recovered from the virus and cleared him for work. While working on the East Side, Plaintiff Speed could barely stand but was forced to keep working. Defendants and their agents observed Plaintiff Speed's COVID-19 symptoms but he was still required to work. Plaintiff Speed worked on the East Side for seven days before his request to be removed from work detail was approved.

175. Another prisoner, Fernando Marulanda Trujillo, was declared recovered from COVID-19 on December 22, 2020, just 10 days after first testing positive for the virus. After supposedly "recovering" from COVID-19, he was transported to an off-site facility because he needed treatment for his COVID-19 symptoms. Mr. Trujillo's condition worsened and three months after being declared recovered, he died from COVID-19 complications.[164]

176. Health Services was equally negligent in their treatment of lingering or "long" COVID-19 symptoms.

---

[164] Woolston, *supra* note 159.

177. For example, Plaintiff Thieme, who suffers from asthma, reported experiencing numerous coughing fits and asthma attacks after contracting COVID-19. On December 14, 2020, Health Services denied Thieme an inhaler. Instead, they did blood work, told Plaintiff Thieme that they would "wait and see" if his symptoms worsened, and scheduled a follow-up visit that was to take place on March 15, 2021. That appointment—three months later—was later cancelled by Health Services for an unknown reason. On April 20, 2021, nearly five weeks after the follow-up visit was supposed to take place, Plaintiff Thieme was finally seen by medical staff.

178. At his medical visit, Plaintiff Thieme was given a copy of his medical records and upon his review, he discovered that in February, medical staff had noted that he needed to be screened for chronic kidney disease because his blood work indicated that his kidneys had not been functioning properly. Plaintiff Thieme had not been informed of this issue and received no subsequent treatment for his kidneys, notwithstanding that kidney damage was a common side effect of COVID-19.[165]

179. Plaintiff Thieme continued to suffer from painful chest palpitations and asthma attacks as a result of his COVID-19 infection and sought medical care in nearly 20 separate requests but received no subsequent medical treatment in the nearly six months that followed, including for his chronic kidney disease.[166]

180. Similarly, in the months following his COVID-19 infection, Plaintiff Williams repeatedly complained of COVID-19 symptoms, including kidney pain, extreme ear pain, and

---

[165] John Sperati, M.D., *Caused By COVID-19*, John Hopkins Medicine (May 14, 2020), hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-kidney-damage-caused-by-covid19#:~:text=COVID-19%20Kidney%20Damage%3A%20A%20Possible%20Complication&text=Signs%20of%20kidney%20problems%20in,severe%20enough%20to%20require%20dialysis.
[166] *Id.*

headaches. Health Services did nothing to address his kidney pain; they merely offered him acetaminophen and aspirin for his headaches.

181. With respect to Plaintiff Williams' ear pain, Health Services treated it as an ear infection and prescribed antibiotics, which did absolutely nothing to address his pain. When he continued to experience extreme pain in his ear, Health Services prescribed stronger antibiotics, which again was ineffective in treating his ear. From December 2020 to July 2021, Plaintiff Williams sought medical treatment for his ear pain no fewer 25 times but Health Services did nothing more than prescribe antibiotics and flush his ear with water.

182. In July 2021, Health Services finally authorized Plaintiff Williams to be seen by an off-site doctor, who at that time conducted an examination of Plaintiff Williams' ear and pulled a foreign object from his left ear drum. Plaintiff Williams has no idea how long that object had been in his ear. The off-site doctor also noted that, at the time of the appointment, Plaintiff Williams' left eardrum did "not look alive at all."[167]

183. Another class member, Vehan Kelerchian, contracted COVID-19 after Fort Dix transferred prisoners from the West Side to East Side. Ultimately, Mr. Kelerchian required surgery as a result of his COVID-19 infection. In the months preceding his surgery, the medical unit routinely ignored his sick call requests or delayed treatment despite his blood pressure and oxygen levels indicating a need for medical intervention.

184. In April 2021, Mr. Kelerchian was transferred to an off-site hospital and had to have triple bypass surgery on his heart. He was transferred back to Fort Dix shortly after his surgery, however, no medical staff checked on Mr. Kelerchian for over 24 hours despite his undergoing a serious medical procedure.

---

[167] Exhibit E, Plaintiff Williams Medical Record.

185. In sum, despite having months to prepare for a COVID-19 outbreak, Defendants failed to take the necessary precautions and in doing so violated Plaintiffs constitutional rights.

186. Defendants also failed to adequately test the prisoner population or test prison staff.[168]

187. Both before and after the 24-day moratorium on transfers into and out of Fort Dix, Defendants transferred prisoners in and out of Fort Dix[169] and routinely transferred prisoners between units without conducting COVID-19 testing.

188. Defendants failed to enforce mask mandates, failed to provide adequate cleaning supplies, and failed to properly clean COVID-19 units and/or cells that housed COVID-19 positive prisoners. Despite having access to pre-made meals, Defendants routinely forced prisoners to ignore social distancing protocols in order to line up to get meals.

189. Defendants declared prisoners recovered, though they were still suffering from COVID-19 symptoms and/or receiving treatment for COVID-19, one of whom eventually died as a result of the virus.

190. Accordingly, as Federal District Court Judge Catherine C. Eagles found, "the reasons for [the COVID-19] explosion [at Fort Dix] are clear from the evidence. BOP (1) transferred a large number of inmates from another prison known to be in the midst of a serious COVID-19 outbreak to Fort Dix without an effective plan in place to avoid spreading the virus from transferring inmates to staff and inmates at Fort Dix; (2) did not appropriately segregate or quarantine inmates, and allowed COVID-positive inmates to use the same common areas as non-infected inmates; (3) did not provide inmates with personal protective equipment, like masks or

---

[168] *See* Kodger Decl., *supra* note 123; Hamilton, *supra* note 115.
[169] *See generally* Kodger Decl., *supra* note 123; Senators Menendez & Booker, *supra* note 138.

sanitizer, despite housing inmates in overcrowded facilities without proper ventilation or sanitation; (4) did not consistently log COVID-positive symptoms in inmates' records; and (5) only enforced social distancing when third-party auditors were present."[170]

191. Defendants unnecessarily exposed Plaintiffs and similarly situated prisoners to a communicable disease, which each of them ultimately contracted while in the care and custody of Defendants. These allegations demonstrate violations of Plaintiffs' well-established rights not to be subject to cruel and unusual punishment as a result of Defendants' deliberate indifference to Plaintiffs' medical needs, and is thus clearly actionable under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

## PLAINTIFFS EXHAUSTED THEIR ADMINISTRATIVE REMEDIES

192. The United States is liable pursuant to the Federal Tort Claims Act for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

193. At all times relevant to this Complaint, Defendants and their staff acted within the scope of their employment and/or their official duties as employees of BOP, an agency of the United States.

194. Pursuant to 28 U.S.C. § 2675(a), on November 30, 2020, Plaintiff Thieme filed a FTCA administrative complaint with BOP for all of the tortious actions alleged here and committed by Defendants, officials acting under the supervision of BOP. Plaintiff Thieme's FTCA complaint was received on December 4, 2020.

---

[170] *Newell*, 1:13-CR-165-1, 2021 WL 3269650, at *2.

195. Pursuant to 28 U.S.C. § 2675(a), on December 12, 2020, Plaintiff Williams filed a FTCA administrative complaint with BOP for all of the tortious actions alleged here and committed by Defendants, officials acting under the supervision of BOP.

196. Pursuant to 28 U.S.C. § 2675(a), on July 28, 2021 Plaintiff Silva filed a FTCA administrative complaint with BOP for all of the tortious actions alleged here and committed by Defendants, officials acting under the supervision of BOP.

197. Pursuant to 28 U.S.C. § 2675(a), on August 27, 2021 Plaintiff Speed filed a FTCA administrative complaint with BOP for all of the tortious actions alleged here and committed by Defendants, officials acting under the supervision of BOP.

198. BOP denied Plaintiff Thieme's FTCA administrative complaint on September 28, 2021 and denied Plaintiff Williams' complaint on October 7, 2021. BOP has yet to respond to Plaintiff Silva's and Plaintiff Speed's FTCA administrative complaints.

199. On information and belief, nearly 150 Fort Dix prisoners already meet the exhaustion requirement imposed by 28 U.S.C. § 2675.

200. Accordingly, Plaintiffs Thieme and Williams have administratively exhausted their claims under the FTCA.[171]

---

[171] Pursuant to 28 U.S.C. § 2675, Plaintiff Silva's FTCA claim will be exhausted on January 28, 2022 and Plaintiff Speed's FTCA claim will be exhausted on February 27, 2022. However, because the class is defined as individuals who both have or will have in the future meet the 28 U.S.C. § 2675 requirement, both Plaintiffs Silva and Speed are included as representatives for the FTCA class.

## CLASS ALLEGATIONS

### A. *Bivens* Class

201. Plaintiffs bring this action pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on their own behalf and on behalf of all persons similarly situated.

202. Plaintiffs seek to represent a certified Plaintiff class consisting of all persons who contracted COVID-19 in the four months following the FCI Elkton transfers while imprisoned at Fort Dix during the COVID-19 pandemic ("the *Bivens* Class").

203. This class is so numerous that joinder of all members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). From October 25, 2020 to March 1, 2021, nearly 2,000 prisoners imprisoned at Fort Dix contracted COVID-19.

204. The *Bivens* class members are readily identifiable using records maintained in the ordinary course of business by Defendants.

205. Common questions of law and fact exists as to all *Bivens* Class members and, at least for liability purposes, predominate over questions that affect only the individual members. These common questions of fact and law include but are not limited to: (1) whether conditions of confinement alleged herein violate the United States Constitution; (2) what measures Defendants took in response to the numerous COVID-19 outbreaks; (3) whether Defendants implemented an adequate emergency plan during the COVID-19 pandemic; (4) whether Defendants' actions during the COVID-19 pandemic exposed and are exposing prisoners at Fort Dix to a substantial risk of harm; (5) whether Defendants violated the United States Constitution by knowing of and disregarding a substantial risk of serious harm to the safety and health of the *Bivens* Class; and (6) what relief should be awarded to redress the harms suffered by members of the *Bivens* Class.

206. Defendants' actions and the claims alleged in this Complaint are common to all members of the *Bivens* Class.

207. Plaintiffs' claims are typical of those of the *Bivens* Class. Plaintiffs have been imprisoned at Fort Dix since the beginning of the COVID-19 pandemic and as a result of Defendants' deliberate indifference, contracted COVID-19.

208. The legal theories on which Plaintiffs rely are the same or similar to those on which all *Bivens* Class members would rely, and the harms suffered by them are typical of those suffered by all the other *Bivens* Class members.

209. Plaintiffs will fairly and adequately protect the interests of the *Bivens* Class. The interests of the *Bivens* Class representative are consistent with those of the *Bivens* Class members. Additionally, Plaintiffs' newly appointed counsel are very experienced in class actions and civil rights litigation.

210. Plaintiffs' counsel know of no conflicts of interest among *Bivens* Class members, or between the attorneys and *Bivens* Class members, that would affect this litigation.

211. Use of the class mechanism here is superior to other available methods for the fair and efficient adjudication of the claims, at least with respect to a determination of Defendants' liability, and will prevent the imposition of undue financial, administrative, and procedural burdens on the parties and on this Court, which individualized litigation of these claims would impose. This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, at least with respect to a determination of Defendants' liability, as joinder of all *Bivens* Class members is impracticable.

**B. FTCA Class**

212.  Plaintiffs Thieme, Williams, Silva, and Speed bring this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2674, under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on their own behalf and on behalf of all persons similarly situated.

213.  Plaintiffs Thieme, Williams, Silva, and Speed seek to represent a certified Plaintiff class consisting of all persons who contracted COVID-19 in the four months following the FCI Elkton transfers while imprisoned at Fort Dix during the COVID-19 pandemic and who have or will in the future have satisfied the exhaustion requirement imposed by 28 U.S.C. § 2675 ("the FTCA Class").

214.  This class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). From October 25, 2020 through March 1, 2021 nearly 2,000 prisoners imprisoned at Fort Dix contracted COVID-19. And on information and belief, nearly 150 Fort Dix prisoners already meet the exhaustion requirement imposed by 28 U.S.C. § 2675.

215.  The class members are readily identifiable using records maintained in the ordinary course of business by Defendants.

216.  Common questions of law and fact exist as to all FTCA Class members and, at least with respect to liability, predominate over questions that affect only the individual members. These common questions of fact and law include but are not limited to: (1) whether conditions of confinement alleged hereto amount to a tort claim of negligence; (2) what measures Defendants took in response to the numerous COVID-19 outbreaks; (3) whether Defendants implemented an adequate emergency plan during the COVID-19 pandemic; (4) whether Defendants' actions during the COVID-19 pandemic exposed and are exposing prisoners at Fort Dix to a substantial risk of harm; (5) whether Defendants harmed Plaintiffs by knowing of and disregarding a substantial risk

of serious harm to the safety and health of the FTCA Class; and (6) what relief should be awarded to redress the harms suffered by members of the FTCA Class.

217. Defendants' actions and the claims alleged in this Complaint are common to all members of the FTCA Class.

218. The claims of Plaintiffs Thieme, Williams, Silva, and Speed are typical of those of the FTCA Class. Plaintiffs Thieme, Williams, Silva, and Speed have been imprisoned at Fort Dix since the beginning of the COVID-19 pandemic and contracted COVID-19 as a result of Defendants' negligence.

219. The legal theories on which Plaintiffs Thieme, Williams, Silva, and Speed rely are the same or similar to those on which all FTCA Class members would rely, and the harms suffered by them are typical of those suffered by all the other FTCA Class members.

220. Plaintiffs Thieme, Williams, Silva, and Speed will fairly and adequately protect the interests of the FTCA Class. Accordingly, the interests of the FTCA Class representative are consistent with those of all FTCA Class members. Additionally, Plaintiffs' counsel are very experienced in class actions and civil rights litigation.

221. Plaintiffs' counsel know of no conflicts of interest among FTCA Class members or between the attorneys and FTCA Class members that would affect this litigation.

222. Use of the class mechanism here is superior to other available methods for the fair and efficient adjudication of the claims, at least with respect to a determination of Defendants' liability, and will prevent the imposition of undue financial, administrative, and procedural burdens on the parties and on this Court, which individualized litigation of these claims would surely impose.

223. This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, at least with respect to a determination of Defendants' liability, as joinder of all FTCA Class members is impracticable. The damages suffered by the members of the FTCA Class as a result of Defendants' unlawful actions, although substantial, are small in relation to the extraordinary expense and burden of individual litigation as to liability and damages and therefore it is highly impractical for such FTCA Class members to attempt individual redress for liability and damages.

**First Cause of Action**
*Bivens*
**(Unconstitutional Conditions of Confinement, Eighth Amendment)**

224. Plaintiffs incorporate by reference each and every allegation contained in this preceding paragraphs as if set forth fully herein.

225. Plaintiffs bring this claim on their own behalf and on behalf of the *Bivens* Class.

226. The Eighth Amendment guarantees sentenced prisoners custody free of "a condition or confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Defendants' failure to protect prisoners in BOP custody from a widespread outbreak of a serious contagious disease that causes potentially permanent damage or death constitutes deliberate indifference in violation of the Eighth Amendment to the United States Constitution. *Estelle v. Gamble*, 429 U.S. 97 (1976).

227. Because of the conditions at Fort Dix, particularly during the four months following the Elkton transfer, Plaintiffs and the *Bivens* class were unable to take steps to protect themselves from the virus—such as social distancing, hand-washing hygiene, or self-quarantining—and Defendants did not and have not provided adequate protections. Accordingly, Plaintiffs contracted

the virus. These conditions were compounded by related failures, including the failure to provide medical treatment to prisoners who did ultimately contract the virus.

228. The failure of Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger to adequately protect Plaintiffs and the *Bivens* class from these unconstitutional conditions, or release them from the conditions altogether, constitute deliberate indifference to a substantial risk of serious harm to Plaintiffs, and all members of the *Bivens* Class.

229. Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger failed to implement even basic preventative measures—such as reducing the prison population, conducting COVID-19 testing, halting transfers, cancelling work detail, or supplying adequate hygiene products—that would have protected Plaintiffs and the *Bivens* Class from the virus.

230. Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger were aware or should have been aware of these protective measures as they are basic public information and Defendants were repeatedly called upon to implement them.

231. Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger knew of and disregarded an excessive risk to health and safety of the Plaintiffs and *Bivens* Class.

232. Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger failed to act with reasonable care to mitigate these risks, subjecting Plaintiffs and the *Bivens* Class to a grave and serious risk of harm of serious illness, permanent injury, or death.

233. Because Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger in these ways failed to act to remedy Plaintiffs' and the *Bivens* Class members' degrading and inhumane conditions of confinement in violation of their Eighth Amendment rights, Plaintiffs and the *Bivens* Class seek damages pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

234. Because of the unlawful conduct of Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger, Plaintiffs and the *Bivens* Class members have suffered physical injury, pain and suffering, emotional distress, humiliation, embarrassment, and monetary damages.

**Second Cause of Action**
**28 U.S.C. § 2674**
**(Gross Negligence)**

235. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

236. Plaintiffs bring this claim on their own behalf and on behalf of all members of the FTCA Class who contracted COVID-19 in the four months following the FCI Elkton transfers while imprisoned at Fort Dix during the COVID-19 pandemic.

237. Gross negligence is an act or omission, which is more than ordinary negligence, but less than willful or intentional misconduct. Gross negligence refers to a person's conduct which creates an unreasonable risk of harm to another because of the person's failure to exercise slight care or diligence.

238. Plaintiffs and the FTCA Class were exposed to COVID-19 because of the actions and inaction of Defendants and the conditions at Fort Dix, a prison at which Defendants were responsible for care and custody of every prisoner. Plaintiffs and the FTCA class were and are unable to take steps to protect themselves from the virus—such as social distancing, hand-washing hygiene, or self-quarantining—and the Defendants did not and have not provided adequate protections. These conditions were compounded by related failures, including the failure to provide adequate medical treatment to prisoners who did ultimately contract the virus.

239. Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger failed to implement even basic preventative measures—such as reducing the prison population, conducting COVID-

19 testing, halting transfers, cancelling work detail, or supplying adequate hygiene products—that would have protected Plaintiffs and the FTCA class from the virus.

240. Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger were aware or should have been aware of these protective measures as they are basic public information and Defendants were repeatedly called upon to implement them.

241. At all relevant times pursuant to this Complaint, Defendant United States, by and through Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger, had a duty to exercise ordinary care in regards to Plaintiffs and the FTCA Class.

242. At all relevant times pursuant to this Complaint, Defendant United States, by and through Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger, failed to uphold its duty of care to Plaintiffs, and the FTCA Class, resulting in a humanitarian and public health crisis. The failure to mitigate this excessive risk to health and safety demonstrated a complete disregard for the humanity of the Fort Dix prisoners who suffered demonstrably throughout the COVID-19 pandemic, and was a result of Defendants' unreasonably negligent acts or omissions.

243. The actions of Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger represent a gross deviation from the actions a reasonable individual would have taken in their positions, given their knowledge and employment as Warden of Fort Dix and Director of BOP.

244. A private employer would otherwise be liable for the negligence of Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger. The United States is therefore liable for tort claims under the Federal Tort Claims Act.

245. Because of Defendants' unlawful conduct, Plaintiffs and members of the FTCA Class have suffered physical injury, pain and suffering, emotional distress, humiliation, embarrassment, and monetary damages.

**Third Cause of Action**
**28 U.S.C. § 2674**
**(Negligence)**

246. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

247. Plaintiffs bring this claim on their own behalf and on behalf of all members of the FTCA Class who contracted COVID-19 in the four months following the FCI Elkton transfers while imprisoned at Fort Dix.

248. Under New Jersey law, to sustain a cause of action for negligence, a plaintiff must establish four elements: (1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages.

249. Plaintiffs and the FTCA Class were exposed to COVID-19 because of the conditions at Fort Dix, a prison at which Defendants were responsible for care and custody of every prisoner. Plaintiffs and the FTCA class were unable to take steps to protect themselves from the virus—such as social distancing, hand-washing hygiene, or self-quarantining—and the Defendants did not provide adequate protections. These conditions were compounded by related failures, including the failure to provide adequate medical treatment to prisoners who did ultimately contract the virus.

250. Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger failed to implement even basic preventative measures—such as reducing the prison population, conducting COVID-19 testing, halting transfers, cancelling work detail, or supplying adequate hygiene products—that would have protected Plaintiffs and the FTCA Class from the virus.

251. Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger were aware or should have been aware of these protective measures as they are basic public information and Defendants were repeatedly called upon to implement them.

252. At all relevant times pursuant to this Complaint, Defendant United States, by and through Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger, had a duty to exercise ordinary care with respect to the medical treatment of Plaintiffs and the FTCA Class.

253. At all relevant times pursuant to this Complaint, Defendant United States, by and through Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger, failed to satisfy, fulfill or uphold its duty of care to Plaintiffs, and the FTCA Class, resulting in a humanitarian and public health crisis. The failure to mitigate this excessive risk to health and safety demonstrated a complete disregard for the humanity of the Fort Dix prisoners who sufferance demonstrably throughout the COVID-19 pandemic and was a result of Defendants' negligent acts or omissions.

254. The actions of Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger represent a deviation – indeed, a gross deviation – from the actions a reasonable individual would have taken in their positions, given their knowledge and employment as Warden of Fort Dix and Director of BOP.

255. A private employer would otherwise be liable for the negligence of Defendants Carvajal, English, Ortiz, N'Diaye, and Kodger. The United States is therefore liable for tort claims under the Federal Tort Claims Act.

256. Because of Defendants' unlawful conduct, Plaintiffs and members of the FTCA Class have suffered physical injury, pain and suffering, emotional distress, humiliation, embarrassment, and monetary damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Thieme, Silva, Williams, Speed, and the Class members respectfully requests that the Court enter class-wide judgement:

a. Certifying this suit as a class;

b. Directing the immediate implementation of remedial measures at Fort Dix, including but not limited training staff about the dangers of COVID-19, developing COVID-19 protocols, quarantining incoming transfers; testing all prisoners, including transfers, and posting information pertaining to COVID-19 prevention and COVID-19 vaccines;

c. Awarding reasonable and just compensatory and punitive damages to Plaintiffs and the Class for injuries they suffered;

d. Awarding Plaintiffs reasonable attorney's fees and costs, as provided by statute and law; and

e. Granting such other and further relief as this Court may deem just and proper.

Dated: February 10, 2022

Respectfully submitted,

GIBBONS P.C.

By: /s/ Lawrence S. Lustberg
Lawrence S. Lustberg, Esq.
Ethan J. Kisch, Esq.
One Gateway Center
Newark, NJ 07102
(973) 596-4500
llustberg@gibbonslaw.com